# EXHIBIT 1

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. _____

---

STATE OF MAINE,

            Plaintiff,

    v.

3M COMPANY, EIDP, INC., *formerly known as* E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., DUPONT DE NEMOURS, INC., and DOW INC.,

            Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

---

Plaintiff, the State of Maine, as trustee of State natural resources, as owner of State property, and in its *parens patriae* capacity on behalf of its citizens, makes the following allegations against Defendants.

## I.    SUMMARY OF THE CASE

1.    The State of Maine, by and through Attorney General Aaron M. Frey, brings this action to recover damages and require payments into an abatement fund to address Defendants' widespread contamination of State natural resources and State property with per- and polyfluoroalkyl substances (PFAS). From the 1940s to the present, defendants are or were the primary manufacturers of PFAS, including PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and GenX, of PFAS-containing products.[1] The ubiquitous contamination caused by these

---

[1] The full chemical names are: perfluorooctanesulfonic acid (PFOS), perfluorooctanoic acid (PFOA), perfluorononanoic acid (PFNA), perfluorohexanesulfonic acid (PFHxS), perfluoroheptanoic acid (PFHpA), perfluorodecanoic acid (PFDA), perfluorobutane sulfonic acid

chemicals in Maine has recently come to light through the State's investigation.

2.      PFAS do not exist naturally in the environment.  They are synthetic chemicals made by the defendant corporations, are toxic at extremely low levels, and have been widely used for decades in consumer products as well as for industrial purposes.  As defendants have known for decades, PFAS chemicals escape into the natural environment and accumulate in the human body, where they remain for years.  PFAS are so resistant to biodegradation that they are known as the "forever chemicals."

3.      PFAS cause a wide array of harmful health effects, including kidney and testicular cancer.  PFAS also harm fetal development, including damage to the fetal liver, immune system, and thyroid function.

4.      In June 2021, Maine set an interim drinking water standard of 20 ppt for the sum of six PFAS (PFOA, PFOS, PFHxS, PFNA, PFHpA, and PFDA).  In June 2022, U.S. EPA (EPA) issued health advisory levels of 0.004 ppt for PFOA (*i.e.*, 4 parts per *quadrillion*) and 0.02 ppt for PFOS (*i.e.*, 20 parts per *quadrillion*), 10 ppt for GenX and 2,000 ppt (*i.e.*, 2 parts per billion) for PFBS.  In March 2023, EPA proposed drinking water standards of 4 ppt for PFOA, 4 ppt for PFOS, and a limit for mixtures of PFHxS, PFNA, PFBS, and GenX combined due to their synergistic effects.  One ppb is analogous to one drop of ink in a 10,000-gallon swimming pool. One ppt is analogous to one drop of ink in 20 Olympic-sized swimming pools.

5.      Defendants are 3M Company and various DuPont-related entities—major chemical companies that manufactured PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS,

---

and its potassium salt (PFBS), and hexafluoropropylene oxide dimer acid and its ammonium salt (GenX).  As used in this Complaint, the terms PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and GenX include those chemicals themselves (including all of their salts, ionic states, and acid forms of the molecules) as well as the "precursor" chemicals that break down into these eight pollutants.

and/or GenX (collectively, the "Eight PFAS"). This Complaint alleges claims based on contamination and injury caused by the Eight PFAS, including as byproducts, and their precursors, acids, salts, and ionic forms.

6.     Defendant 3M Company (3M) manufactured PFOA from approximately the 1940s until 2002 and was the exclusive manufacturer of PFOS, which it produced from the 1940s until 2002 when it complied with an EPA request to stop production of PFOA and PFOS due to their toxicity, propensity to contaminate the environment, and accumulation in human beings. For over 60 years, 3M used PFOS in many of its consumer products, including its Scotchgard products widely used in households. PFOA and PFOS are "C-8" chemicals, meaning that each molecule is comprised of a chain of eight carbon atoms. In approximately 2003, 3M began using PFBS in its products, including Scotchgard, which were widely used in households.

7.     Defendant EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company (Historical DuPont), used PFOA starting in the 1950s in many of its consumer products, including those with Teflon. Historical DuPont also manufactured PFOA from approximately 2002 (when it could no longer buy PFOA from 3M) until approximately 2013, when it complied with an EPA request to stop production and replaced PFOA in its products with "GenX" in or around 2013. In 2015, Historical DuPont spun off its performance chemicals business into a publicly-traded company, Defendant The Chemours Company, which then became the producer of GenX. The remaining defendants are DuPont entities that have manufactured PFAS chemicals and/or have succeeded to DuPont PFAS liabilities. Historical DuPont, The Chemours Company, and these affiliates are collectively referred to in this Complaint as "DuPont."

8.     3M and DuPont knew for decades that PFOA and PFOS in particular were toxic and posed substantial health and environmental risks, but they covered up this information and instead promoted these chemical products as safe and appropriate for widespread use.

9.    For example, 3M repeatedly acknowledged internally that PFAS were highly dangerous chemicals beginning no later than 1960:

a.  An internal memo from 1960 described 3M's understanding that waste products from its PFAS operations "[would] eventually reach the water table and pollute domestic wells."

b.  A 1963 3M report described PFAS as being stable in the environment, "completely resistant to biological attack." The same report also confirmed that 3M knew the chemicals to be "toxic."

c.  In 1975, 3M scientists learned that PFAS had been found within, and could build up in, the human body, and that the suspected source was Teflon cookware or "Scotchgarded" fabrics. When questioned about these concerns, 3M researchers said that they "plead[ed] ignorance." The same year, 3M found that there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

d.  In 1978, a 3M internal report warned that PFOS and PFOA "are likely to persist in the environment for extended periods." Results of a 90-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic." A 1979 internal report further discussing the study on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated." 3M decided to not publish the findings of this investigation.

e.  In 1979, an employee in 3M's medical department concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

f.  These pleas for additional testing were essentially ignored. In March 1999, a 3M environmental scientist lamented that, "[f]or more than twenty years" 3M had not acted on recommendations "to allow testing to perform an ecological risk assessment on PFOS and similar chemicals." He noted that PFOS was "probably more damaging" than PCBs and concluded: "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

10.    DuPont's internal documents are equally candid about the dangers posed by PFAS:

a.  As early as 1954, employees at DuPont's Washington Works plant reported that C8 (another name for PFOA) might be toxic. DuPont was concerned enough about the complaints that it delayed marketing Teflon containing PFOA to the public until 1961.

b.  By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care."

- 4 -

c.  By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed suggested human exposure to PFOA.

d.  By at least 1980, DuPont had internally confirmed that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

e.  By at least 1981, DuPont had obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero and urged female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy." Around this time, a DuPont employee gave birth to a baby with only half a nose and a ragged eyelid that gaped down to the middle of his cheek. DuPont's own experts concluded that "the observed fetal eye defects were due" to PFOA. Shortly afterward, DuPont's study of birth defects in its workers was quietly abandoned (without any disclosure to regulators or employees) after it discovered "statistically significant" abnormalities.

f.  By the early 1980s, DuPont secretly discovered PFOA contamination in drinking water around its Washington Works plant. In response, DuPont corporate managers predicted that the medical and legal departments "will likely take a position of total elimination" of PFOA but instead decided that "corporate image, and corporate liability" would drive decisions about PFOA.

g.  In 1988, DuPont began treating PFOA internally as a possible human carcinogen.

h.  In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C-8 issue as "a debacle at best." Around the same time, a DuPont lawyer said that PFAS's bio-persistence "will kill us," that "our story is not a good one," and that he had urged the company to "act[] responsibly" to "reduce the potential for punitives."

i.  In 2005, DuPont publicly stated that "no human health effects are known to be caused by PFOA"—a statement that an expert within the company called "[s]omewhere between misleading and disingenuous."

11.     Products containing PFAS chemicals made by 3M and DuPont were sold into Maine, including for use in industrial processes. By sending toxic chemicals into Maine while misleading the public about their properties, the Defendants have caused widespread contamination and injuries to State natural resources. PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have contaminated Maine drinking water, groundwater, surface water, wildlife, soil, and sediment. For example, there is PFAS contamination in public water systems, private drinking water wells, at many dairy farms where sludge containing PFAS have

been spread, in leachate from municipal and industrial landfills, and in surface water bodies and in soils and sediments.

12.     The State has been proactively addressing PFAS contamination since PFAS emerged as contaminants of concern.  As the State's ongoing investigation of PFAS contamination progresses, it continually discovers additional PFAS contamination, including in new locations.

13.     The State has the authority and responsibility to protect, conserve, and manage State natural resources for present and future generations of Mainers.  The State seeks damages and other relief for PFAS contamination and injury in its capacity as trustee of State natural resources and in its *parens patriae* capacity on behalf of State citizens.  The State also acts to protect its own interests in property.

14.     The State brings claims of public and private nuisance, trespass, strict products liability, and negligence.  The State also brings claims against DuPont for violation of the Maine and/or Delaware Uniform Fraudulent Transfer Act, based on a web of transactions that Historical DuPont orchestrated over the past decade designed to shield significant assets from the State and other creditors.  The State seeks compensatory damages, including natural resources restoration and loss-of-use damages, and costs to investigate, monitor, abate, contain, prevent, treat, and remove PFAS from the State's natural resources and property.  The State also seeks punitive damages commensurate with Defendants' reprehensible conduct.

15.     The State is not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam, a firefighting material that contains PFAS.  Finally, although this Complaint alleges claims based on these eight specific PFAS chemicals, PFAS contamination is a rapidly developing issue, and additional information

(potentially including information on other PFAS chemicals) is expected to come to light over the course of this litigation.

## II.    PLAINTIFF

16.    Plaintiff State of Maine is a sovereign state and brings this action by and through its Attorney General, with his principal office at 6 State House Station, Augusta, Maine 04333, pursuant to the powers vested in him by the common law and by 5 M.R.S. § 191 as the chief law enforcement officer of the State of Maine.

17.    The State brings this action in its capacity as sovereign, as trustee of State natural resources and owner of property (or of substantial interests in property) contaminated and injured by Defendants, and pursuant to its *parens patriae* authority on behalf of the citizens of Maine.

18.    The State also brings this action based upon its statutory authority, including M.R.S. § 341-A, to protect State natural resources and State property and its common-law police power.  This power includes its power to prevent pollution of the State's natural resources and State property, to prevent nuisances, and to prevent and abate hazards to public health, safety, welfare, and the environment.

19.    In this Complaint, the term "State's natural resources and property" refers to all natural resources or property for which the State seeks damages, including without limitation fish, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, public lands the State holds in trust, and State-owned lands.

## III.    DEFENDANTS

20.    Defendants at all times relevant to this Complaint were and are, manufacturers, marketers, distributors, sellers, and promoters of PFAS and PFAS-containing products.  The following Defendants, at all times relevant to this Complaint, manufactured, marketed, distributed, and/or otherwise sold (directly or indirectly) PFAS, including the Eight PFAS and

products containing the Eight PFAS, that each such Defendant knew or should have known would be delivered into areas affecting the State's natural resources and property, or otherwise did business in the State.

21.     Defendant 3M Company is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.

22.     Defendant EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company and referred to here as Historical DuPont, is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

23.     Defendant The Chemours Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.  The Chemours Company was incorporated as a subsidiary of Historical DuPont as of April 30, 2015.  From that time until July 2015, The Chemours Company was a wholly owned subsidiary of Historical DuPont.  In July 2015, Historical DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its PFAS business, along with vast environmental liabilities.  Historical DuPont distributed shares of The Chemours Company stock to Historical DuPont stockholders, and The Chemours Company has since been a separate, publicly traded company.

24.     Defendant The Chemours Company FC, LLC is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.  The Chemours Company FC, LLC operates as a subsidiary of The Chemours Company and manufactures fluoropolymer resins.

25.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

26.     Following the spinoff of The Chemours Company, Historical DuPont merged with The Dow Chemical Company (Old Dow) in August 2017 to create DowDuPont Inc. (DowDuPont).  Historical DuPont and Old Dow each merged with wholly owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont.  Since that time, DowDuPont has effected a series of separation transactions to split its businesses into three independent, publicly traded companies.  These three companies are the remaining Defendants in this action: Dow Inc. (New Dow), Corteva, Inc. (Corteva) and DuPont de Nemours, Inc. (New DuPont).

27.     Defendant Dow Inc., referred to here as New Dow, is a corporation formed and existing under the laws of the State of Delaware with its principal place of business at 2211 H.H. Dow Way, Midland, Michigan 48674.  New Dow was spun out of DowDuPont and became an independent, publicly traded company on April 1, 2019.  It operates a materials science business.

28.     Defendant Corteva, Inc. is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.  Corteva was initially formed in February 2018 to serve as the holding company for the agriculture business.  On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata dividend, which converted Corteva into a separate, publicly traded company.  Following that distribution, Corteva is the direct parent of Historical DuPont (*i.e.*, EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company) and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

29.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. and referred to here as New DuPont, is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.  On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and New Dow, changed its name to DuPont de Nemours, Inc. New DuPont retained assets in the specialty products business lines following the above-

described spin-offs, as well as the balance of the financial assets and liabilities of Historical DuPont not assumed by Corteva.

30.    Throughout this Complaint, Historical DuPont, New DuPont, Chemours, Corteva, and New Dow are referred to collectively as "DuPont." Similarly, 3M and DuPont are referred to collectively herein as "Defendants." Where differentiation of legal entities is necessary, this Complaint will refer to particular companies individually.

31.    Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants in addition to those expressly identified in the Complaint.

## IV.    JURISDICTION AND VENUE

32.    This Court has jurisdiction over the subject matter of this action pursuant to 4 M.R.S. § 105. This Court may exercise jurisdiction over Defendants under 14 M.R.S. § 704-A because they either are or at the relevant time were: authorized to do business in Maine; registered with the Maine Secretary of State; transacting sufficient business with sufficient minimum contacts in Maine or otherwise intentionally availing themselves of the Maine market through the manufacturing, marketing, distribution, and/or sale of PFAS and PFAS-containing products in Maine; and causing a tortious act to be done, or causing the consequences of a tortious act to occur, within this State, as set forth in detail herein.

33.    Venue is proper in this Court under 14 M.R.S. §§ 501, 505, and 507 because the State is the Plaintiff, and State natural resources and/or property have been contaminated, injured, and damaged by PFAS contamination in Cumberland County, because Defendants conduct business in Cumberland County, and because this is an action to recover monies due the State or property belonging to the State or the value thereof.

## V.    PFAS ARE TOXIC AND POSE SUBSTANTIAL HEALTH AND ENVIRONMENTAL RISKS

34.    PFAS are a family of chemical compounds containing fluorine and carbon atoms.

35.    PFAS have been used for decades in industrial processes and to produce consumer, household, and commercial products that Defendants promoted as being resistant to heat and stains, long-lasting, and repellent to water and oil.

36.    PFAS are human-made, synthetic chemicals that do not exist naturally in the environment.

37.    The Eight PFAS are persistent in the environment and do not readily break down or biodegrade.  The Eight PFAS are stable in the environment and will persist for an indefinite (and very long) period of time.  Because of their persistence, unless the Eight PFAS are actively cleaned up from contaminated State natural resources and property, these chemicals will remain and continue to contaminate State natural resources and property indefinitely.  While it is possible to clean up PFAS from certain State natural resources and property, it is difficult and expensive to do so.

38.    The Eight PFAS are soluble in water, do not readily adsorb or stick to soil particles, are mobile in the environment, and migrate long distances through soil and groundwater.

39.    The Eight PFAS are transported long distances through the air.

40.    The pernicious characteristics of the Eight PFAS mean that once these chemicals are released into the environment, they migrate into and cause extensive contamination and injury of State natural resources and property.

41.    Contamination from the Eight PFAS is a serious threat to human health and State natural resources and property.

42.    The Eight PFAS bioaccumulate and bio-magnify in humans and in wildlife such as fish.

43.    The Eight PFAS are toxic to humans at extremely low levels.

44.    Exposure to one or more of the Eight PFAS is associated with harmful and serious health effects in humans and animals, including but not limited to:

     a.    altered growth;

     b.    impacts to learning and behavior of infants and older children;

     c.    lowering a woman's chance of getting pregnant;

     d.    interference with the body's natural hormones;

     e.    increased cholesterol levels;

     f.    modulation of the immune system; and

     g.    increased risks of testicular and kidney cancers.

45.    Humans are exposed to the Eight PFAS through ingestion of drinking water and contaminated food, inhalation, and dermal contact, among other pathways.

46.    Known pathways for the Eight PFAS to enter the environment include releases to air, waters, and soil from industrial processes and sites, and from consumer, household, and commercial products containing PFAS during their normal and foreseeable use and disposal.

47.    In connection with the State's recent and ongoing investigation into PFAS contamination in Maine, PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have been detected in sludge at wastewater treatment plants and/or in septage from septic systems.  Sludges from wastewater treatment plants were until recently often used throughout Maine as a soil additive at agricultural sites (to supplement farmland with nutrients) or in commercial products.  Thus, PFAS contamination through these pathways has greatly expanded the area of PFAS contamination and injury in the State.

## VI.    MAINE IS INVESTIGATING PFAS CONTAMINATION

48.    The State of Maine has conducted a series of investigations and collected

sampling data to begin to address risks to public health and State natural resources.  The State's

investigation and response to this vast threat to public health are ongoing and evolving.

### A.    Statewide PFAS Investigations.

49.    The State is investigating PFAS contamination in Maine through the Maine

Department of Environmental Protection (DEP), the Maine Department of Agriculture,

Conservation and Forestry (DACF), the Maine Center for Disease Control and Prevention

(Maine CDC), and other state agencies and departments.

50.    Maine has documented PFAS contamination in drinking water, groundwater,

surface water, soil, compost, sludge and other residuals, milk, fish, and other resources in Maine,

and at locations including hazardous waste sites, landfills, wastewater treatment plants, and farm

fields.

51.    PFAS contamination has impacted private drinking water wells in Fairfield

located near fields fertilized with sludge, at levels hundreds or even more than 1,000 times

higher than Maine's recently enacted 20 ppt interim drinking water standard.

52.    Maine is concentrating on protecting drinking water and the food supply from

PFAS, further investigating PFAS contamination, and seeking the necessary funding to fully

address PFAS pollution.

53.    Maine has already spent substantial amounts of money to address PFAS and  will

need to spend substantial additional amounts of money to clean-up PFAS contamination to

protect public health and the environment.

54.    The State Legislature has  required DEP to develop and implement a program to

evaluate soil and groundwater for PFAS at locations licensed to land apply sludge or septage

prior to 2019.  These sludge-application sites were selected due to the potential for widespread PFAS impacts at these locations.  Land application of sludge was a common practice in the United States and within Maine for decades to enhance nutrient value at agricultural sites during time periods that Defendants concealed information from the State, consumers, and others regarding the health and environmental risks posed by PFAS and that PFAS could be found in sludge.

55.    In October 2021, DEP prioritized all licensed sludge sites statewide for sampling by dividing them into four tiers (Tiers I, II, III, IV) based, in part, on volume of sludge applied, proximity to drinking water wells and other points of potential exposure to humans, and the sources of the sludge.  Sampling of Tier I and II sites is ongoing and expected to conclude in 2023; sampling of Tier III and IV sites is expected to begin in 2024.  Sampling data at certain of these locations demonstrated that PFAS contamination exceeded the State's drinking interim water standard of 20 ppt.  It is likely that additional PFAS contamination will continue to be discovered.

56.    Overall Maine has budgeted millions of dollars to sample many sites where wastewater sludge has been spread, and to install treatment systems to remove PFAS from drinking water wells.  DEP has hired substantial numbers of  new staff members to work on this sampling.  In October 2021, the State established The Land Application Contaminant Monitoring Fund to, among other things, test and monitor soil and groundwater for PFAS and provide treatment for drinking water wells contaminated by PFAS.

57.    PFAS contamination has also resulted in substantial additional costs to Maine municipalities.  For example, on August 31, 2020, the Maine Public Utilities Commission authorized the Kennebunk, Kennebunkport, and Wells Water District to issue a bond for the construction and operation of a filtration system to remove PFAS chemicals from the

groundwater at the Kennebunk River Well source. Testing had revealed PFOS in Kennebunk's public wells at up to 50 ppt.

**B.    State and Federal PFAS Standards.**

58.    In June 2021, Maine set an interim drinking water standard of 20 ppt for the sum of PFOA, PFOS, PFNA, PFDA, PFHpA, and PFHxS—all six of which are also included as part of the Eight PFAS at issue in this Complaint. The June 2021 Resolve setting this limit stated that PFAS "are being identified at alarming levels in well water across the State" and are "increasingly associated with significant health concerns that have major consequences for the residents of this State." The Resolve also required monitoring and treatment of certain public water systems for PFAS contamination.

59.    Information on the health and environmental risks of PFAS is still being developed, and the federal government and other states are continuing to lower health advisories and related standards for PFAS chemicals as more information on the toxicity of these pernicious chemicals becomes known. Maine's drinking water standard therefore may be revised as additional data and information become available.

60.    PFOA and PFOS target many organ systems, including the liver, endocrine, and the immune system. The National Toxicology Program, a Division of the National Institute of Environmental Health Sciences, concluded that PFOA and PFOS are presumed to be immune hazards to humans, based on high levels of evidence in animals that PFOA and PFOS suppress the antibody response. Exposure to PFOA and PFOS is also associated with developmental toxicity, including neurodevelopmental effects and skeletal alterations.

61.    Toxicity studies have indicated that PFHxS, PFHpA, PFNA, PFDA, PFBS and Gen-X have similar impacts, including but not limited to, immunotoxicity, disruption of the endocrine system, developmental toxicity, and liver toxicity. For example, in 2021 the EPA

concluded that (i) PFBS is associated with health effects on the thyroid, reproductive organs and tissues, developing fetuses, and kidneys and (ii) GenX is associated with cancer and with health effects on the liver, kidneys, the immune system, and the development of offspring.

62.     Aside from establishing drinking water standards for PFAS, the State has also established screening levels for PFAS in soil, fish tissue, beef, and milk; established wastewater sludge testing requirements; and eliminated land spreading of PFAS-contaminated sludge, among other actions.

63.     In addition to setting an interim drinking water standard, establishing screening levels for soil, fish tissue, beef, and milk, and addressing treatment and clean-up of PFAS contamination, Maine has also banned the use of PFAS in various types of products, including carpets, rugs, and fabric treatments.  Maine is continuing to identify additional products that it will ban because they are likely to cause contamination of the State's land or water resources.  In addition, Maine completed rulemaking in 2020 to designate PFOS and its salts a priority chemical and began requiring reporting for certain children's products that contain PFOS or its salts.  Further, beginning January 1, 2023, manufacturers must identify their products supplied into Maine that contain PFAS as intentionally added ingredients.  Finally, subject to the availability of funding, Maine intends to implement a program to encourage the use of safer alternatives to PFAS and management of PFAS-containing products, provide grants to operators of publicly owned treatment works to develop and implement pretreatment standards for PFAS, and grants to municipalities for education on disposal of PFAS in solid waste, among other actions.

64.     At the federal level, EPA has issued health advisories for PFOA, PFOS, PFBS, and GenX.  On June 15, 2022, EPA announced new drinking water Health Advisories Levels (HALs) for certain PFAS as part of its PFAS Strategic Roadmap.  HALs provide information on

a contaminant that may cause negative human health effects and is known or anticipated to occur in drinking water. HALs are EPA's recommendations for the concentrations of such drinking water contaminants at which adverse health effects are not anticipated to occur over specific exposure durations, such as one-day, 10 days, or a lifetime. The new HALs announced by EPA in June 2022 apply to PFOA, PFOS, PFBS, and GenX. The lifetime interim updated HALs are 0.004 ppt for PFOA and 0.02 ppt for PFOS, and the lifetime final HALs are 2,000 ppt for PFBS and 10 ppt for GenX.

65. On March 14, 2023, EPA proposed Maximum Contaminant Levels ("MCLs") in drinking water of 4 ppt for PFOA, 4 ppt for PFOS, and limits on PFNA, PFHxS, PFBS, and HFPO-DA as a PFAS mixture because PFAS mixtures can pose a health risk greater than each PFAS chemical independently. The proposed MCL Goals for PFOA and PFOS are zero because any level of PFOA and PFOS may pose risks to human health.

## VII.  DEFENDANTS HAVE CAUSED PFAS CONTAMINATION AND INJURY IN MAINE

### A.  3M's Manufacturing and Use of PFAS.

66. 3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

67. 3M manufactured PFOA, PFOS, PFBS, and PFHxS as standalone products or as ingredients (often the principal ingredient) in products, including 3M products and products made by third parties. 3M was the only known manufacturer of PFOS and PFHxS in the United States, and was a major manufacturer of PFOA.

68. 3M introduced PFBS in 2003 in some products, such as Scotchgard. 3M publicly stated at the time that PFBS was "a sustainable alternative to PFOS-based surfactants," that it was "practically non-toxic," and that it was "not considered persistent, bioaccumulative and toxic."

- 17 -

69.     In addition to selling certain PFAS as standalone chemicals or intentionally adding certain PFAS to other products, 3M manufactured and sold products that it knew contained other PFAS chemicals (including PFOA, PFOS, PFHxS, PFHpA, and/or PFNA) as byproducts or impurities, as well as products that it knew or should have known contained precursor chemicals that broke down into these PFAS chemicals.  More generally, 3M manufactured PFAS by electrochemical fluorination beginning in the 1940s.

70.     3M marketed and sold PFAS and products containing PFAS throughout the United States, including in and throughout Maine.

71.     3M supplied PFAS to third parties for use in manufacturing, including but not limited to DuPont, and throughout the United States.

**B.      DuPont's Manufacturing and Use of PFAS.**

72.     DuPont began purchasing PFOA from 3M in 1951 for use in manufacturing DuPont's brand-name Teflon products.  Teflon is commonly known for its use as a coating for non-stick cookware.  DuPont has used PFAS in other brand-name products, including Stainmaster.

73.     Although DuPont knew about the health and environmental risks of PFAS from its use of PFAS starting in 1951, DuPont began manufacturing its own PFAS chemicals in 2002 when 3M phased out production of PFOA.  3M and DuPont were the only companies to manufacture PFOA in the United States.

74.     DuPont manufactured for commercial sale products containing PFOA that it intentionally added as an ingredient to the products.  DuPont also manufactured for commercial sale products containing PFOA when it knew that the products contained PFOA as a byproduct or impurity, and that they contained precursor chemicals that broke down into PFOA.  DuPont

intentionally used PFOA as a processing aid in the manufacture of certain products for commercial sale.

75.    DuPont also manufactured for commercial sale products containing PFHpA and/or PFNA as byproducts or impurities and products that contained precursor chemicals that broke down into PFHpA and/or PFNA.  DuPont manufactured these products when it knew that the products contained PFHpA and/or PFNA as byproducts or impurities, or that they contained precursor chemicals that broke down into PFHpA and/or PFNA.  DuPont also manufactured these products when it should have known that its products contained PFHpA and/or PFNA as byproducts or impurities, or that they contained precursor chemicals that broke down into PFHpA and/or PFNA.

76.    DuPont continued to manufacture, market, and sell PFOA until at least 2013. After 2013, DuPont started using GenX in many of its products.  Chemours has continued to manufacture, market, and sell GenX after the 2015 spinoff from Historical DuPont.  DuPont is the only company known to manufacture GenX in the United States.

77.    DuPont marketed and sold PFAS and products containing PFAS throughout the United States, including in Maine.  DuPont supplied PFAS to third parties for use in manufacturing.

**C.    3M Has Known for Decades of PFAS's Health and Environmental Risks.**

78.    3M knew of the health and environmental hazards posed by PFAS, including the Eight PFAS, for decades but all the while continued to manufacture, market, distribute, and/or sell PFAS and products containing PFAS into Maine.  3M failed to disclose key information on these hazards to regulators and the public.

79.    3M began testing the physiological and toxicological properties of PFAS compounds as early as 1950.  Based on these internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

80.    In the 1950s, 3M knew that PFAS chemicals had the ability to move throughout groundwater.  By 1960, 3M knew that PFOA and PFOS were capable of leaching into groundwater and contaminating the environment.  For example, by 1960, chemical wastes from its PFAS manufacturing were known to be able to leach from its waste dumps into groundwater and pollute underground basins.  An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."  In 1960, 3M confirmed the presence of PFAS pollution in the wells.

81.    By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade.  A 1963 3M report described PFAS as being stable in the environment, "completely resistant to biological attack."  The same report also confirmed that 3M knew the chemicals to be "toxic."

82.    In the 1970s, 3M researchers documented PFOA and PFOS chemicals in fish.  At that time, 3M was aware that its PFAS products were hazardous to marine life.

83.    In 1975, 3M scientists were informed that PFAS had been found within, and could build up in, the human body.  The source of these chemicals was suspected by a researcher at the University of Florida investigating the matter to be Teflon cookware or "Scotchgarded" fabrics.  When questioned about these concerns, 3M researchers said that they "plead[ed] ignorance."

84.    In the 1970s, 3M began monitoring the blood of its employees for PFAS because 3M was concerned about the health effects of PFAS.  For example, in 1976 3M measured

fluorochemicals in the blood of workers at its PFAS-manufacturing plant in Cottage Grove, Minnesota, at "1,000 times normal."

85.    In 1975, 3M found that there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

86.    Because PFOA is not naturally occurring, these findings should have alerted 3M that its products were the likely source of this PFOA—a possibility that 3M considered internally but did not share outside the company.  These findings also should have alerted 3M that PFOA is mobile, persistent, bio-accumulative, and biomagnifying.

87.    A 3M internal report from 1978 warned that PFOS and PFOA "are likely to persist in the environment for extended periods."  That same study found that one common PFAS compound was "found to be completely resistant to biodegradation."  Similarly, a 3M internal document from 1979 stated that PFOA and PFOS "are known to persist for a long time in the body and thereby give long term chronic exposure."

88.    Results of a 90-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic."  A 1979 internal 3M report further discussing the study on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated," and further recommended that "lifetime rodent studies . . . be undertaken as soon as possible."  3M decided to not publish the findings of this investigation.

89.    A 1979 memo from M.T. Case, employed at the time in 3M's medical department, concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."  That same year, an outside researcher named Dr. H.C. Hodge recommended further testing and told 3M that reducing employees' exposure to PFAS "should have top priority."

- 21 -

90.    In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This was based on internal research showing that PFAS compounds were causing birth defects in rats. In 1983, 3M scientists concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

91.    In March 1999, 3M environmental scientist Rich Purdy wrote to 3M and expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. According to Mr. Purdy, "[f]or more than twenty years 3M's ecotoxicologists have urged the company to allow testing to perform an ecological risk assessment on PFOS and similar chemicals," without 3M ever taking action; he noted that the company "waited too long to tell customers about the widespread dispersal of PFOS in people and the environment." Mr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

92.    Despite decades of research, 3M first shared its concerns with EPA in the late 1990s. Even then, the disclosure was far from complete. As a former 3M employee told EPA in May 1998, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information."

93.     In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000.  In connection with the phase-out in 2000, 3M issued a press release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

94.     That same day, the EPA issued a press release regarding 3M's phase-out of PFOS and PFOA presenting a different story: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

95.     Even after 3M's phase out, the company worked to control and to distort the science on PFAS.  For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for 3M.  Mr. Giesy's goal, as expressed in a March 25, 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

96.     In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information."  3M was fined $1.52 million for these violations.

97.     In November 2018, 3M stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood."  As recently as December 30, 2022, 3M informed DEP that "3M's products, including those containing PFAS, are safe and effective for their intended uses in everyday life."  These statements contradict a large body of research demonstrating the serious health risks posed by PFAS.

- 23 -

98.    When 3M introduced PFBS in 2003 in Scotchgard and other products and stated that PFBS was "a sustainable alternative to PFOS-based surfactants" and that PFBS was "not considered persistent, bioaccumulative and toxic," 3M knew or should have known that this characterization of PFBS was misleading and inaccurate.  Although 3M argued that PFBS clears the human body quickly, PFBS was detected in human blood samples that 3M analyzed in 2005. In 2008 and 2010, 3M submitted evidence to EPA that PFBS was found in the blood and livers of certain animals and increased the liver weight of laboratory mice.

99.    In June 2022, EPA issued a health advisory that the level of PFBS in drinking water should not exceed certain levels.

100.    In short, by the early 1950s, 3M knew or should have known that, in their intended and/or common use, PFAS (including products containing PFAS and PFAS used in industrial processes) would injure and/or threaten public health and the environment in Maine.

**D.    DuPont Has Known for Decades of PFAS's Health and Environmental Risks.**

101.    Like 3M, DuPont has known for decades of the health and environmental risks of PFAS, including some or all of the Eight PFAS.  But instead of warning the public, users, or consumers about such risks, DuPont covered up this information and promoted PFAS and PFAS-containing products as safe.

102.    In approximately 1951, DuPont started using PFOA in making Teflon at its Washington Works manufacturing plant in Parkersburg, West Virginia.  As early as 1954, employees at DuPont's Washington Works plant reported that C-8 (another name for PFOA) might be toxic.  DuPont was concerned enough about the complaints that it delayed marketing Teflon containing PFOA to the public.  In 1961, seven years later, Teflon consumer products hit the marketplace.

- 24 -

103.    By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care." As early as the 1960s, DuPont knew that PFOA caused adverse liver reactions in dogs and rats.

104.    As early as 1966, DuPont was aware that PFOA could leach into groundwater.

105.    By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed could be a potential result of human exposure to PFOA.

106.    By 1979, DuPont had data indicating that its workers who were exposed to PFOA had a significantly higher frequency of health issues compared to unexposed workers but did not report this data to any government agency or any community where it used PFOA.

107.    By at least 1980, DuPont had internally confirmed that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

108.    By at least 1981, DuPont had obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero and urged female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy." Around this same time, a pregnant DuPont worker in the Teflon division of the Washington Works began moving PFOA waste into pits. Tragically, when the DuPont employee gave birth in January 1981, the baby had only half a nose and a ragged eyelid that gaped down to the middle of his cheek. This was consistent with the 3M study, and in March 1981, DuPont had a pathologist and a birth defects expert review the 3M study. They concluded that "the study was valid" and that "the observed fetal eye defects were due to C8." DuPont immediately removed all female workers away from areas where they might come into contact with PFOA.

109.    In April 1981, DuPont began secretly monitoring 50 female employees who had been exposed to PFOA. As DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question—does C8 cause abnormal children?" Initial data showed that two of the seven pregnant workers exposed to PFOA had babies with eye and nostril deformities, which the researchers concluded was "statistically significant." DuPont abandoned the study rather than inform regulators or employees.

110.    In a confidential November 1982 memo, DuPont's medical director warned about employees being exposed to potentially dangerous levels of PFOA. He recommended that all "available practical steps be taken to reduce this exposure."

111.    By at least the early 1980s, DuPont began considering the effects of PFOA beyond its Washington Works plant. In 1984, DuPont sent employees to secretly fill jugs of water from gas stations and general stores around the plant. Testing of the water revealed PFOA in Lubeck, West Virginia, and Little Hocking, Ohio. But DuPont decided not to notify the public.

112.    In 1984, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA. The corporate managers expressed concern about "C-8 exposures off plant as well as to our customers and the communities in which they operate." The corporate managers admitted internally that "none of the options developed are … economically attractive and would essentially put the long-term viability of this business segment on the line." The DuPont corporate managers predicted that the medical and legal departments "will likely take a position of total elimination," of PFOA but instead decided that "corporate image, and corporate liability" would drive decisions about PFOA. The corporate managers admitted that it was too late to address past liability: "Liability was further defined as the incremental liability from this point on if we do

nothing as we are already liable for the past 32 years of operation." DuPont did not disclose the information discussed at the 1984 meeting to EPA, the State, or the general public. DuPont began manufacturing PFOA itself over 15 years later and continued to use PFOA for almost another 30 years.

113. By the mid-1980s, DuPont was aware that PFOA is bio-persistent and bio-accumulative.

114. In an October 20, 1986 memorandum, a DuPont employee stated that DuPont's management in Wilmington, Delaware was "concerned about the possible liability resulting from long-term C-8 exposure to our employees and to the population in the surrounding communities and those downriver from the [Washington Works] plant."

115. In 1988, DuPont began treating PFOA internally as a possible human carcinogen.

116. In 1999, DuPont received preliminary results from a study showing that C8 caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one became so ill it had to be euthanized.

117. An internal DuPont memorandum from around 2000 regarding its litigation strategy shows that DuPont sought to "not create [the] impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

118. In 2000, John R. Bowman, a DuPont in-house counsel for C8 issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the C-8 out of the water." He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another notorious groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

- 27 -

We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one....

119.    In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C-8 issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

120.    Notwithstanding its internal knowledge of PFOA's health and environmental risks beginning as early as the 1950s, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

121.    DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about the truthfulness of these statements. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

122.    In October 2006, contrary to ERB's advice, DuPont's chief medical officer issued a press release stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

123.    By December 2005, EPA uncovered evidence that DuPont had concealed the environmental and health effects of C8 for more than two decades.  In response, EPA levied a $16.5 million administrative penalty on DuPont, which at that time was the largest civil administrative penalty EPA had ever obtained under any federal environmental statute.

124.    At approximately the time this penalty was issued, DuPont was making approximately $1 billion a year in revenue from products containing C8.

125.    Facing increased scrutiny from EPA, DuPont began to gradually phase out PFOA production in 2006.  Shortly thereafter, DuPont notified EPA that it intended to produce GenX as a replacement for PFOA.

126.    In January 2009, EPA and DuPont agreed to a "premanufacture notice consent order" on GenX, issued under section 5(e) of the Toxic Substances Control Act, 15 U.S.C. § 2604(e).  The consent order stated that "EPA has concerns that [GenX] will persist in the environment, could bioaccumulate, and be toxic … to people, wild mammals, and birds."  The consent order went on to note that EPA expected GenX to be "highly persistent" and that EPA has "high concern for possible environmental effects over the long-term" because of GenX's similarity to its "analog" PFOA.  The consent order concluded that "uncontrolled manufacture, import, processing, distribution in commerce, use, and disposal of the [GenX] may present an unreasonable risk of injury to human health and the environment."  The consent order imposed restrictions on DuPont's manufacture of GenX, and required DuPont to submit additional testing results to EPA.  Notwithstanding these statements in the consent order, DuPont emphasized to others that GenX has a "favorable toxicological profile" compared to PFOA.

127.    Following the consent order, DuPont conducted additional studies of GenX. These studies revealed that the biodegradation of GenX "was 0%," and that GenX was associated with (among other effects) tumors, enlargement of the liver and kidneys, and lower

fetal weight in laboratory animals. DuPont downplayed these results, telling EPA that these effects were "not considered adverse."

128.    EPA's 2021 human health toxicity assessment concluded that GenX chemicals pose serious health and environmental risks, including because they have "similar persistence in the environment as longer chain PFAS, such as PFOA and PFOS," that GenX chemicals are "more mobile" than PFOA and PFOS, and that studies of laboratory animals have shown "health effects including on the liver, kidneys, the immune system, development of offspring, and an association with cancer." In June 2022, EPA issued a health advisory for GenX in drinking water, advising that the level of GenX in drinking water should not exceed certain levels.

129.    Historical DuPont manufactured GenX, a business activity that Chemours continued after the 2015 spinoff. Even after EPA's recent findings about GenX's threat to human health and the environment, Chemours has continued to describe GenX as a "suitable substitute" for PFOA. In 2019, Chemours sponsored research that downplayed GenX's toxicity and the animal studies previously carried out by Historical DuPont. After GenX was discovered in drinking water near a Chemours facility in North Carolina, in 2017 Chemours managers publicly insisted that drinking the contaminated water was "safe" and comparable to risks from cooking and eating Brussels sprouts. But a Chemours employee (who formerly worked at Historical DuPont) privately acknowledged in 2017 to a colleague that the "spin" on this contamination would be that "Chemours poisoned people for years, and finally stepped up after they got caught."

E.    **Defendants Failed to Act on Their Knowledge of the Health and Environmental Risks of PFAS.**

130.    Despite their knowledge that PFAS posed environmental and human health risks, and despite the availability of reasonable alternatives, Defendants failed to warn customers,

- 30 -

users, the public, or the State, and failed to take any other appropriate precautionary measures to prevent or mitigate such contamination. Instead, Defendants improperly marketed and promoted their PFAS and PFAS-containing products, including the Eight PFAS and products containing the Eight PFAS, for uses and applications that would inevitably cause harmful environmental contamination, and provided warnings and instructions for use and disposal that were inadequate to protect against the risk to public health and the environment created by the ordinary use and disposal of such consumer and industrial products.

131.    At all times relevant to this Complaint, Defendants were or should have been aware that PFAS contamination and injury of State natural resources and property were inevitable. The contamination and injury were due to PFAS's solubility, recalcitrance to biodegradation and bioremediation, and the normal and foreseen use of PFAS in industrial processes, and in consumer, household, and commercial products, including in Maine. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to State natural resources and property.

132.    Defendants' acts and omissions directly and proximately caused and continue to cause PFAS to intrude into and contaminate and injure State natural resources and property, as described below.

## VIII.    STATE NATURAL RESOURCES AND PROPERTY INJURIES

133.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have been found in and around State natural resources and property, including groundwater, surface waters, soil, sediments, and wildlife in locations throughout Maine.

134.   Many locations in Maine are contaminated and injured by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX.  For example:

    a.   There is extensive PFAS contamination and injury of drinking water, including of the Kennebunk, Kennebunkport & Wells Water District (Kennebunk) and China Middle School (China)..

    b.   There is contamination of private drinking water wells in Fairfield from sludge containing PFAS.  There is also extensive PFAS contamination of other private drinking water wells in Maine.

    c.   There is PFAS contamination of organic matter (residuals) at wastewater treatment plants and in finished compost using this organic matter.

    d.   There is extensive PFAS contamination and injury at many dairy farms within the State, including in Arundel and Fairfield.

    e.   There is PFAS contamination of landfill leachate at municipal, state-owned, and other landfills, including at the following landfills: City of Augusta Landfill, Juniper Ridge Landfill, and Midcoast Solid Waste Corporation Landfill.  Many of these landfills received PFAS-containing products, including household, commercial, and industrial products, along with sludge, for disposal.  There is also PFAS contamination of landfill leachate at landfills associated with the paper industry, including at Kimberly-Clark Larson Chapman Landfill and ND Paper LLC Landfill.

135.   Contamination by the Eight PFAS has occurred as a result of foreseeable releases from many sources, including solid waste facilities (which contain consumer, household and commercial products containing PFAS), industrial facilities, sites contaminated with hazardous

waste, wastewater disposal sites, wastewater treatment facilities, sludge and septage processing and application sites.

136.    Most of the remainder of this section describes other instances of contamination in groundwater, surface waters, and soils, sediments and wildlife.

### A.    Groundwater.

137.    Groundwater is a precious and finite natural resource that is used for drinking water, irrigation, and other important purposes.

138.    The Legislature has found and declared that the "protection of ground water resources is critical to promote the health, safety and general welfare of the people of the State." 38 M.R.S. § 401.  It further has found that aquifers "provide a significant amount of the water used by the people of the State," and that aquifers are "critical elements in the hydrologic cycle." *Id.*

139.    The Legislature also has found and declared that an "adequate supply of safe drinking water is a matter of the highest priority and that it is the policy of the State to protect, conserve and maintain ground water supplies in the State." *Id.*

140.    The Legislature has found and declared it to be the "policy of the State, consistent with its duty to protect the health, safety and welfare of its citizens, to establish a coordinated statewide program to protect drinking water wells from contamination by oil or hazardous waste." 38 M.R.S. § 1391.

141.    Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have contaminated and injured the State's groundwater in locations throughout the State.  For example, groundwater is contaminated at the following locations:

    a.    Fairfield, including near sludge application sites along Middle Road, Ohio Hill Road, and Ridge Road;

- 33 -

      b.    Portland Ocean Avenue Landfill in Portland; and

      c.    Kennebunk, Kennebunkport & Wells Water District.

142.    Ongoing additional testing continues to reveal further PFAS contamination and injury of groundwater in locations throughout Maine.  It is virtually certain that additional testing will reveal further PFAS contamination and injury of groundwater in locations throughout Maine.

**B.    Surface Waters.**

143.    Surface waters are precious and finite State natural resources that are used for drinking water, irrigation, recreation such as swimming and fishing, and ecological and other important purposes.

144.    The Legislature in its role as trustee of the public waters has declared that waters shall be restored to a "condition clean enough to allow fishing and swimming in all our rivers and streams" to promote the "well-being of the citizens of this State."  12 M.R.S. § 402(1).

145.    The State's tourism and recreation industries are dependent upon clean water, including surface waters.  Surface waters are vitally important to the State and its citizens, including by supporting aquatic ecosystems, and biota such as fish.

146.    Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have contaminated and injured the State's surface waters in locations throughout the State.  For example, surface water is contaminated at the following locations:

      a.    The Fairfield Police Athletic League ponds and Fish Brook (from the headwaters to the confluence with Messalonskee Stream) in Fairfield;

      b.    Unity Pond in Unity; and.

      c.    the Presumpscot River in Westbrook.

147. Ongoing additional testing continues to reveal further PFAS contamination and injury of surface waters in locations throughout Maine. It is virtually certain that additional testing will reveal further PFAS contamination and injury of surface waters in locations throughout Maine.

**C.    Soils, Sediments, and Wildlife.**

148. Soils and sediments are interconnected with the health of other State natural resources such as surface waters, groundwater, and wildlife. For instance, sediments are important as habitat for wildlife, including fish, among other important ecological uses. Soils may contain contaminants that migrate to groundwater.

149. Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have contaminated and injured soils and sediments in locations throughout the State. For example, soils and sediments are contaminated at the following locations:

  a.    Fairfield, including near sludge utilization sites along Middle Road, Ohio Hill Road, and Ridge Road; and

  b.    Unity, including near sludge application sites along Albion Road and Stevens Road

  c.    .

150. There is widespread PFAS contamination and injury of soil at locations throughout the State. Ongoing additional testing continues to reveal further PFAS contamination and injury of soils and sediments in locations throughout Maine.

151. Wildlife is a precious and finite State natural resource. Maine's fish and other wildlife are used for food, recreational purposes, and provide a significant economic benefit to the State, including through tourism and recreation.

152.    Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have contaminated and injured fish, including in Fish Brook in Fairfield, the Presumpscot River in Westbrook, Sheepscot Pond in Palermo.

153.    Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX have contaminated and injured other wildlife, including deer.

154.    It is virtually certain that additional testing will reveal further PFAS contamination and injury of soils, sediments, and wildlife in locations throughout Maine.

**D.    Absent Prompt Remediation, PFAS Contamination Will Continue to Spread.**

155.    PFAS continues to move through the environment and contaminate and injure State natural resources and property at a number of locations throughout the State with known PFAS contamination.

156.    There are proven and preliminary remedial techniques for cleaning up PFAS in environmental media and successfully treating drinking water.  Absent use of remediation and treatment methods, PFAS contamination will continue to spread throughout the State and its natural resources and property.

157.    PFAS's presence and migration in Maine's natural resources and property, absent large-scale and costly remediation and/or treatment, will continue indefinitely, and will continue to indefinitely threaten such natural resources and property.

158.    Because of the injury PFAS have caused and are causing to Maine's natural resources and property, Maine's natural resources and property require restoration, including compensation for interim and other losses.

**IX.    HISTORICAL DUPONT'S FRAUDULENT SCHEME TO INSULATE ITS ASSETS FROM ITS PFAS LIABILITIES**

159.    After Historical DuPont had been sued and faced the threat of further lawsuits regarding its manufacturing and releases of PFOA, it announced in October 2013 its intention to

spin off its "performance chemicals" business, responsible for manufacturing and sales of PFAS and PFAS-containing products, including PFOA and GenX. The performance chemicals business would be spun off as a new, independently owned company named The Chemours Company (the Chemours Spin-off) that would assume certain liabilities of Historical DuPont.

160.    In February 2014, Historical DuPont formed The Chemours Company as a wholly-owned subsidiary with a separate board of directors that was controlled by Historical DuPont employees.

161.    According to a lawsuit filed by Chemours against Historical DuPont, DowDuPont, and Corteva in 2019, the Chemours Spin-off was not an arm's length transaction. *See* Chemours's Verified First Amended Complaint, C.A. No. 2019-0351-SG (Del. Ch.) (the Chemours Compl.), ¶ 25.[2] From formation through consummation of the Chemours Spin-off, Historical DuPont controlled development of the Chemours Spin-off's terms, dictated the terms of the Chemours Spin-off, and there were no procedural protections for Chemours. *Id.* ¶¶ 25, 27.

162.    Historical DuPont did not allow Chemours (or its prospective management team) to have independent counsel to represent Chemours's interests in structuring the Chemours Spin-off. *Id.* ¶ 26. Instead, Historical DuPont and its outside counsel unilaterally prepared all of the documents underlying and effectuating the Chemours Spin-off. *Id.*

163.    The initial draft of the "Separation Agreement" between Historical DuPont and Chemours (the Chemours Separation Agreement) did not include the schedules listing the assets and liabilities to Chemours, preventing Chemours's designated management team from evaluating central economic terms of the transaction even though Chemours's designated management team requested these schedules. *Id.* ¶ 29.

---

[2] A copy of the Chemours Complaint is available at: https://www.chemours.com/en/-/media/files/corporate/fayetteville-works/chemours-amended-complaint.pdf.

164.    On May 12, 2015, the Chemours Board, which then consisted of three Historical DuPont employees, Michael Heffernan, Nigel Pond, and Steven Zelac (the DuPont Employee Board Members) who were not going to be with Chemours following the Chemours Spin-off, authorized the Dividend (as defined below). *See id.* ¶ 35(a).

165.    On June 5, 2015, the DuPont Board approved the Chemours Spin-off. *Id.* ¶ 70.

166.    On June 9, 2015, DuPont Employee Board Members, as the sole members of the Chemours' Board, held a DuPont Board "meeting" to "discuss" whether Chemours should approve the Chemours Spin-off and the Chemours Separation Agreement. *Id.* ¶ 35(c). That meeting was also attended by other Historical DuPont employees and Historical DuPont's outside counsel. *Id.* The meeting consisted of "presentations" by Historical DuPont's outside counsel and Historical DuPont. *Id.* The DuPont Employee Board Members (1) took "notice" that "DuPont, as the sole stockholder of [Chemours], has communicated" that the DuPont Board had determined that the Chemours Spin-off "are in DuPont's best interests," and (2) "unanimously" adopted resolutions approving the Chemours Spin-off on Chemours's supposed behalf. *Id.*

167.    On June 26, 2015, Nigel Pond, Historical DuPont's M&A Counsel, formerly one of the DuPont Employee Board Members, and then designated a "Vice President" of Chemours (a temporary position he would resign immediately thereafter) executed the Chemours Separation Agreement on Chemours's behalf. *Id.* ¶ 35(d).

168.    On July 1, 2015, Michael Heffernan, Nigel Pond, and Steven Zelac all resigned from the Chemours Board.

169.    In connection with the Chemours Spin-off, Historical DuPont and Chemours executed the Chemours Separation Agreement, dated as of June 26, 2015.

170.    On May 12, 2015, Chemours borrowed over $4 billion through Senior Secured Term Loans (the Term Loans), Notes, and related indentures.

171.    The Term Loans were incurred pursuant to the terms of the Credit Agreement, dated May 12, 2015 by and among Chemours, certain Guarantors party thereto and JPMorgan Chase Bank, N.A., as administrative agent. *See* Chemours's Form 10, Amendment No. 3, Ex. 10.14, filed on May 13, 2015 (as amended) (the Credit Agreement).

172.    The Information Statement for the Chemours Spin-off dated June 5, 2015 (the Info Statement), disclosed that a "Dividend" of over $3.9 billion would be paid to Historical DuPont by Chemours.

173.    As part of the Chemours Spin-off, Chemours received approximately 19% of Historical DuPont's business lines, while being saddled with approximately two-thirds of Historical DuPont's environmental liabilities and 90% of Historical DuPont's pending litigation by volume of cases.  Chemours Compl., ¶ 38.

174.    These environmental liabilities included those related to over 80 Historical DuPont-associated sites, the majority of which were sites that Chemours would never operate. *Id.* ¶ 39.

175.    Historical DuPont even gave Chemours all liabilities related to Historical DuPont's historical explosives operations and asbestos and benzene exposures that had nothing to do with its performance chemicals business.

176.    As a result of the Chemours Spin-off, Chemours's capital structure carried a debt-to-EBITDA (earnings before interest, taxes, depreciation, and amortization) ratio of 7.3 to 1.0. *Id.* ¶ 41.

177.    Under the Chemours Separation Agreement, The Chemours Company agreed to defend and indemnify Historical DuPont against, and assumed for itself, all "Chemours

Liabilities," defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time." This indemnification is uncapped and does not have a survival period.

178.    The Chemours Company agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Historical DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

179.    The Chemours Company agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business. Such liabilities were deemed "primarily associated" if Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

180.    The Chemours Company also agreed to use its best efforts to be fully substituted for Historical DuPont with respect to "any order, decree, judgment, agreement or [any litigation or investigation] with respect to Chemours Assumed Environmental Liabilities" in effect at the time of the Chemours Spin-off. Chemours Separation Agreement at § 6.10(b).

181.    The schedules to the Chemours Separation Agreement, as referenced in the "Chemours Assumed Environmental Liabilities" definition, have never been publicly filed.

182.    The Chemours Spin-off was predicated upon a determination that Chemours would be solvent following the Chemours Spin-off (*see* Chemours Separation Agreement at § 4.5(e)), but that solvency opinion was based upon faulty and fictitious certified "maximum" liability figures that were unrealistic and designed to mask Chemours's insolvency.

183.    Houlihan Lokey (Houlihan) was commissioned to provide a financial opinion regarding Chemours's solvency on the spinoff date.  *See* Chemours Compl., ¶¶ 49-50. Houlihan's opinion, however, was based on Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for dozens of sites that were given to it by Historical DuPont.  *Id.* ¶ 50.

184.    DuPont engineered the "High End Maximum Realistic Exposure" figures to massively understate the real potential maximum exposure.  *Id.* ¶ 56.

185.    In May 2015, Historical DuPont demanded that Chemours's newly appointed chief financial officer (Mark E. Newman) certify to the accuracy of the "High End (Maximum) Realistic Exposure" numbers.  *Id.* ¶ 52.  Newman conditioned his certification upon Historical DuPont's acknowledgement that it supplied the maximum liability numbers, which Historical DuPont did through "Backup Certificates" signed by its employees.  *Id.*

186.    Historical DuPont understated the real maximum liabilities related to the Chemours Spin-off.

187.    For multiple categories of litigation (such as PFOA, other PFAS, and benzene), Historical DuPont does not appear to have undertaken any analysis.  *Id.* ¶ 58.  Rather, Historical DuPont's certification invoked a supposed "analysis" of the maximum liabilities done by Deloitte Transactions and Business Analytics LLP (Deloitte).  *Id.*  But Deloitte did not certify those "maximums."  *Id.*

- 41 -

188.    Prior to the closing of the Chemours Spin-off, Chemours's management complained to Historical DuPont's senior management that Chemours would lack appropriate cash reserves. *See* Chemours Compl., ¶ 51.

189.    In June 2015, Historical DuPont summarily rejected the plea of Chemours's chief financial officer for an additional $200-300 million in cash reserves to function on day one. *Id.* ¶ 32.

190.    Historical DuPont ignored the concerns of Chemours's management that paying quarterly stockholder dividends of $100 million would adversely affect Chemours's cash position. *Id.* ¶ 51. Chemours's management went on to cut future dividends to almost zero after the Chemours Spin-off. *Id.* ¶ 74.

191.    On July 1, 2015, Historical DuPont spun off Chemours.

192.    Chemours's financial condition at the time of the Chemours Spin-off was rapidly deteriorating and Chemours as an independent company was suffering from slumping EBITDA.

193.    In the midst of weakness in the global titanium dioxide market cycle and continued foreign currency impacts, Chemours had vastly overstated its own financial health.

194.    Chemours's financial condition was much worse at the time of the Chemours Spin-off than Chemours and Historical DuPont publicly disclosed.

195.    At the time of the Chemours Spin-off, Chemours's debt-to-EBITDA ratio was 7.3 to 1.0. *Id.* ¶ 41. This ratio far exceeded the Credit Agreement's maximum "Total Net Leverage Ratio," barring Chemours from accessing $1 billion of revolving loans. *See* Credit Agreement, § 6.13.

196.    Chemours suffered a liquidity shortage within months of the Chemours Spin-off. Chemours Compl., ¶ 75. As a result, Chemours laid off 1,000 employees, shut plants or

production lines in Delaware and Tennessee, sold off business lines, undertook two corporate restructurings, and made multiple amendments to the Credit Agreement. *Id.* ¶ 76.

197.    In November 2015, Chemours announced that it would sell to Dow its facility in Beaumont, Texas for approximately $140 million in cash. *Id.* ¶ 77.

198.    In February 2016, Historical DuPont advanced Chemours $190 million to pay for goods and services to be provided to Historical DuPont through mid-2017. *Id.*

199.    As of the last trading date before the Chemours Spin-off closed, the markets reflected Chemours's insolvency.[3]  As set forth in Chemours's publicly filed financial statements, the market believed that Chemours was insolvent by $77 million.

200.    On August 6, 2015, Chemours filed its first Form 10-Q following the Chemours Spin-off, containing a deconsolidated balance sheet as of June 30, 2015, immediately prior to the Chemours Spin-off, reflecting Chemours's insolvency by at least $309 million.

201.    Just three months after the Chemours Spin-off, Chemours was insolvent by $829 million based upon the value of its traded debt.

### A. Historical DuPont Saddled Chemours with Liabilities Far in Excess of the Amounts Attributed to Such Liabilities at the Time of the Chemours Spin-off.

202.    In 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.  Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded

---

[3] Chemours's share price, originally pegged by DuPont at $21 per share, declined to $11.48 within a month, and to $3.16 within six months.  Chemours Compl., ¶ 65.

regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

203.    Also in 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

204.    The C8 science panel completed its research in 2013 and found several significant diseases, including cancer, with a probable link to PFOA.  Thereafter, more than 3,500 personal injury claims were filed in Ohio and West Virginia (in connection with the 2005 class-action settlement) that were consolidated into a multidistrict litigation court in Ohio (the Ohio MDL).[4]

205.    At the time of the Chemours Spin-off, Historical DuPont certified to Houlihan a "maximum" liability figure for the 3,500 cancer and other bodily injury claims relating to PFOA of $128 million.  *Id.* ¶¶ 82, 84.

206.    In mid-2016, Historical DuPont lost the first three bellwether trials, the first having gone to trial just two months after the Chemours Spin-off.  Juries returned multi-million dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their illnesses, in the total amount of $19.7 million.  *Id.* ¶ 85.

207.    On February 13, 2017, Historical DuPont and The Chemours Company reached a global settlement of the Parkersburg, West Virginia cases agreeing to pay $670.7 million to resolve the Ohio MDL.  *Id.* ¶¶ 89-90.

---

[4] Under the settlement, if the science panel found a "probable link" as to a disease, plaintiffs having that disease could then bring personal injury actions against DuPont, and DuPont could not defend by contesting general causation.  *See* Chemours Compl., ¶¶ 82-83.

208.    At the time of the Chemours Spin-off, Historical DuPont certified Chemours's "maximum" exposure as $2.09 million with respect to Historical DuPont's Fayetteville Works operation in North Carolina. *Id.* ¶ 93. At the time of the Chemours Spin-off, Historical DuPont knew that the Fayetteville plant had been discharging PFAS for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people. *Id.* ¶ 94.

209.    Beginning in September 2017, the State of North Carolina, public water authorities, well owners, and a consolidated putative class of North Carolina residents, among others, filed suit against Chemours and/or Historical DuPont. *Id.* ¶ 97.

210.    In February 2019, Chemours entered into a judicially approved consent order with the State of North Carolina to resolve North Carolina's claims arising from Historical DuPont's long-running discharges into the Cape Fear River and contamination of area groundwater. *Id.* ¶ 99. That consent order requires Chemours to take steps to remediate Historical DuPont's historical contamination and to implement environmental protection measures at a cost of more than $200 million. Additionally, a number of private lawsuits relating to Historical DuPont's activities in the region remain outstanding, including a class action.

211.    At the time of the Chemours Spin-off, Historical DuPont certified that the "maximum" Chemours could have to pay for total New Jersey environmental liabilities was $337 million, divided among different sites in New Jersey. *Id.* ¶ 101. In 2018, in connection with the DowDuPont spin-off, Historical DuPont revised its liability estimate upward to approximately $620 million. *Id.* The State of New Jersey has criticized even Historical DuPont's upward-revised estimates, claiming it "implausible" that these amounts could represent "good-faith estimates of [Historical DuPont's historical New Jersey] environmental obligations and liabilities." *Id.*

212.    For benzene-related liabilities, Historical DuPont certified a "maximum" liability of $17 million, including defense costs, at the time of the Chemours Spin-off. *Id.* ¶ 108.  In 2018, Historical DuPont provided Chemours with a more comprehensive study valuing the potential maximum costs for benzene-related liabilities at over $111 million.  *Id.*  Historical DuPont addressed PFAS litigation, if at all, as part of a catch-all "maximum" of $194 million covering "General Litigation . . . to Perpetuity," which apparently included everything from PFAS liabilities to commercial litigation.  *Id.* ¶ 110.

213.    Significant additional environmental and other litigation arising from Historical DuPont's performance chemical business was likewise pending or threatened at the time of the Chemours Spin-off and additional lawsuits continue to be filed against Historical DuPont relating to its performance chemicals business.

214.    In 2017, Chemours then also agreed, in an amendment to the Chemours Separation Agreement, to pay Historical DuPont $25 million for future PFOA costs not covered by the Chemours Separation Agreement for each of the next five years (up to an additional $125 million).  Historical DuPont also agreed to cover additional amounts up to $25 million for five years, with Chemours taking responsibility for any amounts greater than $50 million.

215.    The effect of the Chemours Spin-off was to segregate a large portion of Historical DuPont's environmental (and other) liabilities, including liabilities related to its manufacturing, use, and disposal of PFAS compounds, and give them to an undercapitalized entity, thus attempting to limit the funds available to satisfy Historical DuPont's legacy liabilities.

216.    Given that Chemours is allegedly responsible for all or substantially all of Historical DuPont's historic environmental liabilities, is saddled with debt, and has comparatively few assets, the separation and spin-off have been described by some market commentators as "a bankruptcy waiting to happen" and "complete securities fraud."

B.  **Following the Chemours Spin-off, Historical DuPont Turned Its Attention to the Next Steps in Its Multi-Step Scheme to Move Valuable Assets Away from PFAS Creditors.**

217.    On December 11, 2015, Historical DuPont announced a merger with Old Dow into the combined DowDuPont (the Merger).  DowDuPont would eventually, in 2019, split into three independent companies: an agriculture company, a materials science company, and specialty products company.  These actions were all a continuation of the fraudulent Chemours Spin-off, which was a necessary precondition to these later mergers and spins.

218.    The DowDuPont Merger closed on August 31, 2017, with Old Dow and DuPont each becoming wholly owned subsidiaries of DowDuPont.

219.    After the completion of the Merger, DowDuPont engaged in a number of internal transactions, realignments, and diversities, that resulted in the transfer, directly or indirectly, of a substantial portion of what had been Historical DuPont's assets from the combined DowDuPont.

220.    Pursuant to an April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the DowDuPont Separation Agreement), DowDuPont jettisoned away from Chemours's and Historical DuPont's creditors DowDuPont's agriculture chemical and seed business (which went with Corteva) and DowDuPont's materials science business (which went with New Dow) (the DowDuPont Separation).

221.    The spin-off of DowDuPont's materials science division into New Dow (the Dow Spin-off) occurred on April 1, 2019, and New Dow became an independent, publicly traded company on April 1, 2019.  New Dow was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the materials science business, and Corteva Inc. was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the agriculture business.  The Dow Spin-off was accomplished through a pro rata dividend in-kind of all of New

Dow's then-issued and outstanding shares of common stock, to holders of DowDuPont's common stock as of the close of business on March 21, 2019 (the Dow Distribution).

222.    The spin-off of DowDuPont's agriculture chemical and seed business to Corteva (a.k.a. Corteva Agriscience) (the Corteva Spin-off) occurred on June 1, 2019. The Corteva Spin-off was accomplished through a pro rata dividend in-kind of all of the then-issued and outstanding shares of Corteva's common stock, to holders of Historical DuPont's common stock as of the close of business on May 24, 2019 (the Corteva Distribution).

223.    In connection with the Dow Distribution and the Corteva Distribution, DowDuPont entered into certain agreements that, among other things, effect the separations, provide for the allocation of assets, employees, liabilities, and obligations (including its investments, property and employee benefits and tax-related assets and liabilities) among DowDuPont, New Dow, and Corteva.

224.    Pursuant to the DowDuPont Separation and Distribution Agreement as well as a June 1, 2019 "Letter Agreement," DowDuPont agreed to indemnify both New Dow and Corteva against certain litigation, environmental, workers' compensation, and other liabilities that arose prior to the distribution.

225.    On or about June 1, 2019, DowDuPont changed its name to DuPont de Nemours, Inc. (i.e., New DuPont), which now holds the former conglomerate's specialty products business.

226.    The DowDuPont board of directors believed the completion of the post-Merger separations was—in DowDuPont's words—"the best available opportunity to unlock the value of DowDuPont's businesses." The practical effect of the post-Merger separations was to frustrate and hinder creditors of Historical DuPont and Chemours by moving valuable assets further away from Historical DuPont.

227.    As a result of these transactions, the assets Historical DuPont had held following the Chemours Spin-off, including the Dividend and/or the proceeds or products thereof, are now distributed across three companies:  DowDuPont, New Dow, and Corteva.

228.    Many details about these transactions are hidden from the public in confidential and/or non-public schedules and exhibits to the various agreements and this has hampered creditors' efforts to understand the final disposition of Historical DuPont's valuable assets and the adequacy of the consideration received in return.

229.    Pursuant to the DowDuPont Separation Agreement, DowDuPont and Corteva assumed direct financial liability of Historical DuPont, including liability that was *not* related to the agriculture, materials science, or specialty products businesses.  Corteva was allocated 29% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.  DowDuPont was allocated 71% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.

230.    Liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested have been allocated between Corteva and DowDuPont as set forth in the non-public confidential schedules to the DowDuPont Separation Agreement.  To the extent that liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested are not listed on the non-public confidential schedules to the DowDuPont Separation Agreement, each of DowDuPont and Corteva may be responsible for $200 million each in the aggregate, and once liability exceeds the aggregate cap, then excess liability will be allocated to the other.  In the event such liabilities exceed $200 million in the aggregate for each of DowDuPont and Corteva, liabilities are allocated 71% to DowDuPont and 29% to Corteva.

231.    The DowDuPont Separation Agreement allocates DowDuPont's assets between DowDuPont, New Dow, and Corteva. Similarly, the DowDuPont Separation Agreement allocates DowDuPont's liabilities, including the liabilities of Historical DuPont.

232.    While the non-public nature of the schedules to the DowDuPont Separation Agreement obscures the precise extent of the liabilities retained by New Dow and those transferred to Corteva, the DowDuPont Separation Agreement caused Corteva and DowDuPont to bear the brunt of liabilities for Historical DuPont, including Historical DuPont's legacy PFAS liabilities and the liabilities of its former performance chemicals business.

233.    As a result of the Merger, DowDuPont was not a good-faith transferee of the proceeds of the Dividend because DowDuPont had sufficient knowledge about the Chemours Spin-off to induce it to inquire further about that transaction.

234.    In each of the Dow Spin-off and the Corteva Spin-off, neither the newly created New Dow nor Corteva were good-faith transferees of the proceeds of the Dividend, because each of New Dow and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

235.    New Dow was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by New Dow in the Dow Spin-off because New Dow had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce New Dow to inquire further about those liabilities.

236.    Likewise, Corteva was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by Corteva in the Corteva Spin-off because Corteva had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce Corteva to inquire further about those liabilities.

237.    Prior to the Dow Spin-off, Old Dow's March 31, 2019 consolidated balance sheet reflected tangible assets of $49,153,000,000 and balance sheet liabilities of $51,591,000,000. Following the Dow Spin-off, New Dow's June 30, 2019 consolidated balance sheet reflected balance sheet tangible assets of $39,887,000,000 and balance sheet liabilities of $46,389,000,000. Thus, Old Dow's and New Dow's balance sheets' liabilities *exceeded* their balance sheet tangible assets, for Old Dow before the Dow Spin-off, and for New Dow after the Dow Spin-off.

238.    Before the Corteva Spin-off, Historical DuPont's March 31, 2019 balance sheet reflected tangible assets of $31,327,000,000 and liabilities of $32,002,000,000. After the Corteva Spin-off, (i) Corteva's June 30, 2019 consolidated balance sheet, which includes Historical DuPont, reflected tangible assets of $19,064,000,000 and liabilities of $17,855,000,000 and (ii) Historical DuPont's June 30, 2019 balance sheet reflected tangible assets of $19,071,000,000 and liabilities of $21,928,000,000. Thus, Historical DuPont's balance sheet liabilities *exceeded* its balance sheet tangible assets both before *and* after the Corteva Spin-off. Additionally, after the Corteva Spin Transaction, Historical DuPont's liabilities included a $4.16 billion intercompany loan to Corteva.

239.    Prior to the Dow Spin-off and the Corteva Spin-off, Historical DuPont's balance sheet reflected an aggregate total cash, cash equivalents, and marketable securities of $3,814,000,000. After the Dow Spin-off and the Corteva Spin-off, DowDuPont's balance sheet reflected an aggregate total cash, cash equivalents and marketable securities of $2,083,000,000.

240.    The Chemours Spin-off, the Dow Spin-off, and the Corteva Spin-off (collectively, the Spin Transactions), were a coordinated series of transactions through which Historical DuPont sought to spin-off (and separate) profitable and valuable assets, free and clear of billions of dollars of legacy environmental liabilities, including PFOA and PFAS liabilities.

241.    The Chemours Spin-off was part of a single integrated scheme that included the Dow Spin-off and the Corteva Spin-off.

242.    While the Spin Transactions as a whole are relevant to the fraudulent schemes alleged herein, each of the Spin Transactions constituted an actual or constructive fraudulent transfer of assets.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Public Nuisance
#### (All Defendants except New Dow)

243.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

244.    Defendants have manufactured, marketed, distributed, promoted, and/or sold the Eight PFAS and/or products containing Eight PFAS in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety, and welfare of the general public and the State of Maine, causing inconvenience and annoyance.

245.    Defendants, by their negligent, reckless, and willful acts and omissions set forth above, have, among other things, knowingly unleashed the long-lasting PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX contamination of State natural resources and property throughout Maine, having concealed the threat, thereby causing and threatening to cause contamination from the Eight PFAS of the State's natural resources and property. Defendants' PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX continues to spread in and contaminate more State natural resources and property throughout the State.

246.    Each Defendant has caused, contributed to, maintained, and/or participated in a public nuisance by substantially and unreasonably interfering with, obstructing, and/or

threatening Mainers' health, safety, peace, comfort, and convenience, including, among other things, (i) Mainers' common public rights to enjoy State natural resources and property free from unacceptable health risk, pollution, and contamination, and (ii) the State's *parens patriae* and public trust abilities and responsibilities to protect, conserve, and manage the State's natural resources.

247.    Each Defendant has, at times relevant to this Complaint, caused, contributed to, maintained, and/or participated in the creation of such public nuisance.  Among other things, each Defendant is a substantial contributor to such public nuisance as follows:

a.    Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX and/or products containing one or more of the Eight PFAS that were delivered into the State (and areas affecting the State's natural resources and property) when they knew, or reasonably should have known, that the Eight PFAS would escape from industrial processes and household, consumer, and commercial products and contaminate State natural resources and property;

b.    Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX and/or products containing one or more of the Eight PFAS that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the Eight PFAS would be released readily into the environment during the normal, intended, and foreseeable uses of the Eight PFAS and products containing the Eight PFAS; and when released, the Eight PFAS would persist in the environment and not break down, contaminate State

natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies, and, ultimately, be difficult and costly to remove;

      c.     Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX and/or products containing one or more of the Eight PFAS that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the Eight PFAS posed substantial risks to human health;

      d.     Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX and/or products containing one or more of the Eight PFAS that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the Eight PFAS and/or products containing one or more of the Eight PFAS were used in consumer and industrial products and promoted the use of the Eight PFAS and/or products containing one or more of the Eight PFAS in such consumer and industrial products. Defendants improperly marketed and promoted the Eight PFAS and/or products containing one or more of the Eight PFAS for uses and applications that would inevitably cause harmful environmental contamination, and provided warnings and instructions for use and disposal that were inadequate to protect against the risk to public health and the environment created by the ordinary use and disposal of such consumer and industrial products; and

      e.     Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce PFOS, PFOA, PFNA, PFHxS, PFHpA,

- 54 -

PFDA, PFBS, and/or GenX and/or products containing one or more of the Eight PFAS that were delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the Eight PFAS and/or products containing one or more of the Eight PFAS were toxic and would inevitably produce contamination and human health risks that have occurred. Yet Defendants misled the public, regulators, and their own customers about these key facts, instead promoting the Eight PFAS and products containing one or more of the Eight PFAS as safe, and that they were not environmentally hazardous and did not require special precautions in use or disposal.

248.    Defendants also had first-hand knowledge and experience regarding releases of PFAS to the environment, including groundwater and other natural resources, because each of them owned, operated, and/or controlled PFAS manufacturing facilities and/or facilities using PFAS where there were releases of PFAS into the surrounding environment that caused substantial contamination. For example, 3M owned, operated, and/or controlled a PFAS manufacturing facility in Cottage Grove, Minnesota, and disposed of PFAS at sites located in the City of Oakdale, Minnesota; Cottage Grove and Woodbury, Minnesota; and the Washington County Landfill in City of Lake Elmo, Minnesota. There was substantial PFAS contamination associated with these 3M facilities. DuPont owned, operated, and/or controlled a PFAS manufacturing facility in Parkersburg, West Virginia, and the Chambers Works site in New Jersey. There was substantial PFAS contamination associated with these DuPont facilities.

249.    Despite their knowledge that contamination of the State's natural resources and property with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX was the inevitable consequence of their conduct, Defendants failed to provide adequate warnings or special instructions, failed to take any other reasonable precautionary measures to prevent or

mitigate such contamination, and/or affirmatively misrepresented the hazards of the Eight PFAS in their product information and/or instructions for use.

250.    Defendants knew, or in the exercise of reasonable care should have known, that the introduction and use of PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of natural resources and property relied upon by the State and its citizens.

251.    Defendants have caused, contributed to, maintained, and/or participated in a public nuisance that has caused substantial injury to the State's natural resources and property, in which the public has interests represented by and protected by the State in its trustee and *parens patriae* capacities.  Defendants' conduct also threatens to cause substantial additional injury to the State's natural resources and property.  The public nuisance has caused and/or threatens to cause substantial injury to property directly owned by the State.

252.    The contamination of the State's natural resources and property with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX is ongoing, as these substances continue to threaten, migrate into, and enter the State's natural resources and property, and cause new contamination in new locations.

253.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX.  The State has incurred, is incurring, and will incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

254.    As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

255.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## SECOND CAUSE OF ACTION

### Private Nuisance
### (All Defendants except New Dow)

256.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

257.    The State's property and public trust resources have been contaminated by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX as a direct and proximate result of the intentional and unreasonable, negligent, and reckless conduct of Defendants, all as alleged in this Complaint.  These resources and property include beds and banks of surface water bodies, water wells, and resources held in trust by the State, including, for example, and without limitation, (i) Juniper Ridge Landfill; (ii) Dolby Landfill; (iii) Maine Correctional Center; and (iv) Charleston Correctional Facility (Charleston).

258.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, the State has suffered injuries from contamination of State-owned property and public trust resources.  Defendants' acts and omissions have substantially, intentionally, and unreasonably interfered with, obstructed, violated, and/or threatened, among other things, the State's interests in its property and public trust resources.  This harm far outweighs any utility or benefit derived from Defendants' conduct.

259.    As a direct and proximate result of Defendants' acts and omissions, the State's property and public trust resources were and are contaminated with one or more of the Eight PFAS.  The State has incurred, is incurring, and will incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring and/or other costs and expenses related to contamination of the State's property and public trust resources, for which Defendants are jointly and severally liable.

260.    As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

261.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's property and public trust resources that are indivisible.

### THIRD CAUSE OF ACTION

### Statutory Nuisance - 17 M.R.S. §§ 2701 & 2802
### (All Defendants except New Dow)

262.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

263.    Under 17 M.R.S. § 2701, "[a]ny person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages, unless otherwise specially provided."

264.    Under 17 M.R.S. § 2802, such nuisances specifically include the "corrupting or rendering unwholesome or impure the water of a river, stream, pond or aquifer."

265.    As set forth at length herein, Defendants have "corrupted" or "render[ed] unwholesome or impure" the water of aquifers, rivers, streams, and/or ponds throughout the State by engaging in the acts and omissions alleged in this Complaint.  For example, and as

shown above, PFAS are associated with significant harmful health effects in humans and animals, including at low concentrations.

266.    Defendants' corruption of rivers, streams, ponds, and/or aquifers caused unreasonable harm by contaminating such rivers, streams, ponds, and/or aquifers, including groundwater, drinking water supplies, public drinking water supply wells, private drinking water wells, and/or other natural resources and property of the State.

267.    As a result of Defendants' actions, the Eight PFAS has profoundly and unreasonably affected rivers, streams, ponds, aquifers and/or groundwater in the State, compromising its use for household purposes, including drinking, cooking, and bathing, and risking public health via exposure to the Eight PFAS.  And as a result of Defendants' actions, the Eight PFAS contamination poses an extraordinary and unjust financial burden on the State and its citizens, who bear the costs of testing, monitoring, and remediation although Defendants profited from the manufacturing, marketing, distribution, and/or sale of the Eight PFAS and/or products containing the Eight PFAS.

268.    As a direct and proximate result of Defendants' acts and omissions, rivers, streams, ponds, and/or aquifers in the State were and are contaminated with the Eight PFAS. The State has incurred, is incurring, and will incur investigation, remediation, cleanup, restoration, removal, treatment, and monitoring costs and expenses related to contamination of rivers, streams, ponds, and/or aquifers in the State, including drinking water, for which Defendants are strictly, jointly, and severally liable.

269.    As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, for which Defendants are strictly, jointly, and severally liable.

- 59 -

270.    Defendants' acts and omissions have caused and/or threatened to cause injuries to rivers, streams, ponds, and/or aquifers in the State that are indivisible.

271.    Maine statutory law also authorizes the State to seek equitable relief, in addition to damages, for the unreasonable harm caused by PFAS contamination, including an order that the nuisance be abated or removed at the expense of Defendants.  17 M.R.S. §§ 2702, 2706.

## FOURTH CAUSE OF ACTION

### Common-Law Trespass
### (All Defendants except New Dow)

272.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

273.    The State has significant property interests in the natural resources of the State. These property rights and interests include, but are not limited to, the State's public trust and *parens patriae* interests and authority in protecting such natural resources from contamination and injury.

274.    A trustee by definition is authorized to take action to protect trust property as if the trustee were the owner of the property.

275.    The State also brings this action in its *parens patriae* capacity on behalf of its citizens to protect quasi-sovereign interests, including the integrity of the State's natural resources.  The State in its *parens patriae* capacity seeks relief for the invasion of its citizens' possessory interests by PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX.

276.    The State never authorized Defendants' invasion of its natural resources and property with any of the Eight PFAS.

277.    The State owns in fee certain property within the State, including lands and some water wells.

278.    Defendants knew, or in the exercise of reasonable care should have known, that the Eight PFAS are hazardous to natural resources and property, including groundwater, surface water, and public water systems, and including the property and interests of the State.

279.    Defendants' acts and omissions directly and proximately caused and continue to cause the Eight PFAS to intrude onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property.

280.    At the time of Defendants' acts and omissions, Defendants knew with substantial certainty that one or more of the Eight PFAS would reach onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property.  Defendants knew and understood, or should have known and understood, the properties of the Eight PFAS, including through their knowledge and experience regarding contamination from the Eight PFAS at their own facilities where they manufactured and/or used the Eight PFAS and other conduct alleged in this Complaint.  Despite this knowledge, Defendants manufactured, marketed, distributed, promoted, and/or sold the Eight PFAS and/or products containing the Eight PFAS with a profit motive in a way that has harmed the State.

281.    As a direct and proximate result of the Defendants' acts and omissions, the State has been damaged and is entitled to compensatory damages for the costs of investigation, remediation, and treatment, damages for loss of use and enjoyment of State natural resources and property, cost of restoring State natural resources and property to their original conditions as if the trespass had not occurred, and/or other relief the State may elect at trial.

282.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA,

PFDA, PFBS, and/or GenX. The State has incurred, is incurring, and will incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

283.    As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

284.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## FIFTH CAUSE OF ACTION

### Strict Liability for Design Defect and/or Defective Product – 14 M.R.S. § 221 (All Defendants except New Dow)

285.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

286.    Defendants during the relevant time period were designers, manufacturers, marketers, distributors, and/or sellers of the Eight PFAS and/or products containing the Eight PFAS.

287.    As designers, manufacturers, marketers, distributors, and/or sellers of the Eight PFAS and/or products containing the Eight PFAS, Defendants owed a duty to all persons whom Defendants' Eight PFAS and/or products containing the Eight PFAS might foreseeably harm, including the State and its citizens, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

288.    Defendants represented, asserted, claimed, and/or warranted that the Eight PFAS and/or products containing the Eight PFAS were safe for their intended and foreseeable uses.

289.    When Defendants placed the Eight PFAS and/or products containing the Eight PFAS into the stream of commerce and delivered them into the State (and areas affecting the State's natural resources and property) they were defective, unreasonably dangerous, and not reasonably suited for their intended, foreseeable, and ordinary storage, handling, and uses, including for the following reasons:

a.    Unintended releases of the Eight PFAS are commonplace;

b.    The Eight PFAS are released to the environment through the normal and foreseen use of the Eight PFAS and/or products containing the Eight PFAS;

c.    When the Eight PFAS are released into the environment, the Eight PFAS have a tendency to mix with groundwater and migrate great distances;

d.    When the Eight PFAS are released into the environment, the Eight PFAS persist over long periods of time because the Eight PFAS are recalcitrant to biodegradation and bioremediation;

e.    The Eight PFAS bioaccumulate in humans and wildlife;

f.    Very low concentrations of the Eight PFAS can make water unpotable;

g.    The Eight PFAS pose risks to human health;

h.    Defendants, with knowledge of the risks, failed to use reasonable care in the design of the Eight PFAS and/or products containing the Eight PFAS;

i.    The Eight PFAS and/or products containing the Eight PFAS pose greater dangers to State natural resources and property than would be expected by ordinary persons such as the State, users, and the general public exercising reasonable care;

j.    The risks which the Eight PFAS and/or products containing the Eight PFAS pose to State natural resources and property outweigh their utility in making products stain and grease resistant, among other supposed benefits; and

k.      Safer alternatives to the Eight PFAS and/or products containing the Eight PFAS have existed and been available to Defendants at all times relevant to this Complaint.

290.    The above-described defects exceeded the knowledge of ordinary persons such as the State, users, and the general public exercising reasonable care.

291.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX and/or products containing one or more of the Eight PFAS were distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

292.    PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX and/or products containing one or more of the Eight PFAS reached consumers and the environment in a condition substantially unchanged from that in which they left Defendants' control.

293.    The Eight PFAS and/or products containing the Eight PFAS failed to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

294.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX.  The State has incurred, is incurring, and will incur investigation, remediation, cleanup, restoration, removal, treatment, and monitoring, and other costs and expenses related to such contamination of State natural resources and property, for which Defendants are strictly, jointly, and severally liable.

295.    As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable under 14 M.R.S. § 221.

296.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## SIXTH CAUSE OF ACTION

### Strict Liability for Failure to Warn - 14 M.R.S. § 221
### (All Defendants except New Dow)

297.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

298.    Strict liability attaches to manufacturers when, by the failure to provide adequate warnings about its hazards, a product is sold in an unreasonably dangerous condition.

299.    As manufacturers, marketers, distributors, promoters, and/or sellers of the Eight PFAS, and/or products containing the Eight PFAS, Defendants had a duty to issue warnings to the State, the public, public officials, consumers, and users of the risks posed by the Eight PFAS and/or products containing the Eight PFAS.

300.    Defendants knew that the Eight PFAS and/or products containing the Eight PFAS would be purchased, transported, stored, handled, used, and disposed of, including within Maine, without notice of the hazards which the Eight PFAS and/or products containing the Eight PFAS pose to State natural resources and property.

301.    Defendants' failure to warn of these hazards made the Eight PFAS unreasonably dangerous.

302.    At all times relevant to this Complaint, Defendants have had actual and/or constructive knowledge of facts, including the following, which rendered the Eight PFAS and/or products containing the Eight PFAS hazardous to State natural resources and property:

a.    Unintended releases of the Eight PFAS are commonplace;

b.  The Eight PFAS are released to the environment through the normal and foreseen use of the Eight PFAS and/or products containing the Eight PFAS;

c.  When the Eight PFAS are released into the environment, the Eight PFAS have a tendency to mix with groundwater and migrate great distances;

d.  When the Eight PFAS are released into the environment, the Eight PFAS persist over long periods of time because the Eight PFAS are recalcitrant to biodegradation and bioremediation;

e.  The Eight PFAS bioaccumulate in humans and wildlife;

f.  Very low concentrations of the Eight PFAS can make water unpotable;

g.  The Eight PFAS pose risks to human health; and

h.  The Eight PFAS are associated with certain cancers in humans.

303.  The foregoing facts relating to the hazards that the Eight PFAS and/or products containing the Eight PFAS pose to State natural resources and property are not the sort of facts that, at the relevant times, the State, users, consumers, or the general public could ordinarily discover or protect themselves against, absent sufficient warnings.

304.  Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged here to the State, public officials, users, consumers, and/or the general public.

305.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to the State. The State and others would have heeded legally adequate warnings, and the Eight PFAS and/or products containing the Eight PFAS would not have gained approval in the marketplace for use in household, consumer, and other products, and/or the Eight PFAS and/or products containing the Eight PFAS would have been treated differently in terms of procedures for handling, storage, use, disposal, emergency response, and/or environmental clean-up.

- 66 -

306.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX.  The State has incurred, is incurring, and will incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are strictly, jointly, and severally liable.

307.    As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable under 14 M.R.S. § 221.

308.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## SEVENTH CAUSE OF ACTION

### Negligence
### (All Defendants except New Dow)

309.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

310.    As manufacturers, marketers, distributors, promoters, and/or sellers of the Eight PFAS and/or products containing the Eight PFAS, Defendants owed a duty to the State as well as to all persons whom Defendants' Eight PFAS and/or products containing the Eight PFAS might foreseeably harm to exercise due care in the design, manufacturing, promotion, marketing, sale, distribution, testing, labeling, use, warning, and instructing for use of the Eight PFAS and/or products containing the Eight PFAS.

311.    Defendants had a duty and the financial and technical means to test the Eight PFAS and products containing the Eight PFAS and to warn public officials, consumers, users, and the general public of the hazardous characteristics of PFAS.

312.    Defendants had a duty to not contaminate the environment.

313.    Defendants had a duty to not contaminate State natural resources and State-owned property.

314.    Defendants represented and claimed that the Eight PFAS and products containing the Eight PFAS did not require any different or special handling or precautions. Any warnings Defendants did provide were generic and did not suffice to warn reasonable users of the dangers to the environment posed by these chemicals.

315.    At times relevant to this Complaint, Defendants knew or should have known of the following environmental and health risks, among others:

a.    Unintended releases of the Eight PFAS are commonplace;

b.    The Eight PFAS are released to the environment through the normal and foreseen use of the Eight PFAS and/or products containing the Eight PFAS;

c.    When the Eight PFAS are released into the environment, the Eight PFAS have a tendency to mix with groundwater and migrate great distances;

d.    When the Eight PFAS are released into the environment, the Eight PFAS persist over long periods of time because the Eight PFAS are recalcitrant to biodegradation and bioremediation;

e.    The Eight PFAS bioaccumulate in humans and wildlife;

f.    Very low concentrations of the Eight PFAS can make water unpotable;

g.    The Eight PFAS pose risks to human health; and

h.    The Eight PFAS are associated with certain cancers in humans.

316.    The foregoing facts relating to the hazards which the Eight PFAS and/or products containing the Eight PFAS pose to State natural resources and property, are not the sort of facts that the State, users, consumers, and the general public could ordinarily discover or protect themselves against, absent sufficient warnings.

317.    The Eight PFAS and/or products containing the Eight PFAS manufactured, marketed, distributed, promoted, and/or sold by Defendants were used in a normal and foreseeable manner.

318.    Defendants have negligently breached their duties of due care to the State, consumers, users, and the general public by, among other things:

a.    Promoting and defending the Eight PFAS and/or products containing the Eight PFAS while concealing the threat the Eight PFAS and/or products containing the Eight PFAS pose to natural resources and property;

b.    Marketing, touting, and otherwise promoting the benefits of the Eight PFAS and/or products containing the Eight PFAS without disclosing the truth about the environmental and potential health hazards posed by the Eight PFAS and/or products containing the Eight PFAS;

c.    Failing to eliminate or minimize the harmful impacts and risks posed by the Eight PFAS and/or products containing the Eight PFAS;

d.    Failing to curtail or reduce the distribution of the Eight PFAS and/or products containing the Eight PFAS;

e.    Failing to instruct the State, consumers, users, and the general public about the safe handling and use of the Eight PFAS and/or products containing the Eight PFAS; and/or

f.    Failing to warn and instruct the State, consumers, users, and the general public about the risks to natural resources posed by the Eight PFAS and/or products containing the

Eight PFAS about the necessary precautions and steps to prevent or minimize releases of the Eight PFAS in distribution, storage, use and disposal, and about how to remediate such releases promptly.

319.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with PFOS, PFOA, PFNA, PFHxS, PFHpA, PFDA, PFBS, and/or GenX.  The State has incurred, is incurring, and will incur investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

320.    As a further direct and proximate result of the acts and omissions of the Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

321.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## EIGHTH CAUSE OF ACTION

**Actual Fraudulent Transfer Related to the
Chemours Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§
1304(a)(1) & 1307 and/or such other applicable state law
(Against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and
Corteva)**

322.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

323.    The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law, against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva.

324.    As a result of the transfer of assets and liabilities related to the Chemours Spin-off described in this Complaint, Historical DuPont limited the availability of assets to cover judgments for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

325.    Historical DuPont has acted with actual intent to hinder, delay, and defraud creditors of Historical DuPont, and what would become Chemours, by (i) transferring the Dividend to Historical DuPont, and (ii) causing the incurrence of obligations in connection with the Chemours Spin-off.

326.    Historical DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of creditors, such as Maine, that have been damaged as a result of Historical DuPont's actions described in this Complaint.

327.    Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS and PFAS-containing products despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

328.    At the time of the Chemours Spin-off, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products, including those damages and injuries caused by the business line that Chemours would come to own.

329.    The State was a creditor of Historical DuPont and the business line that Chemours would come to own at the time of the Chemours Spin-off.

330.    A number of the statutorily enumerated badges of fraud are present with respect

- 71 -

to the Chemours Spin-off and evidence Defendants' fraudulent intent. *See* 14 M.R.S. § 3575(2); 6 Del. C. § 1304(b).

331.    The transfer of the Dividend to Historical DuPont was a transfer to an insider of Chemours, and the incurrence of obligations by Chemours to Historical DuPont, was to an insider of Chemours, Historical DuPont. *See* 14 M.R.S. § 3575(2)(A); 6 Del. C. § 1304(b)(1). That obligation was the assumption of the Chemours Liabilities which include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours Separation Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours Separation Agreement. The transfer of these obligations to Chemours from Historical DuPont occurred at a time that Historical DuPont owned sufficient shares of Chemours, and through (i) the DuPont Board's members, (ii) Historical DuPont employees (i.e., Nigel Pond and the other DuPont Employee Board Members), and (iii) Historical DuPont agents (i.e., Historical DuPont's outside counsel), Historical DuPont controlled Chemours. Historical DuPont was an insider of Chemours when the Chemours Spin-off was approved and consummated. *See* 14 M.R.S. §§ 3572(1), (7); 6 Del. C. §§ 1302(a), (b).

332.    The Chemours Spin-off concealed the liabilities actually assumed by Chemours. *See* 14 M.R.S. § 3575(2)(C); 6 Del. C. § 1304(b)(3). The true scope of the obligations that were to be assumed by Chemours in the Chemours Spin-off was kept from Chemours management designees (and later when they were actually functioning in those roles). Additionally, the schedules to the Chemours Separation Agreement that correspond with the subsections of the definition of "Chemours Assumed Environmental Liabilities" were not publicly filed and the Info Statement dramatically understated the amount of those liabilities.

333.    The Chemours Spin-off occurred at a time when Historical DuPont and/or the business line that Chemours would come to own had been sued or threatened with suit related to

environmental liabilities. *See* 14 M.R.S. § 3575(2)(D); 6 Del. C. § 1304(b)(4). The business line that Chemours would come to own and Historical DuPont were subject to a substantial amount of litigation at the time that the Chemours Spin-off was approved and when it occurred, including numerous environmental suits and remediation actions.

334.    The consideration received by Chemours in respect of the Chemours Spin-off for the transfer of the Dividend to Historical DuPont, and for the incurrence of obligations by Chemours to Historical DuPont in respect of the Chemours Spin-off, was not for reasonably equivalent value. *See* 14 M.R.S. § 3575(2)(H); 6 Del. C. § 1304(b)(8). The Chemours Spin-off was predicated upon Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for liabilities, which were valued based on accounting principles and have proven in several instances to be drastically below the actual liability amounts.

335.    Chemours was insolvent or became insolvent shortly after the Chemours Spin-off. *See* 14 M.R.S. § 3575(2)(I); 6 Del. C. § 1304(b)(9). The Maine Uniform Fraudulent Transfer Act (UFTA) recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation, or when a debtor is generally not paying debts as they become due. *See* 14 M.R.S. §§ 3573(1), (2); *see also* 6 Del. C. §§ 1302(a), (b). Chemours was balance-sheet insolvent at the time of the Chemours Spin-off. Additionally, the trading prices for Chemours's debt reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off. Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.

336.    Lastly, the existence of Houlihan's solvency opinion does not support Chemours's solvency. Houlihan used Historical DuPont's contingent liability figures that Historical DuPont engineered to massively understate the real potential maximum exposure in preparing Houlihan's solvency opinion.

337.    Finally, the Chemours Spin-off occurred shortly before or shortly after a substantial debt was incurred. *See* 14 M.R.S. § 3575(2)(J); 6 Del. C. § 1304(b)(10).  The Chemours Spin-off occurred after the indebtedness under the Credit Agreement and indentures was incurred.  As part of the Chemours Spin-off, Chemours incurred significant obligations, namely the assumption of the Chemours Liabilities which include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours Separation Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours Separation Agreement. Additionally, Chemours paid the Dividend to Historical DuPont.

338.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-off, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

339.    DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

340.    The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may

be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

### NINTH CAUSE OF ACTION

**Constructive Fraudulent Transfer Related to the Chemours Spin-off, Pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a) & 1307 and/or such other applicable state law (Against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva)**

341.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

342.    The State seeks relief pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a)(1) & 1307 and/or such other applicable state law, against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva.

343.    The State was a creditor of Historical DuPont and Chemours at the time of the Chemours Spin-off.

344.    Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of Chemours Spin-off related obligations, including the transfer of the Dividend.

345.    Chemours was insolvent as a result of the Chemours Spin-off.  Chemours was balance-sheet insolvent at the time of the Chemours Spin-off.  Additionally, the debt trading prices of the Notes reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off.  Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.  Lastly, the existence of Houlihan's solvency opinion does not support Chemours's solvency.

346.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other

provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-off, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

347.    DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to DowDuPont, New Dow, and Corteva because each of Historical DuPont, DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

348.    The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## TENTH CAUSE OF ACTION

### Constructive Fraudulent Transfer Related to the Chemours Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law (Against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva)

349.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

350.    The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law, against Historical DuPont, The

Chemours Company, DowDuPont, New Dow, and Corteva.

351.    Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain Chemours Spin-off-related obligations, including the transfer of the Dividend.  Historical DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Historical DuPont believed or reasonably should have believed that it would incur debts beyond Chemours's ability to pay as they became due.

352.    At the time of the Chemours Spin-off, Chemours (i) was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to Chemours' business, and/or (ii) intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

353.    At the time of the Chemours Spin-off, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products, including those damages and injuries caused by the business line that Chemours would come to own.

354.    At the time of the Chemours Spin-off, and at all times relevant to this Complaint, Chemours has been insolvent.

355.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-off, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont,

DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

356.     DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to DowDuPont, New Dow, and Corteva because each of Historical DuPont, DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

357.     The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## ELEVENTH CAUSE OF ACTION

### Actual Fraudulent Transfer Related to the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law (Against Historical DuPont, DowDuPont, New Dow, and Corteva)

358.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

359.     The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law against Historical DuPont, DowDuPont, New Dow, and Corteva.

360.     The State is and was a creditor of Historical DuPont and DowDuPont at all relevant times.

361.    Through its participation in the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off, Historical DuPont and DowDuPont transferred valuable assets and business to DowDuPont, New Dow and Corteva (the Separation Transfers).

362.    The Separation Transfers were made for the benefit of DowDuPont, New Dow, and Corteva.

363.    At the time that the Separation Transfers were made, DowDuPont was in a position to control, and did control, DowDuPont, New Dow, and Corteva.

364.    DowDuPont, Historical DuPont, New Dow, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors of Historical DuPont and DowDuPont.

365.    The State has been harmed as a result of the Separation Transfers.

366.    DowDuPont, Historical DuPont, New Dow, and Corteva engaged in acts in furtherance of a scheme to transfer assets out of the reach of creditors, such as Maine, that have been harmed as a result of Historical DuPont's and DowDuPont's actions described in this Complaint.

367.    As a result of the transfer of assets and liabilities related to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off described in this Complaint, DowDuPont, New Dow, and Corteva sought to limit the availability of assets to cover judgements for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

368.    Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS and PFAS-containing products despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

369.    At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, Historical DuPont and/or DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding liability of Historical DuPont and DowDuPont, for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

370.    The State was a creditor of Historical DuPont and DowDuPont at the time of the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off.

371.    Historical DuPont and/or DowDuPont acted without receiving reasonably equivalent value in exchange for the transfers and/or obligations comprising the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off.  Historical DuPont and/or DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

372.    At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, and at all times relevant to this Complaint, Historical DuPont and DowDuPont had been insolvent because each of their debts were greater than the fair saleable value of each of their assets.

373.    A number of the statutorily enumerated badges of fraud are present with respect to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off,

and the Corteva Spin-off, and evidence Defendants' fraudulent intent. *See* 14 M.R.S. §3575(2); 6 Del. C. § 1304(b).

374.    In connection with the DowDuPont Separation, DowDuPont divided up its assets and obligations among entities it controlled, namely DowDuPont and Corteva. *See* 14 M.R.S. § 3575(2)(A); 6 Del. C. § 1304(b)(1).  Certain obligations were assumed by DowDuPont and Corteva, but not New Dow, including Historical DuPont's liabilities, as well as the indemnification obligations under Article VIII of the DowDuPont Separation Agreement.  The transfer of these obligations from Historical DuPont to DowDuPont, then from DowDuPont to DowDuPont, New Dow, and Corteva, occurred at a time that DowDuPont controlled DowDuPont, New Dow, and Corteva through DowDuPont's Board's members, DowDuPont employees, and DowDuPont agents.  DowDuPont was an insider of DowDuPont, New Dow, and Corteva, when the DowDuPont Separation was approved and consummated. *See* 14 M.R.S. §§ 3572(1), (7); 6 Del. C. §§ 1301(1)(b), (e).

375.    The DowDuPont Separation concealed the liabilities actually assumed by DowDuPont and Corteva. *See* 14 M.R.S. § 3575(2)(C); 6 Del. C. § 1304(b)(3).  The true scope of the obligations that were to be assumed by DowDuPont, New Dow, and Corteva in the DowDuPont Separation Agreement were concealed.  Additionally, the schedules to the DowDuPont Separation Agreement were not publicly filed.

376.    The DowDuPont Separation occurred at a time when Historical DuPont and DowDuPont had been sued or threatened with suit related to environmental liabilities. *See* 14 M.R.S. § 3575(2)(D); 6 Del. C. § 1304(b)(4).  Historical DuPont and DowDuPont were subject to a substantial amount of litigation at the time that the DowDuPont Separation was approved and when it occurred, including numerous environmental suits and remediation actions.

377.    The consideration received by DowDuPont, New Dow, and Corteva in respect of the DowDuPont Separation was not reasonably equivalent to the value of the obligation incurred by DowDuPont, New Dow, and Corteva in the DowDuPont Separation.  *See* 14 M.R.S. § 3575(2)(H); 6 Del. C. § 1304(b)(8).

378.    DowDuPont was insolvent or became insolvent shortly after the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off.  *See* 14 M.R.S. § 3575(2)(I); *see also* 6 Del. C. § 1304(b)(9).  The Maine UFTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.  *See* 14 M.R.S. §§ 3573(1), (2); *see also* 6 Del. C. §§ 1302(a), (b).  DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation and the Corteva Spin-off.

379.    Finally, the DowDuPont Separation and the Corteva Spin-off occurred shortly before or shortly after a substantial debt was incurred.  *See* 14 M.R.S. § 3575(2)(J); 6 Del. C. § 1304(b)(10).  The DowDuPont Separation and the Corteva Spin-off occurred either shortly before or shortly after DowDuPont's incurrence of $4 billion in indebtedness to Corteva.  As part of the DowDuPont Separation and the Corteva Spin-off, DowDuPont incurred significant obligations, namely the assumption of the liabilities and indemnification obligations, each under the DowDuPont Separation Agreement.

380.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Corteva and New Dow and the incurrence of obligations to Corteva pursuant to the Corteva Spin-off and the Dow Spin-off, respectively, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold

Historical DuPont, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

381.    DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and asset transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

382.    The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## TWELFTH CAUSE OF ACTION

**Constructive Fraudulent Transfer Related to the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, Pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a) & 1307 and/or such other applicable state law (Against Historical DuPont, DowDuPont, New Dow, and Corteva)**

383.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

384.    The State seeks relief pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a) & 1307 and/or such other applicable state law against Historical DuPont, DowDuPont, New Dow, and Corteva.

385.    The State was a creditor of Historical DuPont and DowDuPont at the time of the DowDuPont Separation.

386.    DowDuPont, New Dow, and Corteva did not receive reasonably equivalent value in return for the assumption and/or incurrence of DowDuPont Separation related obligations.

387.    DowDuPont was insolvent as a result of the DowDuPont Separation. DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation.

388.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont, New Dow, and Corteva and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

389.    DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and asset transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to DowDuPont, New Dow, and Corteva because DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

390.    The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may

be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## THIRTEENTH CAUSE OF ACTION

### Constructive Fraudulent Transfer Related to the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law (Against Historical DuPont, DowDuPont, New Dow, and Corteva)

391.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

392.    The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law against Historical DuPont, DowDuPont, New Dow, and Corteva.

393.    Historical DuPont and DowDuPont did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain DowDuPont Separation related obligations.  DowDuPont acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

394.    At the time of the DowDuPont Separation, DowDuPont was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to the business or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

395.    At the time of the DowDuPont Separation, DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's and DowDuPont's liability for damages and injuries from Historical DuPont's

- 85 -

manufacturing, marketing, distribution, sale, and promotion of PFAS and PFAS-containing products.

396.    At the time of the DowDuPont Separation, and at all times relevant to this Complaint, DowDuPont has been insolvent because its debts were greater than the fair saleable value of its assets.

397.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

398.    DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

399.    The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## PUNITIVE DAMAGES

## <u>(All Defendants)</u>

400.    Defendants' conduct in manufacturing, marketing, distributing, promoting, and/or selling PFAS and/or products containing PFAS was undertaken with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Maine.  Defendants' conduct was outrageously reprehensible and malicious.  Defendants acted and/or failed to act with conscious and deliberate disregard for a known, substantial, and intolerable risk of harm, with the knowledge that their acts or omissions were substantially certain to result in the threatened harm, and/or as a matter of free and intentional business choices.  Therefore, the State requests an award of punitive damages to the maximum extent permitted by law in an amount reasonable, appropriate, and sufficient to punish Defendants and deter them from committing the same or similar tortious acts in the future.

## XI.    PRAYER FOR RELIEF

The State of Maine seeks judgment against all Defendants for:

A.    Compensatory damages arising from PFAS contamination and injury to State natural resources and property, including groundwater, surface waters, drinking water supplies, biota, wildlife, including fish, and their associated soils, sediments, and uses, and other State natural resources and property, according to proof, including, but not limited to:

      (i)      natural resource damages;

      (ii)      loss-of-use damages;

      (iii)      costs of investigation;

      (iv)      costs of testing and monitoring;

      (v)      costs of providing water from an alternate source;

(vi)     costs of installing and maintaining wellhead treatment;

(vii)    costs of installing and maintaining a wellhead protection program;

(viii)   costs of installing and maintaining an early warning system to detect PFAS before it reaches wells;

(ix)     costs of remediating PFAS from natural resources, including groundwater, surface waters, soils, sediments, and other natural resources;

(x)      costs of remediating PFAS contamination at release sites;

(xi)     any other costs or other expenditures incurred to address PFAS contamination and injury; and

(xii)    interest on the damages according to law;

B.      An order compelling Defendants to abate the PFAS public nuisance, including by establishing an abatement fund to investigate, remove, treat, remediate, clean up and otherwise mitigate PFAS contamination in Maine;

C.      An order compelling Defendants to abate PFAS contamination by removing PFAS from State natural resources and property and/or by paying the State's costs to abate PFAS contamination in Maine;

D.      An order voiding the fraudulent transfers of assets among Defendants The Chemours Company, Corteva, Inc., Historical DuPont, New DuPont, and New Dow and recovering the property or value fraudulently transferred among these Defendants to put the State in the position in which it would have been had these fraudulent transfers not occurred;

E.      An order enjoining New DuPont, Corteva, and New Dow from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to

- 88 -

Historical DuPont and/or impose a constructive trust over any proceeds from the sale of Historical DuPont assets for the benefit of the State;

      F.      Punitive damages;

      G.      Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

      H.      Prejudgment interest;

      I.      An order compelling Defendants to pay for all other damages sustained by the State in its public trustee, *parens patriae*, and other capacities as a direct and proximate result of Defendants' acts and omissions alleged herein; and

      J.      Any other and further relief as the Court deems just, proper, and equitable.

## XII.    JURY TRIAL DEMANDED

The State demands a trial by jury on all claims so triable.

**Dated:**    March 29, 2023

STATE OF MAINE

AARON M. FREY
ATTORNEY GENERAL

Scott Boak
Katherine Tierney
Assistant Attorneys General
6 State House Station
Augusta, Maine 04333
(207) 626-8566
(207) 626-8897
Email: Scott.Boak@maine.gov
      Katherine.Tierney@maine.gov

Matthew F. Pawa*
Benjamin A. Krass*
Wesley Kelman*
SEEGER WEISS LLP
1280 Centre Street, Suite 230
Newton Centre, MA  02459

(617) 641-9550
Email: MPawa@seegerweiss.com
       BKrass@seegerweiss.com
       WKelman@seegerweiss.com

David Buchanan*
Steven Daroci*
Nigel Halliday*
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100
Email: DBuchanan@seegerweiss.com
       SDaroci@seegerweiss.com
       NHalliday@seegerweiss.com

Kyle J. McGee*
Viola Vetter*
Jason H. Wilson*
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
Email: kmcgee@gelaw.com
       vveter@gelaw.com
       jwilson@gelaw.com

Gordon Z. Novod*
GRANT & EISENHOFER P.A.
485 Lexington Ave., 29th Floor
New York, NY 10017
(646) 722-8523
Email: gnovod@gelaw.com

*Pro hac vice forthcoming