# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| STATE OF MAINE, | MDL No. 2873 |
| Plaintiff, | **Master Docket No: 2:18-mn-2873-RMG** |
| v. | **JUDGE RICHARD GERGEL** |
| 3M COMPANY;<br>BUCKEYE FIRE EQUIPMENT COMPANY;<br>CARRIER FIRE & SECURITY AMERICAS LLC (*formerly known as* CARRIER FIRE & SECURITY AMERICAS CORPORATION);<br>CARRIER GLOBAL CORPORATION;<br>CHEMGUARD, INC.;<br>CORTEVA, INC.;<br>DOW INC.;<br>DUPONT DE NEMOURS, INC.;<br>EIDP, INC. (*formerly known as* E. I. DU PONT DE NEMOURS AND COMPANY);<br>FIRE SERVICE PLUS, INC.;<br>KIDDE-FENWAL, INC.;<br>NATIONAL FOAM, INC.;<br>PERIMETER SOLUTIONS LP;<br>RTX CORPORATION;<br>THE CHEMOURS COMPANY;<br>THE CHEMOURS COMPANY FC, LLC;<br>TYCO FIRE PRODUCTS L.P.; | **Civil Action No. 2:23-cv-02573-RMG**<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, the State of Maine, as trustee of State natural resources, as owner of State property, and in its *parens patriae* capacity on behalf of its citizens, makes the following allegations against Defendants.

## I.    SUMMARY OF THE CASE

1.    The State of Maine, by and through Attorney General Aaron M. Frey, brings this

action to recover damages and require payments into an abatement fund to address Defendants' contamination of State natural resources with per- and polyfluoroalkyl substances (PFAS) related to the use of aqueous film-forming foam (AFFF), a firefighting foam containing PFAS compounds.

2.      Defendants are the manufacturers of PFAS-containing AFFF, and/or the manufacturers of PFAS, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFDA (collectively, the Six PFAS) for use in AFFF.[1]  The contamination caused by these chemicals in Maine has recently come to light through the State's investigation.

3.      PFAS do not exist naturally in the environment.  They are synthetic chemicals made by the defendant corporations and are toxic at extremely low levels.

4.      AFFF is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

5.      AFFF was developed in the 1960s to be used for flammable liquid fire extinguishment, including flammable vapor suppression.  Training with AFFF is a critical part of proper AFFF use.  AFFF concentrate contains PFAS, including PFOA and PFOS, that Defendants have used to meet performance standards for fire extinguishing agents.

6.      As Defendants have known for many years, PFAS chemicals escape into the natural environment and accumulate in the human body, where they remain for years.  PFAS are so resistant to biodegradation that they are known as the "forever chemicals."

7.      PFAS cause a wide array of harmful health effects, including kidney and

---

[1] The full chemical names are: perfluorooctanesulfonic acid (PFOS), perfluorooctanoic acid (PFOA), perfluorononanoic acid (PFNA), perfluorohexanesulfonic acid (PFHxS), perfluoroheptanoic acid (PFHpA), and perfluorodecanoic acid (PFDA).  As used in this Complaint, the terms PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFDA include those chemicals themselves (including all of their salts, ionic states, and acid forms of the molecules) as well as the "precursor" chemicals that break down into these six pollutants.

testicular cancer.  PFAS also harm fetal development, including damage to the fetal liver, immune system, and thyroid function.

8.      In June 2021, Maine set an interim drinking water standard of 20 parts per trillion (ppt) for the sum of six PFAS (PFOA, PFOS, PFHxS, PFNA, PFHpA, and PFDA).  One year later, in June 2022, the United States Environmental Protection Agency (EPA) issued health advisory levels of 0.004 ppt for PFOA (*i.e.*, 4 parts per *quadrillion*) and 0.02 ppt for PFOS (*i.e.*, 20 parts per *quadrillion*).  In March 2023, EPA proposed drinking water standards of 4 ppt for PFOA and 4 ppt for PFOS.  One ppt is analogous to one drop of ink in 20 Olympic-sized swimming pools.

9.      Defendants are major chemical companies that manufactured PFAS-containing AFFF and/or PFAS, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.

10.     Defendant 3M Company (3M) manufactured PFOA from approximately the 1940s until 2002 and was the exclusive manufacturer of PFOS, which it produced from the 1940s until 2002 when it complied with an EPA request to stop production of PFOA and PFOS due to their toxicity, propensity to contaminate the environment, and accumulation in human beings.  For decades, 3M manufactured, marketed, and sold AFFF that contained PFAS compounds throughout the United States, including into Maine.

11.     When 3M phased out production of PFOA, Defendant EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company (Historical DuPont) began manufacturing its own PFAS chemicals, despite knowing about the health and environmental risks of PFAS from its use of PFAS for consumer products starting in 1951.  DuPont marketed and sold PFAS to be used in AFFF throughout the United States, including in Maine.  In 2015, DuPont transferred its performance chemicals business and some associated liabilities to Defendant The Chemours Company (Chemours).  Defendants Chemours, Corteva, Inc. (Corteva) and DuPont de Nemours,

Inc. (New DuPont) are other DuPont affiliates that manufactured PFAS chemicals and/or have succeeded to Historical DuPont's PFAS liabilities. Historical DuPont, Chemours, Corteva, and New DuPont are collectively referred to in this Complaint as "DuPont."

      12.     In addition to 3M and DuPont, Defendants Chemguard Inc. (Chemguard), Tyco Fire Products L.P. (Tyco), National Foam, Inc. (National Foam), Buckeye Fire Equipment Company (Buckeye), Kidde-Fenwal, Inc. (Kidde), Perimeter Solutions LP (Perimeter Solutions), Fire Service Plus, Inc. (Fire Service Plus), Carrier Fire & Security Americas LLC (Carrier Fire), Carrier Global Corporation (Carrier Global), and RTX Corporation (RTX) each manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold AFFF that contained PFAS chemicals and that was transported, stored, used, handled, released, spilled, and/or disposed in Maine, and/or have contractual assumption of liability or successor liability for AFFF products.[2]

---

[2] Plaintiff's claims as against Defendant Kidde are stayed pursuant to Section 362(a) of the Bankruptcy Code based on the voluntary Chapter 11 petition filed by Kidde in the United States Bankruptcy Court for the District of Delaware. *See In re Kidde-Fenwal, Inc.*, Case No. 23-10638 (Bankr. D. Del.), D.I. 1. For the avoidance of doubt, and notwithstanding anything stated herein or in any of the subsequent filings made in the above-captioned action, this action is not and should not be deemed an attempt to commence or continue an action against Kidde, to collect a debt against Kidde, or take any other action in violation of the automatic stay imposed by section 362 of Title 11 of the United States Code. Plaintiff's claims as against Defendant National Foam are stayed by order of this Court. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, Nos. 2:18-mn-02873-RMG, 2:18-cv-03487-RMG, Text Order (D.S.C. May 15, 2023) (observing "claims against Kidde and National Foam are automatically stayed by the filing of bankruptcy on May 14, 2023."). While Plaintiff believes that Section 362(a) of the Bankruptcy Code does not apply to National Foam, since National Foam has not filed a petition for relief under the Bankruptcy Code, for the avoidance of doubt, and notwithstanding anything stated herein or in any of the subsequent filings made in the above-captioned action, this action is not and should not be deemed an attempt to commence or continue an action against National Foam, to collect a debt against National Foam, or take any other action in violation of this Court's order. Notwithstanding the foregoing, pursuant to the orders entered in *Kidde-Fenwal Inc. v. Those Parties Listed on Exhibit A to Adversary Complaint and Jane and John Does 1-1000*, a plaintiff may file and serve an amended complaint as necessary to protect its rights regarding timeliness arguments. *Kidde-Fenwal Inc. v. Those Parties Listed on Exhibit A to*

13. Defendants' AFFF products, which were distributed, released, promoted, sold, and/or otherwise used in the State of Maine, were unreasonably dangerous and Defendants failed to warn of this danger. The result has been contamination and injury of State natural resources with AFFF-related PFAS.

14. 3M and DuPont knew for decades that PFAS chemicals were toxic and posed substantial health and environmental risks, but they continued to promote these chemical products for use in AFFF or, in the case of 3M, to use PFAS in the manufacture of its own AFFF products. Even though toxicity tests confirmed that 3M's AFFF product was "hazardous to marine life," 3M distributed ad brochures for its AFFF that stated that "[t]ests and actual use situations have shown that animal and aquatic life are not adversely affected." Despite its extensive knowledge of the dangers of PFAS, DuPont was a founding member of the Fire Fighting Foam Coalition, which was formed to advocate for AFFF's continued viability. Each Defendant that manufactured PFAS-containing AFFF and/or the Six PFAS for use in AFFF had access to information related to the dangers of PFAS compounds used in AFFF products, but they kept this information hidden from the public as they continued to profit from the sale of AFFF products or PFAS to be used in AFFF.

15. For example, 3M repeatedly acknowledged internally that PFAS were highly dangerous chemicals beginning no later than 1960:

    a. An internal memo from 1960 described 3M's understanding that waste products from its PFAS operations "[would] eventually reach the water table and pollute domestic wells."

    b. A 1963 3M report described PFAS as being stable in the environment, "completely resistant to biological attack." The same report also confirmed that 3M knew the chemicals to be "toxic."

---

*Adversary Complaint and Jane and John Does 1-1000*, Adv. Case No. 23-50387 (LSS) (Bankr. D. Del.), Adv. D.I. 69 (at ¶ 4), 82 (at ¶ 2), 91 (at ¶ 2).

c.  In the 1970s, 3M researchers documented PFOA and PFOS chemicals in fish.  At that time, 3M was aware that its AFFF products were hazardous to marine life.  In fact, effects of toxicity testing of 3M's "Light Water" line of PFAS-containing AFFF conducted in 1970 were (according to an outside researcher) "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

d.  Toxicity tests conducted in 1972 on 3M's Light Water AFFF on bluegill, grass shrimp, fiddler crab, and mummichog further confirmed AFFF's toxicity.  After exposure to a 33.4 milligrams per liter (mg/l) concentration of Light Water AFFF, 100% of bluegills died.

e.  Despite these findings, 3M's 1978 advertising brochure touted Light Water AFFF as "biodegradable" and "low in toxicity."  Specifically, the ad stated that "[t]ests and actual use situations have shown that animal and aquatic life are not adversely affected."  Further, it stated that "as a foam solution, there are no noticeable negative effects."

f.  In 1975, 3M scientists learned that PFAS had been found within, and could build up in, the human body, and that the suspected source was 3M or DuPont products.  When questioned about these concerns, 3M researchers said that they "plead[ed] ignorance."  The same year, 3M found that there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

g.  In 1978, a 3M internal report warned that PFOS and PFOA "are likely to persist in the environment for extended periods."  Results of a 90-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic."  A 1979 3M internal report further discussing the study on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated."  3M decided not to publish the findings of this investigation.

h.  In 1979, an employee in 3M's medical department concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

i.  These pleas for additional testing were essentially ignored.  In March 1999, a 3M environmental scientist lamented that, "[f]or more than twenty years" 3M had not acted on recommendations "to allow testing to perform an ecological risk assessment on PFOS and similar chemicals."  He noted that PFOS was "probably more damaging" than PCBs and concluded: "I can no longer participate in the process that 3M has established for the management of [PFAS.]  For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

16.  DuPont's internal documents are equally candid about the dangers posed by PFAS:

a.  As early as 1954, employees at DuPont's Washington Works plant reported that C8

- 6 -

(another name for PFOA) might be toxic.  DuPont was concerned enough about the complaints that it delayed marketing Teflon containing PFOA to the public until 1961.

b.  By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care."

c.  By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed suggested human exposure to PFOA.

d.  By at least 1980, DuPont had internally confirmed that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

e.  By at least 1981, DuPont had obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero and urged female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy."  Around this time, a DuPont employee gave birth to a baby with only half a nose and a ragged eyelid that gaped down to the middle of his cheek.  DuPont's own experts concluded that "the observed fetal eye defects were due" to PFOA.  Shortly afterward, DuPont's study of birth defects in its workers was quietly abandoned (without any disclosure to regulators or employees) after it discovered "statistically significant" abnormalities.

f.  By the early 1980s, DuPont secretly discovered PFOA contamination in drinking water around its Washington Works plant.  In response, DuPont corporate managers predicted that the medical and legal departments "will likely take a position of total elimination" of PFOA but instead decided that "corporate image, and corporate liability" would drive decisions about PFOA.

g.  In 1988, DuPont began treating PFOA internally as a possible human carcinogen.

h.  In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C-8 issue as "a debacle at best."  Around the same time, a DuPont lawyer said that PFAS's bio-persistence "will kill us," that "our story is not a good one," and that he had urged the company to "act[] responsibly" to "reduce the potential for punitives."

i.  In 2005, DuPont publicly stated that "no human health effects are known to be caused by PFOA"—a statement that an expert within the company called "[s]omewhere between misleading and disingenuous."

17.     Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX each had ready access to information

regarding PFAS compounds because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.  Through trade associations and groups including the Fire Fighting Foam Coalition, each of these Defendants shared knowledge and information regarding PFAS, worked together to protect their AFFF market, and cooperated on messaging on PFOA's toxicity.

18.     PFAS related to the sale and uses of AFFF have contaminated Maine drinking water, groundwater, surface water, wildlife, soil, and sediment.

19.     The State has been proactively addressing PFAS contamination since PFAS emerged as contaminants of concern.  As the State's ongoing investigation of PFAS contamination as a result of the use, storage, release, and/or disposal of AFFF progresses, it continually discovers additional PFAS contamination, including in new locations.

20.     The State has the authority and responsibility to protect, conserve, and manage State natural resources for present and future generations of Mainers.  The State seeks damages and other relief for AFFF-related PFAS contamination and injury in its capacity as trustee of State natural resources and in its *parens patriae* capacity on behalf of State citizens.  The State also acts to protect its own interests in property.

21.     The State brings claims for public nuisance, trespass, strict products liability, and negligence.  The State also brings claims against DuPont for violation of the Maine and/or Delaware Uniform Fraudulent Transfer Act, based on a web of transactions that Historical DuPont orchestrated over the past decade designed to shield significant assets from the State and other creditors.  The State seeks compensatory damages, including natural resources restoration and loss-of-use damages, and costs to investigate, monitor, abate, contain, prevent, treat, and

remove AFFF-related PFAS from the State's natural resources and property. The State also seeks punitive damages commensurate with Defendants' reprehensible conduct.

22.     This Complaint alleges claims based on contamination and injury caused by the six specific PFAS chemicals listed above (PFOS, PFOA, PFNA, PFHxS, PFHpA, and PFDA), including as byproducts, as well as their precursors, acids, salts, ionic forms. The State is not seeking to recover through this Complaint any relief for contamination and injury from PFAS that is not related to the manufacture and use of AFFF, which the State is addressing through a separate legal action. The State is also not seeking to recover through this Complaint any relief for past, present, or future personal injury claims or diminution in value of private property. Finally, although this Complaint alleges claims based on these six specific PFAS chemicals, PFAS contamination (including AFFF-related PFAS contamination) is a rapidly developing issue, and additional information (potentially including information on other PFAS chemicals) is expected to come to light over the course of this litigation.

## II.     PLAINTIFF

23.     Plaintiff State of Maine is a sovereign state and brings this action by and through its Attorney General, with his principal office at 6 State House Station, Augusta, Maine 04333, pursuant to the powers vested in him by the common law and by 5 M.R.S. § 191 as the chief law enforcement officer of the State of Maine.

24.     The State brings this action in its capacity as sovereign, as trustee of State natural resources and owner of substantial interests in property contaminated and injured by Defendants, and pursuant to its *parens patriae* authority on behalf of the citizens of Maine.

25.     The State also brings this action based upon its statutory authority, including M.R.S. § 341-A, to protect State natural resources and substantial interests in property and its common-law police power. This power includes its power to prevent pollution of the State's

natural resources and State property, to prevent nuisances, and to prevent and abate hazards to public health, safety, welfare, and the environment.

26.     In this Complaint, the term "State's natural resources and property" refers to all natural resources or property for which the State seeks damages, including without limitation fish, wildlife, biota, air, surface water, groundwater, wetlands, drinking water supplies, soil, sediment, public lands the State holds in trust, and where the State is an owner of substantial interests in property.

### III.     DEFENDANTS

27.     Defendants at all times relevant to this Complaint were and are manufacturers, marketers, distributors, sellers, and promoters of PFAS-containing AFFF and/or PFAS for use in AFFF.  The following Defendants, at times relevant to this Complaint, manufactured, marketed, distributed, and/or otherwise sold (directly or indirectly) PFAS-containing AFFF or PFAS for use in AFFF that each such Defendant knew or should have known would be delivered into areas affecting the State's natural resources and property, or otherwise did business in the State.

28.     Defendant 3M Company is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.

29.     Defendant Tyco Fire Products L.P. is a Delaware limited partnership with principal offices at One Stanton Street, Marinette, WI 54143.  Tyco is a subsidiary of Johnson Controls International plc.  Upon information and belief, Tyco is the successor-in-interest to The Ansul Company (Ansul), having acquired Ansul in 1990.  Tyco manufactures the Ansul brand of products.  Tyco does business throughout the United States, including conducting business in Maine.

30.     Defendant Buckeye Fire Equipment Company is a corporation organized under the laws of the State of Ohio, with principal offices at 110 Kings Road, Kings Mountain, North

Carolina 28086. Buckeye does business throughout the United States, including conducting business in Maine.

31.     Defendant Chemguard, Inc., is a corporation organized under the laws of the State of Texas, with principal offices at One Stanton Street, Marinette, Wisconsin 54143-2542. Chemguard was acquired by Defendant Tyco Fire Products L.P. in 2011. Chemguard does business throughout the United States, including conducting business in Maine.

32.     Defendant National Foam, Inc., is a corporation organized under the laws of the State of Delaware, with principal offices at 141 Junny Road, Angier, North Carolina 27501 and 350 East Union Street, West Chester, Pennsylvania 19382. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation. National Foam does business throughout the United States, including conducting business in Maine.

33.     Defendant Kidde-Fenwal, Inc., is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (formerly known as Chubb National Foam, Inc., formerly known as National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Maine.

34.     Defendant Perimeter Solutions LP is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 8000 Maryland Avenue, Suite 350, Clayton, Missouri 63105. In 2019, Perimeter Solutions purchased The Solberg Company (Solberg) products division of Amerex Corporation. Perimeter Solutions is the successor-in-interest to Solberg. Perimeter Solutions does business throughout the United States, including conducting business in Maine.

35.     Defendant Fire Service Plus, Inc., is a corporation organized under the laws of the

State of Georgia, with its principal place of business located at 473 Dividend Drive, Peachtree City, Georgia 30269.  Fire Service Plus does business throughout the United States, including conducting business in Maine.

36.     Defendant Carrier Fire & Security Americas LLC (formerly known as Carrier Fire & Security Americas Corporation) is a limited liability company organized under the laws of Delaware, with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.  Carrier Fire is the indirect parent of Kidde-Fenwal, Inc.  Carrier Fire is a successor to UTC Fire & Security Americas Corporation, Inc.  Carrier Fire does business throughout the United States, including conducting business in Maine.

37.     Defendant Carrier Global Corporation is a corporation organized under the laws of Delaware with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.  On or around April 3, 2020, United Technologies Corporation (UTC) completed the spin-off of one of its reportable segments into Carrier Global, a separate, publicly traded company.  Pursuant to the 2020 Separation and Distribution Agreement by and among United Technologies Corporation, Carrier Global Corporation, and Otis Worldwide Corporation, Carrier Global contractually assumed certain liabilities held by United Technologies Corporation, including those related to the business operated by Kidde-Fenwal, Inc.  Carrier Global, including through its contractual assumption of liabilities, has designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States, including products sold under the brand names "Chubb" and "Kidde."  Carrier Global does business throughout the United States, including conducting business in Maine.

38.     Defendant RTX Corporation, formerly known as Raytheon Technologies Corporation, is a corporation organized under the laws of Delaware with its principal place of business located at 1000 Wilson Boulevard, Arlington, Virginia 22209.  RTX is a successor to

UTC and the liabilities held by UTC as the parent company of Kidde. RTX, including through its contractual assumption of liabilities and its own independent conduct, has designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States. RTX does business throughout the United States, including conducting business in Maine.

39.     Defendant EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company and referred to here as Historical DuPont, is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

40.     Defendant The Chemours Company is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899. The Chemours Company was incorporated as a subsidiary of Historical DuPont as of April 30, 2015. From that time until July 2015, The Chemours Company was a wholly owned subsidiary of Historical DuPont. In July 2015, Historical DuPont spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its PFAS business, along with vast environmental liabilities. Historical DuPont distributed shares of The Chemours Company stock to Historical DuPont stockholders, and The Chemours Company has since been a separate, publicly traded company.

41.     Defendant The Chemours Company FC, LLC is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898. The Chemours Company FC, LLC operates as a subsidiary of The Chemours Company and manufactures fluoropolymer resins.

42.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

43.     Following the Chemours Spin-off, Historical DuPont merged with The Dow Chemical Company (Old Dow) in August 2017 to create DowDuPont Inc. (DowDuPont). Historical DuPont and Old Dow each merged with wholly owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has effected a series of separation transactions to split its businesses into three independent, publicly traded companies. These three companies are the remaining Defendants in this action: Dow Inc. (New Dow), Corteva, Inc. (Corteva), and DuPont de Nemours, Inc. (New DuPont).

44.     Defendant Dow Inc. is a corporation formed and existing under the laws of the State of Delaware with its principal place of business at 2211 H.H. Dow Way, Midland, Michigan 48674. New Dow was spun out of DowDuPont and became an independent, publicly traded company on April 1, 2019. It operates a materials science business.

45.     Defendant Corteva, Inc is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. Corteva was initially formed in February 2018 to serve as the holding company for the agriculture business. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata dividend, which converted Corteva into a separate, publicly traded company. Following that distribution, Corteva is the direct parent of Historical DuPont (*i.e.*, EIDP, Inc., formerly known as E. I. du Pont de Nemours and Company) and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

46.     Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc., is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and New Dow, changed its name to DuPont de Nemours, Inc. New DuPont retained

assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of Historical DuPont not assumed by Corteva.

47.     Throughout this Complaint, New DuPont, Historical DuPont, Chemours, and Corteva are referred to collectively as "DuPont."  Where differentiation of legal entities is necessary, this Complaint will refer to particular companies individually.

48.     Throughout this Complaint, 3M, DuPont, Tyco, Buckeye, Chemguard, National Foam, Kidde, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX are referred to collectively herein as "Defendants."  Where differentiation of legal entities is necessary, this Complaint will refer to particular companies individually.

49.     In 2001, DuPont became a founding member of the Fire Fighting Foam Coalition (FFFC).

50.     In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants, which contain PFAS, to AFFF manufacturers for use in the production of AFFF.

51.     Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by DuPont.

52.     Defendants, among other things: (i) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFAS-containing AFFF and/or PFAS for use in AFFF that was delivered into areas affecting the State's natural resources and property, such that AFFF-related PFAS have contaminated, injured, and threatened the State's natural resources and property; (ii) acted with actual or constructive knowledge that PFAS-containing AFFF and/or PFAS for use in AFFF would be delivered into areas affecting the State's natural resources and property; (iii) are legally responsible for and committed each of the multiple tortious and wrongful acts alleged in this Complaint; and (iv) promoted PFAS-

containing AFFF and/or PFAS for use in AFFF, despite the availability of reasonable alternatives and their actual or constructive knowledge that the pollution alleged in this Complaint would be the inevitable result of their conduct.

53.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants in addition to those expressly identified in the Complaint.

## IV.    JURISDICTION

54.     On May 8, 2023, 3M Company, Tyco Fire Products LP, and Chemguard, Inc. removed this action to the federal District Court for the District of Maine alleging federal officer and federal enclave jurisdiction.  The case was subsequently transferred into the multi-district litigation captioned In re: Aqueous Film-Forming Foams Products Liability Litigation (the "AFFF MDL").  The State files this Amended Complaint in the District of South Carolina consistent with the Case Management Orders entered in the AFFF MDL, but reserves all rights to object to federal jurisdiction.

55.     This Court may exercise jurisdiction over Defendants under 14 M.R.S. § 704-A because they either are or at the relevant time were: authorized to do business in Maine; registered with the Maine Secretary of State; transacting sufficient business with sufficient minimum contacts in Maine or otherwise intentionally availing themselves of the Maine market through the manufacturing, marketing, distribution, and/or sale of PFAS-containing AFFF and/or PFAS for use in AFFF in Maine; and causing a tortious act to be done, or causing the consequences of a tortious act to occur, within this State, as set forth in detail herein.

## V.    AFFF-RELATED PFAS ARE TOXIC AND POSE SUBSTANTIAL HEALTH AND ENVIRONMENTAL RISKS

56.     AFFF is a foam intended for fighting high-hazard flammable liquid fires.

57.     AFFF products are typically formed by combining hydrocarbon foaming agents with fluorinated surfactants.  PFAS are ingredients in fluorosurfactants.

58.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.

59.     PFAS are human-made, synthetic chemicals that do not exist naturally in the environment.

60.     The Six PFAS are persistent in the environment and do not readily break down or biodegrade.  The Six PFAS are stable in the environment and will persist for an indefinite (and very long) period of time.  Because of their persistence, unless the Six PFAS are actively cleaned up from contaminated State natural resources and property, these chemicals will remain and continue to contaminate State natural resources and property indefinitely.  While it is possible to clean up PFAS from certain State natural resources and property, it is difficult and expensive to do so.

61.     The Six PFAS are soluble in water, do not readily adsorb or stick to soil particles, are mobile in the environment, and migrate through soil and groundwater.

62.     The pernicious characteristics of the Six PFAS mean that once these chemicals are released into the environment, they migrate into and cause extensive contamination and injury of State natural resources and property.

63.     Contamination from the Six PFAS is a serious threat to human health and State natural resources and property.

64.     The Six PFAS bioaccumulate and bio-magnify in humans and in wildlife such as fish.

65.     The Six PFAS are toxic to humans at extremely low levels.

66.     Exposure to one or more of the Six PFAS is associated with harmful and serious health effects in humans and animals, including but not limited to:

      a.  altered growth;

      b.  impacts to learning and behavior of infants and older children;

      c.  lowering a woman's chance of getting pregnant;

      d.  interference with the body's natural hormones;

      e.  increased cholesterol levels;

      f.  modulation of the immune system; and

      g.  increased risks of testicular and kidney cancers.

67.    Humans are exposed to the Six PFAS through ingestion of drinking water and contaminated food, inhalation, and dermal contact, among other pathways.

68.    Known pathways for the AFFF-related PFAS to enter the environment include releases to air, waters, and soil from extinguishing fires, firefighting drills, and other related normal and foreseeable use and disposal.

69.    AFFF is commonly stored and used by chemical plants; flammable liquid storage and processing facilities; airports; HAZMAT teams; military facilities; fire training facilities; local fire departments; and merchant operations, such as oil tankers and offshore platforms.

## VI.    MAINE IS INVESTIGATING AFFF-RELATED PFAS CONTAMINATION

70.    The State of Maine has conducted a series of investigations and collected sampling data to begin to address risks to public health and State natural resources.  The State's investigation and response to this vast threat to public health associated with AFFF-related PFAS are ongoing and evolving.

### A.    Statewide PFAS Investigations.

71.    The State is investigating AFFF-related PFAS contamination in Maine through the Maine Department of Environmental Protection (DEP), the Maine Center for Disease Control and Prevention (Maine CDC), and other state agencies and departments.

72.     Maine continues to investigate the inventory and use of AFFF in firefighting and fire training activities.

73.     Maine is taking action to protect State natural resources, including drinking water, from AFFF-related PFAS, further investigating AFFF-related PFAS contamination in the environment, and seeking the necessary funding to fully address AFFF-related PFAS pollution.

74.     The State Legislature in July 2021 (i) prohibited the discharge of AFFF for testing or training purposes; (ii) required reporting of discharges of AFFF to the Maine DEP; and (iii) regulated the manufacture, sale, and distribution of new firefighting foams with intentionally added PFAS.

75.     The normal and foreseeable use of AFFF, including on military bases and by fire departments, has contaminated surface and groundwater, sediment, soils, and aquatic and other wildlife.

**B.     State and Federal PFAS Standard**s.

76.     Maine is a national leader in addressing AFFF-related PFAS contamination.

77.     In June 2021, Maine set an interim drinking water standard of 20 ppt for the sum of PFOA, PFOS, PFNA, PFDA, PFHpA, and PFHxS—i.e., the Six PFAS at issue in this Complaint because the Six PFAS are "increasingly associated with significant health concerns that have major consequences for the residents of this State."  Maine requires monitoring and treatment of certain public water systems for PFAS contamination.

78.     Information on the health and environmental risks of PFAS is still being developed, and the federal government and other states are continuing to lower health advisories and related standards for PFAS chemicals as more information on the toxicity of these pernicious chemicals becomes known.  Maine's drinking water standard therefore may be revised as additional data and information become available.

79.     Each of the six PFAS compounds subject to the State's health advisory poses significant human health risks.

80.     PFOA and PFOS target many organ systems, including the liver, endocrine, and the immune system.  The National Toxicology Program, a Division of the National Institute of Environmental Health Sciences, concluded that PFOA and PFOS are presumed to be immune hazards to humans, based on high levels of evidence in animals that PFOA and PFOS suppress the antibody response.  Exposure to PFOA and PFOS is also associated with developmental toxicity, including neurodevelopmental effects and skeletal alterations.

81.     Toxicity studies have indicated that PFHxS, PFHpA, PFNA, and PFDA have similar impacts, including but not limited to immunotoxicity, disruption of the endocrine system, developmental toxicity, and liver toxicity.

82.     The combination of multiple PFAS also can pose a substantial risk to human health.  Some or all of the Six PFAS are often found together.  Further, some PFAS chemicals degrade into other PFAS chemicals.

83.     Aside from establishing drinking water standards for PFAS, the State has also established screening levels for PFAS in soil, fish tissue, beef, and milk, among other actions.

84.     At the federal level, EPA has issued health advisories for PFOA and PFOS.  On June 15, 2022, EPA announced new drinking water Health Advisories Levels (HALs) for certain PFAS as part of its PFAS Strategic Roadmap.  HALs provide information on a contaminant that may cause negative human health effects and is known or anticipated to occur in drinking water.  HALs are EPA's recommendations for the concentrations of such drinking water contaminants at which adverse health effects are not anticipated to occur over specific exposure durations, such as one-day, 10 days, or a lifetime.  The new HALs announced by EPA in June 2022 apply to PFOA and PFOS, among other PFAS.  The lifetime interim updated HALs are 0.004 ppt for

PFOA and 0.02 ppt for PFOS.

85.     On March 14, 2023, EPA proposed Maximum Contaminant Levels (MCLs) in drinking water of 4 ppt for PFOA, 4 ppt for PFOS, and limits on PFNA, PFHxS, PFBS, and HFPO-DA as a PFAS mixture because PFAS mixtures can pose a health risk greater than each PFAS chemical independently.  The proposed MCL Goals for PFOA and PFOS are zero because any level of PFOA and PFOS may pose risks to human health.

## VII.    DEFENDANTS HAVE CAUSED AFFF-RELATED PFAS CONTAMINATION AND INJURY IN MAINE

### A.    Defendants' Manufacturing of PFAS for Use in AFFF and PFAS-Containing AFFF.

86.     AFFF is a fire-suppressing foam used to extinguish flammable liquid fires and is routinely used to train firefighters and test firefighting equipment.

87.     AFFF is applied by firefighters in the field by mixing foam concentrate and water to make a foam solution.  When applied to a fire, the foam solution is aerated at the nozzle.  The foam solution is sprayed out to coat the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier.  A film also forms to smother the fire after the foam has dissipated.

88.     A single firefighting training event can release thousands of gallons of PFAS-laced foam solution into the environment.

89.     In other words, it is intended by, and foreseeable to, the AFFF manufacturer or supplier that AFFF will be mixed with water and sprayed in such a manner that it can freely seep into the groundwater and soil, contaminating the environment.

90.     The following image, reprinted as part of the investigative series published by journalists at The Intercept, depicts firefighting training exercises/suppression system testing, drenching the test space in AFFF.



91.     For decades, PFAS have been used in the manufacture of AFFF.

92.     The PFAS family of chemicals are entirely human-made and do not exist in nature.

93.     3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.

94.     3M was the only known manufacturer of PFOS and PFHxS in the United States.

95.     3M was a major manufacturer of PFOA.

96.     3M manufactured PFAS by electrochemical fluorination beginning in the 1940s.

97.     The electrochemical fluorination process results in a product that contains and/or breaks down into compounds containing the Six PFAS, among other PFAS.

98.     In response to pressure from the EPA, 3M began to phase out production of PFOS and PFOA products in 2000.

99.     Much like 3M, DuPont has been aware of the toxicity of PFAS, including PFOA, for decades.

100.    Although DuPont knew about the health and environmental risks of PFAS from its use of PFAS starting in 1951, DuPont began manufacturing its own PFAS chemicals in 2002 for use in manufacturing when 3M phased out production of PFOA.  DuPont continued to manufacture, market, and sell PFOA until at least 2013.

101.    DuPont manufactured for commercial sale products containing PFOA when it knew that the products contained PFOA as a byproduct or impurity, and that they contained precursor chemicals that broke down into PFOA.

102.    DuPont also manufactured for commercial sale products containing PFHpA and/or PFNA as byproducts or impurities and products that contained precursor chemicals that broke down into PFHpA and/or PFNA.  DuPont manufactured these products when it knew that the products contained PFHpA and/or PFNA as byproducts or impurities, or that they contained precursor chemicals that broke down into PFHpA and/or PFNA.  DuPont also manufactured these products when it should have known that its products contained PFHpA and/or PFNA as byproducts or impurities, or that they contained precursor chemicals that broke down into PFHpA and/or PFNA.

103.    3M and DuPont were the only companies to manufacture PFOA in the United States.

104.    3M manufactured PFOA and PFOS as raw chemical materials for use in 3M products, including its own AFFF products and AFFF products made by third parties from the 1960s to the early 2000s.

105.    3M marketed and sold PFAS and AFFF containing PFAS throughout the United States, including in Maine.

106.    3M sold AFFF products containing PFAS to the United States Department of Defense (DOD) and others from approximately 1964 through at least 2000.

107.    In the late 1960s, the United States military issued military specification MIL-F-24385 governing the requirements for AFFF (AFFF Mil-Spec).  It requires that the AFFF concentrate "consist of fluorocarbon surfactants plus other compounds . . . ."  The AFFF Mil-Spec, however, contains no further requirements concerning these fluorocarbons surfactants, such as the length of the fluorine-carbon chain.  The AFFF Mil-Spec also states that "[t]he material shall have no adverse effect on the health of personnel when used for its intended purpose."  From 1969 to 2019, the AFFF MilSpec required "fluorocarbon surfactants plus other compounds," which "shall have no adverse effect on the health of personnel when used for its intended purpose."

108.    On January 6, 2023, DOD issued a new military specification for fluorine-free liquid concentrate for use on Class B fires (MIL-PRF-32725), which states that AFFF concentrate may not contain more than 1 ppb of PFAS, that the manufacturer shall certify in writing that PFAS has not been intentionally added to the concentrate, and that the AFFF concentrate "shall pose no serious or high risk to the health of personnel or the environment" when used for its intended purpose.  This specification also expresses DOD's intent to transition to fluorine free foam altogether.

109.    National Foam and Tyco began to manufacture, market, and sell PFAS-containing AFFF in the 1970s.

110.    From the 1960s through 2001, the DOD purchased AFFF exclusively from 3M and Tyco.

111.    Angus Fire and Chemguard began to manufacture, market, and sell PFAS-containing AFFF in the 1990s.

112.     Buckeye began to manufacture, market, and sell PFAS-containing AFFF in the 2000s.

113.     Perimeter Solutions, itself and through its predecessor businesses, manufactured, marketed, and sold PFAS-containing AFFF during the relevant time period.

114.     Fire Service Plus, founded in 1999, began to manufacture, market, and sell PFAS-containing AFFF in the 2000s.

115.     Chemguard, National Foam, Buckeye, Kidde, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, RTX, and/or their predecessors also sold AFFF products to DOD or other federal agencies.

116.     After 3M exited the AFFF market in 2000, the remaining Defendants continued to manufacture and sell AFFF and/or PFAS compounds to be used in AFFF.

117.     Chemguard, Tyco, National Foam, Buckeye, Kidde, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX AFFF products contained PFAS and/or precursors that result in PFAS at times relevant to this Complaint.

118.     3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX advertised, offered for sale, and sold AFFF to the military as well as State government entities, counties, municipalities, local fire departments, and/or other governmental entities and quasi-governmental entities for use in Maine.

119.     When used as intended, AFFF will contaminate the environment in a variety of ways, including, but not limited to, through soil, surface water, and groundwater, in relation to firefighting events, training exercises, fire preparations, equipment maintenance, and other activities.

120.    The manufacture, distribution, and/or sale of AFFF by 3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX resulted in the release of the Six PFAS into the environment.

121.    3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX, through their manufacturing, distribution, and/or sale of AFFF, and through their involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that the Six PFAS would contaminate the environment.

122.    3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX were and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that their marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale, and/or use or disposal of AFFF, including in Maine, would result in the contamination and injury of the State's natural resources and property.

123.    AFFF products containing PFAS manufactured, marketed, distributed, sold, and promoted by 3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX were unreasonably dangerous, and the Defendants failed to warn of this danger.

124.    3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX knew their customers warehoused large stockpiles of AFFF and touted the shelf-life of AFFF.

125.    To the extent that 3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX phased out production or transitioned to new formulas of AFFF, they did not instruct users of AFFF that

they should not use existing stockpiles of AFFF that contained the Six PFAS, and/or their precursors.

126.    3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX did not act to remove AFFF from the stream of commerce.

127.    3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX did not warn public entities or others that AFFF would harm the environment, endanger human health, or cause them to incur substantial costs to investigate and clean up contamination of groundwater and other natural resources and to dispose of AFFF.

128.    Accordingly, for many years after the original sale of AFFF, these AFFF products continued to be applied directly to the ground, discharged into floor drains, and washed into sediments, soils, and waters, harming the environment, and endangering human health.

129.    3M, Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX did not properly instruct users, consumers, public officials, or those who were in a position to properly guard against the dangers of PFAS that they needed to properly dispose of their stockpiles of AFFF or how to properly dispose of AFFF.

130.    DuPont also manufactured, marketed, and sold PFAS to be used in AFFF throughout the United States.

131.    In part, through its involvement in the FFFC, DuPont actively marketed its fluorosurfactants to AFFF manufacturers for use in the production of AFFF.

132.    Some or all of the AFFF manufactured and sold by the Defendants contained fluorosurfactants manufactured and sold by 3M or DuPont.

133.    DuPont's manufacture, distribution, and/or sale of fluorosurfactants used in the manufacture of AFFF resulted in the release of PFAS into the environment.

134.    DuPont, through its manufacturing, distribution, and/or sale of fluorosurfactants used in the manufacture of AFFF, and through its involvement and/or participation in the creation of training and instructional materials and activities, knew, foresaw, and/or should have known and/or foreseen that PFAS would contaminate the environment.

135.    DuPont was and/or should have been aware, knew and/or should have known, and/or foresaw and/or should have foreseen that its marketing, development, manufacture, distribution, release, training of users of, production of instructional materials about, sale, and/or use or disposal of fluorosurfactants used in the manufacture of AFFF, including in Maine, would result in the contamination and injury of the State's natural resources and property.

136.    Defendants' AFFF containing PFAS and/or PFAS for use in AFFF were unreasonably dangerous, and the Defendants failed to warn of this danger.

137.    Practical and feasible alternative designs capable of reducing the State's injuries were available.

138.    Defendants knew, or should have known, that the Six PFAS would contaminate the environment through their manufacturing, marketing, distribution, and sales of PFAS chemicals to be used in AFFF and/or AFFF containing PFAS.

139.    Defendants knew, or should have known, that their manufacturing, marketing, distribution, and sales of AFFF containing PFOS, PFOA, PFNA, PFHxS, PFHpA and/or PFDA and/or PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA for use in AFFF, including in Maine, would result in contamination and injury of the State's natural resources and property.

**B.    3M Has Known for Decades of PFAS's Health and Environmental Risks.**

140.    3M knew of the health and environmental hazards posed by PFAS, including the

Six PFAS, as well as its PFAS-containing AFFF products, for decades but continued to manufacture, market, distribute, and/or sell PFAS for use in AFFF and AFFF containing PFAS into Maine. 3M failed to disclose key information on these hazards to regulators and the public.

141.   3M began testing the physiological and toxicological properties of PFAS compounds as early as 1950. Based on these internal studies, 3M knew that PFOA and PFOS were harmful to humans and the environment as early as the 1950s.

142.   In the 1950s, 3M knew that PFAS chemicals had the ability to move throughout groundwater. By 1960, 3M knew that PFOA and PFOS were capable of leaching into groundwater and contaminating the environment. For example, by 1960, chemical wastes from its PFAS manufacturing were known to be able to leach from its waste dumps into groundwater and pollute underground basins. An internal memo from 1960 described 3M's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells." In 1960, 3M confirmed the presence of PFAS pollution in the wells.

143.   By the early 1960s, 3M understood that some PFAS are stable and persist in the environment and that they do not degrade. A 1963 3M report described PFAS as being stable in the environment, "completely resistant to biological attack." The same report also confirmed that 3M knew the chemicals to be "toxic."

144.   In the 1970s, 3M researchers documented PFOA and PFOS chemicals in fish.

145.   At that time, 3M was aware that its AFFF products were hazardous to marine life. In fact, effects of toxicity testing of 3M's "Light Water" line of PFAS-containing AFFF conducted in 1970 were (according to an outside researcher) "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

146.   Toxicity tests conducted in 1972 on 3M's Light Water AFFF on bluegill, grass shrimp, fiddler crab, and mummichog further confirmed AFFF's toxicity. After exposure to a

33.4 mg/l concentration of Light Water AFFF, 100% of bluegills died.

147.    Despite these findings, 3M's 1978 advertising brochure touted Light Water AFFF as "biodegradable" and "low in toxicity."  Specifically, the brochure stated that "[t]ests and actual use situations have shown that animal and aquatic life are not adversely affected." Further, it stated that "as a foam solution, there are no noticeable negative effects."

148.    In 1975, 3M scientists were informed that PFAS had been found within, and could build up in, the human body.  The source of these chemicals was suspected by a researcher at the University of Florida investigating the matter to be Teflon cookware or "Scotchgarded" fabrics.  When questioned about these concerns, 3M researchers said that they "plead[ed] ignorance."

149.    In the 1970s, 3M began monitoring the blood of its employees for PFAS because 3M was concerned about the health effects of PFAS.  For example, in 1976 3M measured fluorochemicals in the blood of workers at its PFAS-manufacturing plant in Cottage Grove, Minnesota, at "1,000 times normal."

150.    In 1975, 3M found that there was a "universal presence" of PFOA in blood serum samples taken from across the United States.

151.    Because PFOA is not naturally occurring, these findings should have alerted 3M that its products were the likely source of this PFOA—a possibility that 3M considered internally but did not share outside the company.  These findings also should have alerted 3M that PFOA is mobile, persistent, bio-accumulative, and biomagnifying.

152.    A 3M internal report from 1978 warned that PFOS and PFOA "are likely to persist in the environment for extended periods."  That same study found that one common PFAS compound was "found to be completely resistant to biodegradation."  Similarly, a 3M internal document from 1979 stated that PFOA and PFOS "are known to persist for a long time

in the body and thereby give long term chronic exposure."

153.    Results of a 90-day animal study conducted by 3M in 1978 indicated that PFAS "should be regarded as toxic." A 1979 internal 3M report further discussing the study on PFOS and PFOA toxicity to animals stated that the compounds were "more toxic than anticipated," and further recommended that "lifetime rodent studies . . . be undertaken as soon as possible." 3M decided to not publish the findings of this investigation.

154.    A 1979 memo from M.T. Case, employed at the time in 3M's medical department, concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure." That same year, an outside researcher named Dr. H.C. Hodge recommended further testing and told 3M that reducing employees' exposure to PFAS "should have top priority."

155.    In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This was based on internal research showing that PFAS compounds were causing birth defects in rats. In 1983, 3M scientists concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."

156.    In March 1999, 3M environmental scientist Rich Purdy wrote to 3M and expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. According to Mr. Purdy, "[f]or more than twenty years 3M's ecotoxicologists have urged the company to allow testing to perform an ecological risk assessment on PFOS and similar chemicals," without 3M ever taking action; he noted that the company "waited too long to tell customers about the widespread dispersal of

PFOS in people and the environment." Mr. Purdy described PFOS as "the most <u>insidious</u> pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

157. Despite decades of research, 3M first shared its concerns with EPA in the late 1990s. Even then, 3M's disclosure was far from complete. As a former 3M employee told EPA in May 1998, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information."

158. In response to pressure from EPA, 3M began to phase out production of PFOS and PFOA products in 2000. In connection with the phase-out in 2000, 3M issued a press release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

159. That same day, the EPA issued a press release regarding 3M's phase-out of PFOS and PFOA presenting a different story: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

160. Even after 3M's phase out, the company worked to control and to distort the science on PFAS. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for

3M.  Mr. Giesy's goal, as expressed in a March 25, 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

161.    In 2006, EPA cited 3M for 244 violations of the Toxic Substances Control Act, accusing 3M of failing to notify the agency about new chemicals and of late reporting of "substantial risk information."  3M was fined $1.52 million for these violations.

162.    In November 2018, 3M stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood."  As recently as December 30, 2022, 3M informed DEP that "3M's products, including those containing PFAS, are safe and effective for their intended uses in everyday life."  These statements contradict a large body of research demonstrating the serious health risks posed by PFAS.

163.    In short, by the early 1950s, 3M knew or should have known that, in their intended and/or common use, PFAS (including AFFF products containing PFAS) would injure and/or threaten public health and the environment in Maine.

**C.    DuPont Has Known for Decades of PFAS's Health and Environmental Risks.**

164.    Like 3M, DuPont has known for decades of the health and environmental risks of PFAS, including some or all of the Six PFAS.  But instead of warning the public, users, or consumers about such risks, DuPont covered up this information and promoted PFAS and PFAS-containing products as safe.

165.    In approximately 1951, DuPont started using PFOA in making Teflon at its Washington Works manufacturing plant in Parkersburg, West Virginia.  As early as 1954, employees at DuPont's Washington Works plant reported that C-8 (another name for PFOA) might be toxic.  DuPont was concerned enough about the complaints that it delayed marketing

Teflon containing PFOA to the public.  In 1961, seven years later, Teflon consumer products hit the marketplace.

166.    By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care."  As early as the 1960s, DuPont knew that PFOA caused adverse liver reactions in dogs and rats.

167.    As early as 1966, DuPont was aware that PFOA could leach into groundwater.

168.    By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers believed could be a potential result of human exposure to PFOA.

169.    By 1979, DuPont had data indicating that its workers who were exposed to PFOA had a significantly higher frequency of health issues compared to unexposed workers but did not report this data to any government agency or any community where it used PFOA.

170.    By at least 1980, DuPont had internally confirmed that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

171.    By at least 1981, DuPont had obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero and urged female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy."  Around this same time, a pregnant DuPont worker in the Teflon division of the Washington Works began moving PFOA waste into pits.  Tragically, when the DuPont employee gave birth in January 1981, the baby had only half a nose and a ragged eyelid that gaped down to the middle of his cheek.  This was consistent with the 3M study, and in March 1981, DuPont had a pathologist and a birth defects expert review the 3M study.  They concluded that "the study was valid" and that "the observed fetal eye defects were due to C8."  DuPont immediately removed

all female workers away from areas where they might come into contact with PFOA.

172. In April 1981, DuPont began secretly monitoring 50 female employees who had been exposed to PFOA. As DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question—does C8 cause abnormal children?" Initial data showed that two of the seven pregnant workers exposed to PFOA had babies with eye and nostril deformities, which the researchers concluded was "statistically significant." DuPont abandoned the study rather than inform regulators or employees.

173. In a confidential November 1982 memo, DuPont's medical director warned about employees being exposed to potentially dangerous levels of PFOA. He recommended that all "available practical steps be taken to reduce this exposure."

174. By at least the early 1980s, DuPont began considering the effects of PFOA beyond its Washington Works plant. In 1984, DuPont sent employees to secretly fill jugs of water from gas stations and general stores around the plant. Testing of the water revealed PFOA in Lubeck, West Virginia, and Little Hocking, Ohio. But DuPont decided not to notify the public.

175. In 1984, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA. The corporate managers expressed concern about "C-8 exposures off plant as well as to our customers and the communities in which they operate." The corporate managers admitted internally that "none of the options developed are … economically attractive and would essentially put the long-term viability of this business segment on the line." The DuPont corporate managers predicted that the medical and legal departments "will likely take a position of total elimination," of PFOA but instead decided that "corporate image, and corporate liability" would drive decisions about PFOA. The corporate managers admitted that it was too late to address past

liability: "Liability was further defined as the incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." DuPont did not disclose the information discussed at the 1984 meeting to EPA, the State, or the general public. DuPont began manufacturing PFOA itself over 15 years later and continued to use PFOA for almost another 30 years.

176.    By the mid-1980s, DuPont was aware that PFOA is bio-persistent and bio-accumulative.

177.    In an October 20, 1986 memorandum, a DuPont employee stated that DuPont's management in Wilmington, Delaware, was "concerned about the possible liability resulting from long-term C-8 exposure to our employees and to the population in the surrounding communities and those downriver from the [Washington Works] plant."

178.    In 1988, DuPont began treating PFOA internally as a possible human carcinogen.

179.    In 1999, DuPont received preliminary results from a study showing that C8 caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one became so ill it had to be euthanized.

180.    An internal DuPont memorandum regarding its litigation strategy shows that DuPont sought to "not create [the] impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

181.    In 2000, John R. Bowman, a DuPont in-house counsel for C8 issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the C-8 out of the water." He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another notorious groundwater contaminant, MTBE] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut

tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one….

182.    In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C-8 issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Mr. Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

183.    Notwithstanding its internal knowledge of PFOA's health and environmental risks beginning as early as the 1950s, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

184.    DuPont's own Epidemiology Review Board (ERB) repeatedly raised concerns about the truthfulness of these statements. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

185.    In October 2006, contrary to ERB's advice, DuPont's chief medical officer issued a press release stating that "there are no health effects known to be caused by PFOA." An ERB

member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

186.    By December 2005, EPA uncovered evidence that DuPont had concealed the environmental and health effects of C8 for more than two decades.  In response, EPA levied a $16.5 million administrative penalty on DuPont, which at that time was the largest civil administrative penalty EPA had ever obtained under any federal environmental statute.

187.    At approximately the time this penalty was issued, DuPont was making approximately $1 billion a year in revenue from products containing C8.

**D.    Other Defendants Also Knew or Should Have Known of the Dangers of PFAS-Containing AFFF.**

188.     Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX knew, or should have known, that in their intended and common use, their PFAS-containing AFFF products would harm the environment and human health.

189.    Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX knew, or should have known, that through their intended and common use, their PFAS-containing AFFF products would injure the State's natural resources.

190.    Information regarding PFAS compounds was readily accessible to Tyco, Chemguard, Buckeye, Kidde, National Foam, Perimeter Solutions, Fire Service Plus, Carrier Fire, Carrier Global, and RTX because each is an expert in the field of AFFF manufacturing and/or the materials needed to manufacture AFFF, and each has detailed information and understanding about the chemical compounds that form AFFF products.

191.    The Firefighting Foam Coalition is an AFFF trade group that was formed in 2001

to advocate for AFFF's continued viability.

192.     All of the Defendants, including through their predecessors and/or subsidiaries, with the exception of 3M, were members of the FFFC, including DuPont, which, as described above, had extensive knowledge about the toxicity associated with PFAS (FFFC Defendants).

193.     Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFAS, worked together to protect AFFF from scrutiny, and cooperated on messaging on PFOA's toxicity.

194.     The FFFC's efforts were designed to conceal information on PFOA's risks to human health and the environment from the public and regulators.

195.     FFFC Defendants regularly published newsletters and attended conferences promoting their AFFF products as appropriate for widespread use.

196.     FFFC Defendants repeated the same message for years: Only one PFAS chemical, PFOS, had been taken off the market.  Thus, the FFFC Defendants asserted, the FFFC Defendants' products were safe because they did not contain PFOS (but rather PFOA and other PFAS chemicals, which the FFFC Defendants knew or, at a minimum, should have known were equally harmful to the environment and public health).  The FFFC stated to the EPA during a September 28, 2001 meeting that telomer-based AFFF "does not contain any PFOA-based product."  This statement was misleading because the FFFC defendants knew, or should have known, that telomer-based AFFF degraded in the environment to PFOA.

197.     Though the FFFC Defendants knew or should have known about the hazards their AFFF products posed, those hazards were not fully understood by the users of AFFF, the public, and regulators, including the State.

**E.     Defendants Failed to Act on Their Knowledge of the Health and**

**Environmental Risks of PFAS and PFAS-Containing AFFF.**

198.    Despite their knowledge that PFAS posed environmental and human health risks, and despite the availability of reasonable alternatives, Defendants failed to warn customers, users, the public, or the State, and failed to take any other appropriate precautionary measures to prevent or mitigate such contamination.  Instead, Defendants improperly marketed and promoted AFFF containing PFAS and PFAS for use in AFFF (including the Six PFAS) for uses and applications that would inevitably cause harmful environmental contamination, and provided warnings and instructions for use and disposal that were inadequate to protect against the risk to public health and the environment created by the ordinary use and disposal of such products.

199.    At all times relevant to this Complaint, Defendants were or should have been aware that AFFF containing PFAS and/or PFAS for use in AFFF that they manufactured, marketed, distributed, sold, and promoted were used in connection with firefighting events, training exercises, fire preparations, equipment maintenance, and other activities, and Defendants promoted such use.  Defendants improperly marketed and promoted their AFFF containing PFAS and/or PFAS for use in AFFF for applications and uses that would inevitably cause harmful environmental contamination, and provided warnings and instructions for use and disposal that were inadequate to protect against the risk to public health and the environment created by the ordinary use and disposal of such products.

200.    For many years, Defendants knew that their AFFF containing PFAS and/or PFAS for use in AFFF were toxic and would inevitably produce contamination and human health risks that have occurred.  Yet Defendants misled the public, regulators, and their own customers about these key facts, instead promoting their AFFF containing PFAS and/or PFAS for use in AFFF as safe, not environmentally hazardous, and not requiring special precautions in use or disposal.

201.    At all times relevant to this Complaint, Defendants were or should have been

aware that AFFF-related PFAS contamination and injury of State natural resources and property was inevitable. This was due to PFAS's solubility, recalcitrance to biodegradation and bioremediation, and the normal and foreseen use of PFAS-containing AFFF, including in Maine.

202.    Defendants possess and have always possessed vastly superior knowledge, resources, experience, and other advantages, in comparison to anyone or any agency, concerning the manufacture, distribution, nature, and properties of PFAS used in AFFF and PFAS-containing AFFF.

203.    By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to State natural resources and property.

204.    Defendants' acts and omissions directly and proximately caused and continue to cause PFAS to intrude into and contaminate and injure State natural resources and property, as described below.

205.    In addition, by virtue of this superior knowledge, and/or by virtue of Defendants' partial and incorrect statements regarding the nature and impacts of AFFF-related PFAS, Defendants had a duty to disclose the truth and to act in accordance with the truth about PFAS for use in AFFF and PFAS-containing AFFF.

## VIII.   STATE NATURAL RESOURCES AND PROPERTY INJURIES

206.    AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA have been found in and around State natural resources and property, including groundwater, surface waters, soil, sediments, and wildlife in locations throughout Maine.

207.    Numerous locations in Maine are contaminated and injured by AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, including, but not limited to, the Naval Air

Station in Brunswick, the Portsmouth Naval Shipyard in Kittery, Loring Air Force Base in Limestone, the Cutler Navy radio facility, and the Maine Air National Guard Base in Bangor, among other locations. PFAS was found at extremely high levels in groundwater at some of these locations, including at levels up to 24,000 ppt at the Brunswick Naval Air Station and 5,861 ppt (PFOA and PFOS combined) at Loring Air Force Base.

208. Maine Fire Departments also have reported the use and release of AFFF at certain locations.

209. AFFF-related PFAS contamination has injured State natural resources and/or adversely impacted their beneficial public trust uses including those for drinking water, recreation, and fishing.

210. AFFF-related PFAS contamination and injury has substantially damaged the intrinsic value of these State natural resources.

211. Maine and its citizens have been deprived of the full use, enjoyment, and benefit of the State's natural resources, and the intrinsic values of such State natural resources have been substantially harmed by the PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within AFFF.

212. The State's natural resources and property have been contaminated and injured by PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within AFFF through foreseeable releases from the use of AFFF, including use at military installations, airports, and industrial facilities, as well as by fire departments at locations across the State. AFFF-related PFAS contamination has been detected at locations where AFFF was historically used.

213. Defendants' acts and omissions have caused and/or contributed to these AFFF-related PFAS releases.

214. Defendants failed to disclose the environmental and health risks of PFAS that

were known or should have been known to them, to the owners or operators of sites from which PFAS-containing AFFF was used, resulting in the release of the Six PFAS. As a result, the risks associated with PFAS were unknown to the users of AFFF containing the Six PFAS; were unknown to the State; and were generally unknown to those other than Defendants who could have reduced or limited the AFFF-related PFAS contamination and injury described above. As manufacturers, marketers, and sellers of PFAS-containing AFFF and/or PFAS for use in AFFF, Defendants were in the best position to reduce the risk of harm of their products.

215.    Each of the State's natural resources is precious, limited, and invaluable, as described in more detail below.

### A.    Groundwater.

216.    Groundwater is a precious, limited, and invaluable natural resource that is used for drinking water, irrigation, and other important purposes.

217.    State natural resources, including groundwater, are vital to the health, safety, and welfare of Maine citizens, and to the State's economy and ecology.

218.    The Legislature has found and declared that the "protection of ground water resources is critical to promote the health, safety and general welfare of the people of the State." 38 M.R.S. § 401. It further has found that aquifers "provide a significant amount of the water used by the people of the State," and that aquifers are "critical elements in the hydrologic cycle." *Id.*

219.    The Legislature also has found and declared that an "adequate supply of safe drinking water is a matter of the highest priority and that it is the policy of the State to protect, conserve and maintain ground water supplies in the State." *Id.*

220.    The Legislature has found and declared it to be the "policy of the State, consistent with its duty to protect the health, safety and welfare of its citizens, to establish a coordinated

statewide program to protect drinking water wells from contamination by oil or hazardous waste." 38 M.R.S. § 1391.

221.    PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated and injured the State's groundwater in locations throughout the State, including, for example, at the following locations:

      a.      Naval Air Station in Brunswick;

      b.      Portsmouth Naval Shipyard in Kittery;

      c.      Loring Air Force Base in Limestone;

      d.      Cutler Navy radio facility in Cutler; and

      e.      Maine Air National Guard Base at Bangor International Airport in Bangor.

222.    PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated and injured drinking water that is drawn from groundwater sources in locations throughout the State, including drinking water wells in connection with AFFF-related contamination at the Cutler Navy radio facility in Cutler, the Naval Air Station in Brunswick, and Loring Air Force Base in Limestone.

223.    Ongoing additional testing continues to reveal further AFFF-related PFAS contamination and injury of groundwater in locations throughout Maine.

224.    It is virtually certain that additional testing will reveal further AFFF-related PFAS contamination and injury of groundwater in locations throughout Maine.

**B.    Surface Waters.**

225.    Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, irrigation, recreation such as swimming and fishing, and ecological

and other important purposes.

226. The Legislature in its role as trustee of the public waters has declared that waters shall be restored to a "condition clean enough to allow fishing and swimming in all our rivers and streams" to promote the "well-being of the citizens of this State." 12 M.R.S. § 402(1).

227. The State's tourism and recreation industries are dependent upon clean water, including surface waters.

228. Surface waters are vitally important to the State and its citizens, including by supporting aquatic ecosystems, and biota such as fish.

229. PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated and injured the State's surface waters in locations throughout the State, including, for example, at the Naval Air Station in Brunswick.

230. Ongoing additional testing continues to reveal further AFFF-related PFAS contamination and injury of surface waters in locations throughout Maine.

231. It is virtually certain that additional testing will reveal further AFFF-related PFAS contamination and injury of surface waters in locations throughout Maine.

**C.  Soils, Sediments, and Wildlife.**

232. Soils and sediments are part of or interconnected with the health of State natural resources such as surface waters, groundwater, and wildlife, and provide numerous values and services. For instance, sediments are important as habitat for wildlife including fish, among other important ecological uses; and soils may contain contaminants that migrate to groundwater. A healthy and functioning ecosystem depends upon the interplay between non-impaired soils, sediments, and wildlife.

233. PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within Defendants'

AFFF products and/or manufactured by Defendants for use in AFFF have contaminated and injured soils and sediments in locations throughout the State, including, for example, at the Naval Air Station in Brunswick.

234.    Ongoing additional testing continues to reveal further AFFF-related PFAS contamination and injury of soils and sediments in locations throughout Maine.

235.    Wildlife is a precious, limited, and invaluable State natural resource.

236.    PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated and injured fish, including, for example, in streams and brooks in Limestone near Loring Air Force Base.

237.    Maine's biodiversity is vital to its ecology, economy, and culture.

238.    Maine's fish and other wildlife are used for food, recreational purposes, and provide a significant economic benefit to the State, including through tourism and recreation.

239.    Injuries to wildlife affect not only individual wildlife, but the entire ecosystem of which they are part.

240.    It is virtually certain that additional testing will reveal further AFFF-related PFAS contamination and injury of soils, sediments, and fish and other wildlife in locations throughout Maine.

**D.    New AFFF-Related PFAS Contamination Continues To Be Discovered and Existing Contamination Continues To Injure State Natural Resources and Property.**

241.    AFFF-related PFAS has contaminated State natural resources and property at various locations in the State.  This contamination has injured these resources; threatens State citizens' health, safety, and welfare; and interferes with the use of these precious resources.

242.    Given PFAS's properties, including its resistance to biodegradation and its

solubility, AFFF-related PFAS continues to move through groundwater, surface waters, and soils, and other natural resources, and cause initial contamination in new locations, adversely impacting State natural resources and property.

243.    AFFF-related PFAS continues to move through the environment and contaminate and injure State natural resources and property at a number of locations throughout the State with known PFAS contamination.

244.    Defendants' acts and omissions directly and proximately caused and continue to cause AFFF-related PFAS to intrude into and contaminate and injure these natural resources and property.

245.    There are proven and preliminary remedial techniques for cleaning up AFFF-related PFAS in environmental media, and successfully treating drinking water.

246.    Absent use of remediation and treatment methods, AFFF-related PFAS contamination will continue to spread through the State's natural resources and property. Although PFAS is persistent in the environment, AFFF-related PFAS can be successfully remediated in certain natural resources and/or successfully treated, but at significant expense.

247.    AFFF-related PFAS contamination levels in State natural resources including groundwater and drinking water typically fluctuate, *i.e.,* increase and decrease, over time as PFAS moves through groundwater and due to other factors, including changes in seasonal precipitation levels.  PFAS levels can fluctuate at a single PFAS contamination site over time. For this reason, the only way to be certain that PFAS no longer exists in State natural resources such as groundwater or drinking water is to remediate or treat the PFAS.

248.    AFFF-related PFAS's presence and migration in Maine's natural resources and property, absent large-scale and costly remediation and/or treatment, will continue indefinitely, and will continue to indefinitely threaten such natural resources and property.

Case 2:23-cv-05013-BHH   Document 106   Filed 09/08/25   Page 49 of 106
Case 2:25-cv-03459-GAW   Document 1-24   Filed 06/23/24   Page 49 of 108   PageID
#: 166

249.     Because of the injury AFFF-related PFAS have caused and are causing to Maine's
natural resources, Maine's natural resources require restoration, including compensation for
interim and other losses.

## IX.     HISTORICAL DUPONT'S FRAUDULENT SCHEME TO INSULATE ITS ASSETS FROM ITS PFAS LIABILITIES

250.     After Historical DuPont had been sued and faced the threat of further lawsuits
regarding its manufacturing and releases of PFOA, it announced in October 2013 its intention to
spin off its "performance chemicals" business, responsible for manufacturing and sales of PFAS
and PFAS-containing products, including PFOA.  The performance chemicals business would be
spun off as a new, independently owned company named The Chemours Company (the
Chemours Spin-off) that would assume certain liabilities of Historical DuPont.

251.     In February 2014, Historical DuPont formed The Chemours Company as a
wholly-owned subsidiary with a separate board of directors that was controlled by Historical
DuPont employees.

252.     According to a lawsuit filed by Chemours against Historical DuPont,
DowDuPont, and Corteva in 2019, the Chemours Spin-off was not an arm's length transaction.
*See* Chemours's Verified First Amended Complaint, C.A. No. 2019-0351-SG (Del. Ch.) (the
Chemours Compl.), ¶ 25.[3]  From formation through consummation of the Chemours Spin-off,
Historical DuPont controlled development of the Chemours Spin-off's terms, dictated the terms
of the Chemours Spin-off, and there were no procedural protections for Chemours.  *Id.* ¶¶ 25, 27.

253.     Historical DuPont did not allow Chemours (or its prospective management team)
to have independent counsel to represent Chemours's interests in structuring the Chemours Spin-
off.  *Id.* ¶ 26.  Instead, Historical DuPont and its outside counsel unilaterally prepared all of the

---

[3]  A copy of the Chemours Complaint is available at: https://www.chemours.com/en/-/media/files/corporate/fayetteville-works/chemours-amended-complaint.pdf.

documents underlying and effectuating the Chemours Spin-off. *Id.*

254.    The initial draft of the "Separation Agreement" between Historical DuPont and Chemours (the Chemours Separation Agreement) did not include the schedules listing the assets and liabilities to Chemours, preventing Chemours's designated management team from evaluating central economic terms of the transaction even though Chemours's designated management team requested these schedules. *Id.* ¶ 29.

255.    On May 12, 2015, the Chemours Board, which then consisted of three Historical DuPont employees, Michael Heffernan, Nigel Pond, and Steven Zelac (the DuPont Employee Board Members) who were not going to be with Chemours following the Chemours Spin-off, authorized the Dividend (as defined below). *See id.* ¶ 35(a).

256.    On June 5, 2015, the DuPont Board approved the Chemours Spin-off. *Id.* ¶ 70.

257.    On June 9, 2015, DuPont Employee Board Members, as the sole members of the Chemours' Board, held a DuPont Board "meeting" to "discuss" whether Chemours should approve the Chemours Spin-off and the Chemours Separation Agreement. *Id.* ¶ 35(c). That meeting was also attended by other Historical DuPont employees and Historical DuPont's outside counsel. *Id.* The meeting consisted of "presentations" by Historical DuPont's outside counsel and Historical DuPont. *Id.* The DuPont Employee Board Members (1) took "notice" that "DuPont, as the sole stockholder of [Chemours], has communicated" that the DuPont Board had determined that the Chemours Spin-off "are in DuPont's best interests," and (2) "unanimously" adopted resolutions approving the Chemours Spin-off on Chemours's supposed behalf. *Id.*

258.    On June 26, 2015, Nigel Pond, Historical DuPont's M&A Counsel, formerly one of the DuPont Employee Board Members, and then designated a "Vice President" of Chemours (a temporary position he would resign immediately thereafter), executed the Chemours

Separation Agreement on Chemours's behalf.  *Id.* ¶ 35(d).

259.    On July 1, 2015, Michael Heffernan, Nigel Pond, and Steven Zelac all resigned from the Chemours Board.

260.    In connection with the Chemours Spin-off, Historical DuPont and Chemours executed the Chemours Separation Agreement, dated as of June 26, 2015.

261.    On May 12, 2015, Chemours borrowed over $4 billion through Senior Secured Term Loans (the Term Loans), Notes, and related indentures.

262.    The Term Loans were incurred pursuant to the terms of the Credit Agreement, dated May 12, 2015, by and among Chemours, certain Guarantors party thereto and JPMorgan Chase Bank, N.A., as administrative agent.  *See* Chemours's Form 10, Amendment No. 3, Ex. 10.14, filed on May 13, 2015 (as amended) (the Credit Agreement).

263.    The Information Statement for the Chemours Spin-off dated June 5, 2015 (the Info Statement), disclosed that a "Dividend" of over $3.9 billion would be paid to Historical DuPont by Chemours.

264.    As part of the Chemours Spin-off, Chemours received approximately 19% of Historical DuPont's business lines, while being saddled with approximately two-thirds of Historical DuPont's environmental liabilities and 90% of Historical DuPont's pending litigation by volume of cases.  Chemours Compl., ¶ 38.

265.    These environmental liabilities included those related to over 80 Historical DuPont-associated sites, the majority of which were sites that Chemours would never operate. *Id.* ¶ 39.

266.    Historical DuPont even gave Chemours all liabilities related to Historical DuPont's historical explosives operations and asbestos and benzene exposures that had nothing to do with its performance chemicals business.

267. As a result of the Chemours Spin-off, Chemours's capital structure carried a debt-to-EBITDA (earnings before interest, taxes, depreciation, and amortization) ratio of 7.3 to 1.0. *Id.* ¶ 41.

268. Under the Chemours Separation Agreement, The Chemours Company agreed to defend and indemnify Historical DuPont against, and assumed for itself, all "Chemours Liabilities," defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time." This indemnification is uncapped and does not have a survival period.

269. The Chemours Company agreed to indemnify Historical DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the Chemours Spin-off; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Historical DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

270. The Chemours Company agreed to indemnify Historical DuPont from, and assume all, environmental liabilities that arose prior to the Chemours Spin-off if they were "primarily associated" with the Performance Chemicals Business. Such liabilities were deemed "primarily associated" if Historical DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

271. The Chemours Company also agreed to use its best efforts to be fully substituted for Historical DuPont with respect to "any order, decree, judgment, agreement or [any litigation

or investigation] with respect to Chemours Assumed Environmental Liabilities" in effect at the time of the Chemours Spin-off. Chemours Separation Agreement at § 6.10(b).

272. The schedules to the Chemours Separation Agreement, as referenced in the "Chemours Assumed Environmental Liabilities" definition, have never been publicly filed.

273. The Chemours Spin-off was predicated upon a determination that Chemours would be solvent following the Chemours Spin-off (*see* Chemours Separation Agreement at § 4.5(e)), but that solvency opinion was based upon faulty and fictitious certified "maximum" liability figures that were unrealistic and designed to mask Chemours's insolvency.

274. Houlihan Lokey (Houlihan) was commissioned to provide a financial opinion regarding Chemours's solvency on the date of the Chemours Spin-off. *See* Chemours Compl., ¶¶ 49-50. Houlihan's opinion, however, was based on Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for dozens of sites that were given to it by Historical DuPont. *Id.* ¶ 50.

275. DuPont engineered the "High End Maximum Realistic Exposure" figures to massively understate the real potential maximum exposure. *Id.* ¶ 56.

276. In May 2015, Historical DuPont demanded that Chemours's newly appointed chief financial officer (Mark E. Newman) certify to the accuracy of the "High End (Maximum) Realistic Exposure" numbers. *Id.* ¶ 52. Newman conditioned his certification upon Historical DuPont's acknowledgement that it supplied the maximum liability numbers, which Historical DuPont did through "Backup Certificates" signed by its employees. *Id.*

277. Historical DuPont understated the real maximum liabilities related to the Chemours Spin-off.

278. For multiple categories of litigation (such as PFOA, other PFAS, and benzene), Historical DuPont does not appear to have undertaken any analysis. *Id.* ¶ 58. Rather, Historical

DuPont's certification invoked a supposed "analysis" of the maximum liabilities done by
Deloitte Transactions and Business Analytics LLP (Deloitte).  *Id.*  But Deloitte did not certify
those "maximums."  *Id.*

279.    Prior to the closing of the Chemours Spin-off, Chemours's management
complained to Historical DuPont's senior management that Chemours would lack appropriate
cash reserves.  *See* Chemours Compl., ¶ 51.

280.    In June 2015, Historical DuPont summarily rejected the plea of Chemours's chief
financial officer for an additional $200-300 million in cash reserves to function on day one.  *Id.*
¶ 32.

281.    Historical DuPont ignored the concerns of Chemours's management that paying
quarterly stockholder dividends of $100 million would adversely affect Chemours's cash
position.  *Id.* ¶ 51.  Chemours's management went on to cut future dividends to almost zero after
the Chemours Spin-off.  *Id.* ¶ 74.

282.    On July 1, 2015, Historical DuPont spun off Chemours.

283.    Chemours's financial condition at the time of the Chemours Spin-off was rapidly
deteriorating and Chemours as an independent company was suffering from slumping EBITDA.

284.    In the midst of weakness in the global titanium dioxide market cycle and
continued foreign currency impacts, Chemours had vastly overstated its own financial health.

285.    Chemours's financial condition was much worse at the time of the Chemours
Spin-off than Chemours and Historical DuPont publicly disclosed.

286.    At the time of the Chemours Spin-off, Chemours's debt-to-EBITDA ratio was 7.3
to 1.0.  *Id.* ¶ 41.  This ratio far exceeded the Credit Agreement's maximum "Total Net Leverage
Ratio," barring Chemours from accessing $1 billion of revolving loans.  *See* Credit Agreement, §
6.13.

287.   Chemours suffered a liquidity shortage within months of the Chemours Spin-off. Chemours Compl., ¶ 75.  As a result, Chemours laid off 1,000 employees, shut plants or production lines in Delaware and Tennessee, sold off business lines, undertook two corporate restructurings, and made multiple amendments to the Credit Agreement.  *Id.* ¶ 76.

288.   In November 2015, Chemours announced that it would sell to Dow its facility in Beaumont, Texas for approximately $140 million in cash.  *Id.* ¶ 77.

289.   In February 2016, Historical DuPont advanced Chemours $190 million to pay for goods and services to be provided to Historical DuPont through mid-2017.  *Id.*

290.   As of the last trading date before the Chemours Spin-off closed, the markets reflected Chemours's insolvency.[4]  As set forth in Chemours's publicly filed financial statements, the market believed that Chemours was insolvent by $77 million.

291.   On August 6, 2015, Chemours filed its first Form 10-Q following the Chemours Spin-off, containing a deconsolidated balance sheet as of June 30, 2015, immediately prior to the Chemours Spin-off, reflecting Chemours's insolvency by at least $309 million.

292.   Just three months after the Chemours Spin-off, Chemours was insolvent by $829 million based upon the value of its traded debt.

A.   **Historical DuPont Saddled Chemours with Liabilities Far in Excess of the Amounts Attributed to Such Liabilities at the Time of the Chemours Spin-off.**

293.   In 2005, Historical DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.  Under the terms of the 2005 class action settlement, Historical DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded

---

[4] Chemours's share price, originally pegged by DuPont at $21 per share, declined to $11.48 within a month, and to $3.16 within six months.  Chemours Compl., ¶ 65.

regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

294.    Also in 2005, Historical DuPont agreed to pay $16.5 million to resolve eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

295.    The C8 science panel completed its research in 2013 and found several significant diseases, including cancer, with a probable link to PFOA.  Thereafter, more than 3,500 personal injury claims were filed in Ohio and West Virginia (in connection with the 2005 class-action settlement) that were consolidated into a multidistrict litigation court in Ohio (the Ohio MDL).[5]

296.    At the time of the Chemours Spin-off, Historical DuPont certified to Houlihan a "maximum" liability figure for the 3,500 cancer and other bodily injury claims relating to PFOA of $128 million.  *Id.* ¶¶ 82, 84.

297.    In mid-2016, Historical DuPont lost the first three bellwether trials, the first having gone to trial just two months after the Chemours Spin-off.  Juries returned multi-million dollar verdicts against Historical DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their illnesses, in the total amount of $19.7 million.  *Id.* ¶ 85.

298.    On February 13, 2017, Historical DuPont and The Chemours Company reached a global settlement of the Parkersburg, West Virginia cases agreeing to pay $670.7 million to resolve the Ohio MDL.  *Id.* ¶¶ 89-90.

299.    At the time of the Chemours Spin-off, Historical DuPont certified Chemours's

---

[5] Under the settlement, if the science panel found a "probable link" as to a disease, plaintiffs having that disease could then bring personal injury actions against DuPont, and DuPont could not defend by contesting general causation.  *See* Chemours Compl., ¶¶ 82-83.

"maximum" exposure as $2.09 million with respect to Historical DuPont's Fayetteville Works operation in North Carolina. *Id.* ¶ 93. At the time of the Chemours Spin-off, Historical DuPont knew that the Fayetteville plant had been discharging PFAS for 30 years or more into the Cape Fear River, which serves as the source of drinking water for tens of thousands of people. *Id.* ¶ 94.

300. Beginning in September 2017, the State of North Carolina, public water authorities, well owners, and a consolidated putative class of North Carolina residents, among others, filed suit against Chemours and/or Historical DuPont. *Id.* ¶ 97.

301. In February 2019, Chemours entered into a judicially approved consent order with the State of North Carolina to resolve North Carolina's claims arising from Historical DuPont's long-running discharges into the Cape Fear River and contamination of area groundwater. *Id.* ¶ 99. That consent order requires Chemours to take steps to remediate Historical DuPont's historical contamination and to implement environmental protection measures at a cost of more than $200 million. Additionally, a number of private lawsuits relating to Historical DuPont's activities in the region remain outstanding, including a class action.

302. At the time of the Chemours Spin-off, Historical DuPont certified that the "maximum" Chemours could have to pay for total New Jersey environmental liabilities was $337 million, divided among different sites in New Jersey. *Id.* ¶ 101. In 2018, in connection with the DowDuPont spin-off, Historical DuPont revised its liability estimate upward to approximately $620 million. *Id.* The State of New Jersey has criticized even Historical DuPont's upward-revised estimates, claiming it "implausible" that these amounts could represent "good-faith estimates of [Historical DuPont's historical New Jersey] environmental obligations and liabilities." *Id.*

303. For benzene-related liabilities, Historical DuPont certified a "maximum" liability

of $17 million, including defense costs, at the time of the Chemours Spin-off. *Id.* ¶ 108. In 2018, Historical DuPont provided Chemours with a more comprehensive study valuing the potential maximum costs for benzene-related liabilities at over $111 million. *Id.* Historical DuPont addressed PFAS litigation, if at all, as part of a catch-all "maximum" of $194 million covering "General Litigation . . . to Perpetuity," which apparently included everything from PFAS liabilities to commercial litigation. *Id.* ¶ 110.

304.    Significant additional environmental and other litigation arising from Historical DuPont's performance chemical business was likewise pending or threatened at the time of the Chemours Spin-off and additional lawsuits continue to be filed against Historical DuPont relating to its performance chemicals business.

305.    In 2017, Chemours then also agreed, in an amendment to the Chemours Separation Agreement, to pay Historical DuPont $25 million for future PFOA costs not covered by the Chemours Separation Agreement for each of the next five years (up to an additional $125 million). Historical DuPont also agreed to cover additional amounts up to $25 million for five years, with Chemours taking responsibility for any amounts greater than $50 million.

306.    The effect of the Chemours Spin-off was to segregate a large portion of Historical DuPont's environmental (and other) liabilities, including liabilities related to its manufacturing, use, and disposal of PFAS compounds, and give them to an undercapitalized entity, thus attempting to limit the funds available to satisfy Historical DuPont's legacy liabilities.

307.    Given that Chemours is allegedly responsible for all or substantially all of Historical DuPont's historic environmental liabilities, is saddled with debt, and has comparatively few assets, the separation and spin-off have been described by some market commentators as "a bankruptcy waiting to happen" and "complete securities fraud."

**B.      Following the Chemours Spin-off, Historical DuPont Turned Its Attention to**

**the Next Steps in Its Multi-Step Scheme to Move Valuable Assets Away from PFAS Creditors.**

308.   On December 11, 2015, Historical DuPont announced a merger with Old Dow into the combined DowDuPont (the Merger).  DowDuPont would eventually, in 2019, split into three independent companies: an agriculture company, a materials science company, and specialty products company.  These actions were all a continuation of the fraudulent Chemours Spin-off, which was a necessary precondition to these later mergers and spins.

309.   The DowDuPont Merger closed on August 31, 2017, with Old Dow and DuPont each becoming wholly owned subsidiaries of DowDuPont.

310.   After the completion of the Merger, DowDuPont engaged in a number of internal transactions, realignments, and diversities, that resulted in the transfer, directly or indirectly, of a substantial portion of what had been Historical DuPont's assets from the combined DowDuPont.

311.   Pursuant to an April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (the DowDuPont Separation Agreement), DowDuPont jettisoned away from Chemours's and Historical DuPont's creditors DowDuPont's agriculture chemical and seed business (which went with Corteva) and DowDuPont's materials science business (which went with New Dow) (the DowDuPont Separation).

312.   The spin-off of DowDuPont's materials science division into New Dow (the Dow Spin-off) occurred on April 1, 2019, and New Dow became an independent, publicly traded company on April 1, 2019.  New Dow was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the materials science business, and Corteva Inc. was formed as a wholly-owned subsidiary of DowDuPont to serve as the holding company for the agriculture business.  The Dow Spin-off was accomplished through a pro rata dividend in-kind of all of New Dow's then-issued and outstanding shares of common stock, to holders of DowDuPont's common

stock as of the close of business on March 21, 2019 (the Dow Distribution).

313.     The spin-off of DowDuPont's agriculture chemical and seed business to Corteva (a.k.a. Corteva Agriscience) (the Corteva Spin-off) occurred on June 1, 2019.  The Corteva Spin-off was accomplished through a pro rata dividend in-kind of all of the then-issued and outstanding shares of Corteva's common stock, to holders of Historical DuPont's common stock as of the close of business on May 24, 2019 (the Corteva Distribution).

314.     In connection with the Dow Distribution and the Corteva Distribution, DowDuPont entered into certain agreements that, among other things, effect the separations, provide for the allocation of assets, employees, liabilities, and obligations (including its investments, property and employee benefits and tax-related assets and liabilities) among DowDuPont, New Dow, and Corteva.

315.     Pursuant to the DowDuPont Separation and Distribution Agreement as well as a June 1, 2019 "Letter Agreement," DowDuPont agreed to indemnify both New Dow and Corteva against certain litigation, environmental, workers' compensation, and other liabilities that arose prior to the distribution.

316.     On or about June 1, 2019, DowDuPont changed its name to DuPont de Nemours, Inc. (i.e., New DuPont), which now holds the former conglomerate's specialty products business.

317.     The DowDuPont board of directors believed the completion of the post-Merger separations was—in DowDuPont's words—"the best available opportunity to unlock the value of DowDuPont's businesses."  The practical effect of the post-Merger separations was to frustrate and hinder creditors of Historical DuPont and Chemours by moving valuable assets further away from Historical DuPont.

318.     As a result of these transactions, the assets Historical DuPont had held following the Chemours Spin-off, including the Dividend and/or the proceeds or products thereof, are now

distributed across three companies: DowDuPont, New Dow, and Corteva.

319. Many details about these transactions are hidden from the public in confidential and/or non-public schedules and exhibits to the various agreements and this has hampered creditors' efforts to understand the final disposition of Historical DuPont's valuable assets and the adequacy of the consideration received in return.

320. Pursuant to the DowDuPont Separation Agreement, DowDuPont and Corteva assumed direct financial liability of Historical DuPont, including liability that was *not* related to the agriculture, materials science, or specialty products businesses. Corteva was allocated 29% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business. DowDuPont was allocated 71% of all financial liabilities of Historical DuPont that are not related to the agriculture business, the materials science business, or the specialty products business.

321. Liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested have been allocated between Corteva and DowDuPont as set forth in the non-public confidential schedules to the DowDuPont Separation Agreement. To the extent that liabilities related to businesses and operations of Historical DuPont that were previously discontinued or divested are not listed on the non-public confidential schedules to the DowDuPont Separation Agreement, each of DowDuPont and Corteva may be responsible for $200 million each in the aggregate, and once liability exceeds the aggregate cap, then excess liability will be allocated to the other. In the event such liabilities exceed $200 million in the aggregate for each of DowDuPont and Corteva, liabilities are allocated 71% to DowDuPont and 29% to Corteva.

322. The DowDuPont Separation Agreement allocates DowDuPont's assets among DowDuPont, New Dow, and Corteva. Similarly, the DowDuPont Separation Agreement allocates DowDuPont's liabilities, including the liabilities of Historical DuPont.

323.     While the non-public nature of the schedules to the DowDuPont Separation Agreement obscures the precise extent of the liabilities retained by New Dow and those transferred to Corteva, the DowDuPont Separation Agreement caused Corteva and DowDuPont to bear the brunt of liabilities for Historical DuPont, including Historical DuPont's legacy PFAS liabilities and the liabilities of its former performance chemicals business.

324.     As a result of the Merger, DowDuPont was not a good-faith transferee of the proceeds of the Dividend because DowDuPont had sufficient knowledge about the Chemours Spin-off to induce it to inquire further about that transaction.

325.     In each of the Dow Spin-off and the Corteva Spin-off, neither the newly created New Dow nor Corteva were good-faith transferees of the proceeds of the Dividend, because each of New Dow and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

326.     New Dow was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by New Dow in the Dow Spin-off because New Dow had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce New Dow to inquire further about those liabilities.

327.     Likewise, Corteva was not a good-faith transferee of Historical DuPont's and DowDuPont's assets received by Corteva in the Corteva Spin-off because Corteva had sufficient knowledge about Historical DuPont's PFAS liabilities and other legacy environmental liabilities to induce Corteva to inquire further about those liabilities.

328.     Prior to the Dow Spin-off, Old Dow's March 31, 2019 consolidated balance sheet reflected tangible assets of $49,153,000,000 and balance sheet liabilities of $51,591,000,000. Following the Dow Spin-off, New Dow's June 30, 2019 consolidated balance sheet reflected

balance sheet tangible assets of $39,887,000,000 and balance sheet liabilities of $46,389,000,000. Thus, Old Dow's and New Dow's balance sheets' liabilities *exceeded* their balance sheet tangible assets, for Old Dow before the Dow Spin-off, and for New Dow after the Dow Spin-off.

329.    Before the Corteva Spin-off, Historical DuPont's March 31, 2019 balance sheet reflected tangible assets of $31,327,000,000 and liabilities of $32,002,000,000.  After the Corteva Spin-off, (i) Corteva's June 30, 2019 consolidated balance sheet, which includes Historical DuPont, reflected tangible assets of $19,064,000,000 and liabilities of $17,855,000,000 and (ii) Historical DuPont's June 30, 2019 balance sheet reflected tangible assets of $19,071,000,000 and liabilities of $21,928,000,000.  Thus, Historical DuPont's balance sheet liabilities *exceeded* its balance sheet tangible assets both before *and* after the Corteva Spin-off.  Additionally, after the Corteva Spin Transaction, Historical DuPont's liabilities included a $4.16 billion intercompany loan to Corteva.

330.    Prior to the Dow Spin-off and the Corteva Spin-off, Historical DuPont's balance sheet reflected an aggregate total cash, cash equivalents, and marketable securities of $3,814,000,000.  After the Dow Spin-off and the Corteva Spin-off, DowDuPont's balance sheet reflected an aggregate total cash, cash equivalents and marketable securities of $2,083,000,000.

331.    The Chemours Spin-off, the Dow Spin-off, and the Corteva Spin-off (collectively, the Spin Transactions), were a coordinated series of transactions through which Historical DuPont sought to spin-off (and separate) profitable and valuable assets, free and clear of billions of dollars of legacy environmental liabilities, including PFOA and PFAS liabilities.

332.    The Chemours Spin-off was part of a single integrated scheme that included the Dow Spin-off and the Corteva Spin-off.

333.    While the Spin Transactions as a whole are relevant to the fraudulent schemes alleged herein, each of the Spin Transactions constituted an actual or constructive fraudulent

transfer of assets.

## X.     CARRIER FIRE, CARRIER GLOBAL, AND RTX TRANSACTIONS.

334.    In 2000, Williams plc demerged into Chubb plc and Kidde plc.  Kidde-Fenwal, Inc. was a subsidiary of Kidde plc at the time of the demerger, and Kidde-Fenwal Inc.'s AFFF business became part of the newly formed Kidde plc.  National Foam, Inc. was a subsidiary of Kidde plc at the time of the demerger, and National Foam, Inc.'s AFFF business became part of the newly formed Kidde plc.  Kidde plc contractually acquired the assets of and contractually assumed the debts and liabilities of Kidde-Fenwal, Inc., National Foam, Inc., and more generally the Kidde group of companies that it acquired.  In July 2003, United Technologies Corporation (UTC) acquired Chubb plc, which became a business unit of UTC that focused on security and fire protection products and services.  UTC contractually acquired the assets of Chubb plc and contractually assumed the debts and liabilities of Chubb plc.  In 2005, UTC contractually acquired Kidde plc's assets and contractually assumed Kidde plc's debts and liabilities, including AFFF liabilities.  At the time of this transaction, Kidde plc owned Kidde and National Foam Inc.'s AFFF businesses.  Thus, as part of this transaction, UTC contractually assumed National Foam, Inc.'s assets, contractually assumed National Foam, Inc.'s debts and liabilities including AFFF liabilities, and contractually assumed Kidde-Fenwal Inc.'s assets and contractually assumed Kidde-Fenwal Inc.'s debts and liabilities, including AFFF liabilities.  UTC is liable for the AFFF liabilities of Kidde and National Foam, Inc. including but not limited through contractual assumption of liabilities and principles of successor liability.  UTC was the ultimate parent of Kidde-Fenwal Inc. from 2005-2020.

335.    According to UTC's 10-K for 2005 filed with the United States Securities & Exchange Commission (2005 10-K), in 2005 upon acquiring Kidde plc, UTC created a new fire and security business (UTC F&S) which included UTC's "former Chubb segment and Kidde's

industrial, residential and commercial fire safety businesses." In or around 2005, UTC also created a separate company known as UTC Fire & Security Americas Corporation, Inc. According to UTC's 2005 10-K, UTC F&S "designs, integrates, installs and services fire detection and fixed suppression systems and manufactures, sells and services portable fire extinguishers and other fire fighting equipment." UTC stated that "Kidde's U.S. presence will complement the largely European and Australian revenue base of the existing Chubb operations." UTC F&S provided "its products and services under Chubb, Kidde, Lenel and other brand names and sells directly to the customer as well as through manufacturers' representatives, distributors and dealers." In 2005 when UTC acquired Kidde plc, Kidde and Chubb brand products were being sold in the United States.

336.    In 2007, Kidde Fire Fighting, Inc. was merged into Kidde-Fenwal, Inc.

337.    In 2011, UTC moved UTC F&S to a new segment within UTC called UTC Climate, Controls & Security.

338.    After UTC bought Kidde plc in 2005, UTC and UTC Fire & Security Americas Corporation, Inc. designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF throughout the United States, including through the Kidde brand.

339.    Carrier Fire is the successor to UTC Fire & Security Americas Corporation, Inc. Carrier Fire therefore has successor liability for UTC Fire & Security Americas Corporation, Inc.'s design, manufacturing, marketing, distributing, and/or sales of PFAS-containing AFFF throughout the United States.

340.    After the acquisition of Kidde in 2005, UTC and UTC Fire & Security Americas Corporation, Inc. manufactured Kidde branded AFFF products at the same physical location in West Chester, Pennsylvania that Kidde-Fenwal had used to manufacture AFFF products prior to 2005.

341.     UTC and UTC Fire & Security Americas Corporation, Inc. controlled companywide decisions and strategy regarding the design, manufacturing, distribution, and sales of PFAS-containing AFFF.

342.     UTC controlled and coordinated "matters relating to our business as a whole" including its AFFF business, including research and development, sourcing of raw materials for products, strategic acquisitions, and its portfolio of assets including manufacturing facilities.

343.     UTC controlled research and development and spent substantial amounts of its own funds on these activities: "[s]ince changes in technology can have a significant impact on our operations and competitive position, we spend substantial amounts of our own funds on research and development." UTC controlled and engaged in research and development activities including through the United Technologies Research Center which serviced businesses across the entire company.

344.     UTC also controlled sourcing of raw materials for UTC's products based upon a companywide strategy: "We believe we have adequate sources for our purchases of materials, components, services and supplies used in our manufacturing. We work continuously with our supply base to ensure an adequate source of supply and to reduce costs. We pursue cost reductions through a number of mechanisms, including consolidating our own purchases, reducing the number of suppliers, strategic global sourcing and using online bidding competitions among potential suppliers."

345.     UTC decided to grow its AFFF business by acquiring Kidde plc in 2005. UTC stated in its 2005 10-K: "We seek to grow through strategic acquisitions. In the past several years, we have made various acquisitions and entered into joint venture arrangements intended to complement and expand our businesses, and may continue to do so in the future. The success of these transactions will depend on our ability to integrate assets and personnel acquired in these

transactions, apply our internal controls processes to these acquired businesses, and cooperate with strategic partners." Thus, UTC controlled strategic decisions to expand its AFFF business and used its expertise to integrate its newly acquired AFFF business with its existing AFFF business.

346.    UTC controlled and evaluated companywide assets, including manufacturing facilities where it made AFFF products: "Our management believes that the fixed assets capitalized and the facilities in operation at December 31, 2005 for the production of our products are suitable and adequate for the business conducted therein in the current business environment and have sufficient production capacity for their present intended purposes. Utilization of the facilities varies based on demand for the products. We continuously review our anticipated requirements for facilities, and based on that review, may from time to time adjust our facility needs."

347.    UTC recognized that it was subject to liability for the "safety or liability" of its products, including AFFF products: "product liability claims (including claims related to the safety or reliability of our products) can result in significant costs, including fines, as well as negative publicity, management distraction and damage to our reputation that could reduce demand for our products and services."

348.    UTC knew that the FFFC falsely told the federal government that UTC's telomer-based AFFF did not contain C8 surfactants. In a 2008 email exchange, two UTC employees discussed the FFFC's claim to the U.S. Department of Defense that telomer-based products were made with C6 surfactants rather than C8 surfactants. They agreed this claim was untrue and was likely done to distinguish telomer AFFF from 3M's discredited AFFF. One of UTC's employees observed that the FFFC had been "economical with the truth" when it led "the EPA to believe that fire fighting foam agents were only made with C6 surfactants."

349.    UTC and the Raytheon Company merged in April 2020. Afterwards, UTC was renamed Raytheon Technologies Corporation and recently renamed RTX Corporation.

350.     In April 2020, in connection with UTC's merger with the Raytheon Company, the former UTC F&S segment was spun off and became part of Carrier Global.  As part of this transaction, Carrier Global contractually assumed all liabilities connected to the UTC F&S segment and the subsidiaries that it acquired, including all AFFF liabilities.  At the time the 2020 Separation Agreement was executed, UTC already had been named as a defendant in numerous AFFF cases.

351.     Following the 2020 spin transaction, Carrier Global became the ultimate parent of Kidde.

352.     As part of the 2020 Separation Agreement, Carrier Global contractually agreed to indemnify UTC (now RTX) for all AFFF claims arising from all liabilities connected to UTC, UTC Fire & Security Americas Corporation, Inc., the UTC F&S segment, and the subsidiaries that Carrier Global acquired.  Carrier Global's contractual indemnification obligations to UTC are, by definition, co-extensive with Carrier Global's contractual assumption of liabilities.  Specifically, under the 2020 Separation Agreement, Carrier Global contractually assumed, and is obligated to contractually indemnify UTC for all "Carrier Liabilities," regardless of when they arose (i.e., regardless of whether they arose before, at, or after the Effective Time) or against whom such liabilities are asserted:

> *Acceptance and Assumption of Carrier Liabilities.* Carrier and the applicable Carrier Designees shall accept, assume and agree faithfully to perform, discharge and fulfill all the Carrier Liabilities in accordance with their respective terms (it being understood that if any Carrier Liability is a liability of a Carrier Transferred Entity or a wholly owned Subsidiary of a Carrier Transferred Entity, such Carrier Liability may be assumed by Carrier as a result of the transfer of all of UTC's and Otis's and any member of their respective Group's (as applicable) equity interests in such Carrier Transferred Entity from UTC, Otis, such member of the UTC Group and/or such member of the Otis Group, to Carrier or the applicable Carrier Designee). Carrier and such Carrier Designees shall be responsible for all Carrier Liabilities, regardless of when or where such Carrier Liabilities arose or arise, or whether the facts on which they are based occurred prior to or subsequent to the Effective Time, regardless of where or against whom such Carrier Liabilities are

asserted or determined (including any Carrier Liabilities arising out of claims made by UTC's, Otis's or Carrier's respective directors, officers, employees, agents, Subsidiaries or Affiliates against any member of the UTC Group, the Otis Group or the Carrier Group) or whether asserted or determined prior to the date hereof, and regardless of whether arising from or alleged to arise from negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the UTC Group, the Otis Group or the Carrier Group, or any of their respective directors, officers, employees, agents, Subsidiaries or Affiliates[.]

353.    The "Carrier Liabilities" include but are not limited to the liabilities of UTC, UTC Fire & Security Americas Corporation, Inc., Kidde, and Kidde plc.  Specifically, under Section 2.3(a) of the 2020 Separation Agreement, "'Carrier Liabilities' shall mean the following Liabilities of any of the Parties or any members of their respective Groups:"

> (iv) "all Liabilities" existing or occurring prior to the Separation, "to the extent that such Liabilities relate to, arise out of or result from the conduct of the Carrier Business or a Carrier Asset, including all Liabilities relating to, arising out of or resulting from any matter set forth on Schedule 2.3(a)(iv).

Thus, Carrier contractually assumed the AFFF liabilities of Kidde-Fenwal, Inc. and Kidde plc.

354.    Section 2.3(a) of the 2020 Separation Agreement further provides that "Carrier Liabilities" shall also mean the following Liabilities of any of the Parties or any members of their respective Groups:

> (v) any and all Liabilities that are expressly provided by this Agreement or any Ancillary Agreement (or the Schedules hereto or thereto) as Liabilities to be assumed by Carrier or any other member of the Carrier Group, and all agreements, obligations and Liabilities of any member of the Carrier Group under this Agreement or any of the Ancillary Agreements; [and]

> (viii) all Liabilities arising out of litigation or other claims (including in respect of Environmental Liabilities or asbestos Liabilities) made by any Third Party (including UTC's, Otis's or Carrier's respective directors, officers, stockholders, employees and agents) against, or any investigations, sanctions or orders of any Governmental Authority in respect of or binding upon, any member of the UTC Group, the Otis Group or the Carrier Group to the extent (A) the facts underlying such litigation, claim, investigation, sanction or order relate to, arise out of or result from the conduct of the Carrier Business or the Carrier Assets or the other Liabilities of Carrier referred to in the foregoing clauses (i) through (vii) . . . .

355.    Article I of the 2020 Separation Agreement defines Carrier Group to include any

entity, such as UTC Fire & Security Americas Corporation, Inc., Kidde, and Kidde plc, that were subsidiaries of Carrier either before or after the transaction: "(a) prior to the Effective Time, Carrier and each Person that will be a Subsidiary of Carrier as of immediately after the Effective Time, including the Carrier Transferred Entities and their respective Subsidiaries" and "(b) on and after the Effective Time, Carrier and each Person that is a Subsidiary of Carrier." Article I also provides that "Carrier Business" includes the reporting segment (UTC Climate, Controls & Security) that contained the National Foam Business operated by Kidde plc.

356. In addition to contractually assuming all Carrier Liabilities, under Section 4.1(a) of the 2020 Separation Agreement, Carrier Global also must contractually indemnify UTC/RTX for all Carrier Liabilities. This provision seeks to relieve UTC of any remaining AFFF Liability and to prevent Raytheon from taking on any.

## XI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Public Nuisance
### (All Defendants except New Dow)

357. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

358. Defendants have manufactured, marketed, distributed, promoted, and/or sold the AFFF containing PFAS and/or PFAS to be used in AFFF, including the Six PFAS and/or products containing the Six PFAS, in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety, and welfare of the general public and the State of Maine, causing inconvenience and annoyance.

359. Defendants, by their negligent, reckless, and willful acts and omissions set forth above, have, among other things, knowingly unleashed the long-lasting AFFF-related PFOS,

PFOA, PFNA, PFHxS, PFHpA, and/or PFDA contamination of State natural resources and property throughout Maine, having concealed the threat, thereby causing and threatening to cause AFFF-related contamination from the Six PFAS of the State's natural resources and property. Defendants' AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA continues to spread in and contaminate more State natural resources and property throughout the State.

360. Each Defendant has caused, contributed to, maintained, and/or participated in a public nuisance by substantially and unreasonably interfering with, obstructing, and/or threatening Mainers' health, safety, peace, comfort, and convenience, including, among other things, (i) Mainers' common public rights to enjoy State natural resources and property free from unacceptable health risk, pollution, and contamination, and (ii) the State's *parens patriae* and public trust abilities and responsibilities to protect, conserve, and manage the State's natural resources.

361. Each Defendant has, at times relevant to this Complaint, caused, contributed to, maintained, and/or participated in the creation of such public nuisance. Among other things, each Defendant is a substantial contributor to such public nuisance as follows:

     a. Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, when they knew, or reasonably should have known, that the Six PFAS would escape from those who store or use AFFF through leaks and other spills and contaminate State natural resources and property;

     b. Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/or PFAS to be

used in AFFF, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, that was delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the Six PFAS would be released readily into the environment during the normal, intended, and foreseeable uses of the PFAS-containing AFFF; and when released, the Six PFAS would persist in the environment and not break down, contaminate State natural resources and property, including soils, sediments, groundwater, surface waters, wildlife, and drinking water supplies, and, ultimately, be difficult and costly to remove;

       c.      Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, that was delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the Six PFAS posed substantial risks to human health;

       d.      Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, that was delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the Six PFAS and/or AFFF containing the Six PFAS would be released readily into the environment during the normal, intended and foreseeable uses of PFAS-containing AFFF.  Defendants improperly marketed and promoted AFFF containing PFAS and/or PFAS to be used in AFFF for uses and applications that would inevitably cause harmful environmental contamination, and provided warnings and instructions for use and disposal that were

inadequate to protect against the risk to public health and the environment created by the ordinary use and disposal of such products; and

       e.    Defendants manufactured, marketed, distributed, promoted, sold, and/or otherwise placed into the stream of commerce AFFF containing PFAS and/or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, that was delivered into the State (and areas affecting the State's natural resources and property), when they knew, or reasonably should have known, that the AFFF containing PFAS and/or PFAS to be used in AFFF were toxic and would inevitably produce contamination and human health risks that have occurred. Yet Defendants misled the public, regulators, and their own customers about these key facts, instead promoting AFFF containing PFAS and/or PFAS to be used in AFFF as safe, and that they were not environmentally hazardous and did not require special precautions in use or disposal.

362.    Defendants, including 3M and DuPont, also had first-hand knowledge and experience regarding releases of PFAS to the environment, including groundwater and other natural resources, because each of them owned, operated, and/or controlled PFAS manufacturing facilities and/or facilities using PFAS where there were releases of PFAS into the surrounding environment that caused substantial contamination. For example, 3M owned, operated, and/or controlled a PFAS manufacturing facility in Cottage Grove, Minnesota, and disposed of PFAS at sites located in the City of Oakdale, Minnesota; Cottage Grove and Woodbury, Minnesota; and the Washington County Landfill in City of Lake Elmo, Minnesota. There was substantial PFAS contamination associated with these 3M facilities. DuPont owned, operated, and/or controlled a PFAS manufacturing facility in Parkersburg, West Virginia, and the Chambers Works site in New Jersey. There was substantial PFAS contamination associated with these DuPont facilities.

363.    Despite their knowledge that contamination of the State's natural resources and

property with AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA was the inevitable consequence of their conduct, Defendants failed to provide adequate warnings or special instructions, failed to take any other reasonable precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of the Six PFAS in their product information and/or instructions for use.

364.    Defendants knew, or in the exercise of reasonable care should have known, that the introduction and use of AFFF containing PFAS and/or PFAS to be used in AFFF, including PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of natural resources and property relied upon by the State and its citizens.

365.    Defendants have caused, contributed to, maintained, and/or participated in a public nuisance that has caused substantial injury to the State's natural resources and property, in which the public has interests represented by and protected by the State in its trustee and *parens patriae* capacities.  Defendants' conduct also threatens to cause substantial additional injury to the State's natural resources and property.  The public nuisance has caused and/or threatens to cause substantial injury to property directly owned by the State.

366.    The contamination of the State's natural resources and property with AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA is ongoing, as these substances continue to threaten, migrate into, and enter the State's natural resources and property, and cause new contamination in new locations.

367.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs

and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

368.    As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

369.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## SECOND CAUSE OF ACTION

### Statutory Nuisance - 17 M.R.S. §§ 2701 & 2802
### (All Defendants except New Dow)

370.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

371.    Under 17 M.R.S. § 2701, "[a]ny person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages, unless otherwise specially provided."

372.    Under 17 M.R.S. § 2802, such nuisances specifically include the "corrupting or rendering unwholesome or impure the water of a river, stream, pond or aquifer."

373.    As set forth at length herein, Defendants have "corrupted," or "render[ed] unwholesome or impure" the water of aquifers, rivers, streams, and/or ponds throughout the State by engaging in the acts and omissions alleged in this Complaint.  For example, and as shown above, AFFF-related PFAS, are associated with significant harmful health effects in humans and animals, including at low concentrations.

374.    Defendants' corruption of rivers, streams, ponds, and/or aquifers caused unreasonable harm by contaminating such rivers, streams, ponds, and/or aquifers, including groundwater, drinking water supplies, public drinking water supply wells, private drinking water

wells, and/or other natural resources and property of the State.

375.     As a result of Defendants' actions, AFFF-related PFAS has profoundly and unreasonably affected rivers, streams, ponds, aquifers and/or groundwater in the State, compromising its use for household purposes including drinking, cooking, and bathing, and risking public health via exposure to PFAS.  Also, as a result of Defendants' actions, AFFF-related PFAS contamination poses an extraordinary and unjust financial burden on the State and its citizens, who bear the costs of testing, monitoring, and remediation although Defendants profited from the manufacturing, marketing, distribution, and/or sale of AFFF containing PFAS and/or PFAS to be used in AFFF.

376.     As a direct and proximate result of Defendants' acts and omissions, rivers, streams, ponds and/or aquifers in the State were and are contaminated with AFFF-related PFAS. The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, and monitoring costs and expenses related to contamination of rivers, streams, ponds and/or aquifers in the State, including drinking water, for which Defendants are strictly, jointly, and severally liable.

377.     As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, for which Defendants are strictly, jointly, and severally liable.

378.     Defendants' acts and omissions have caused and/or threatened to cause injuries to rivers, streams, ponds and/or aquifers in the State that are indivisible.

379.     Maine statutory law also authorizes the State to seek equitable relief, in addition to damages, for the unreasonable harm caused by AFFF-related PFAS contamination, including an order that the nuisance be abated or removed at the expense of Defendants. 17 M.R.S. §§ 2702, 2706.

## THIRD CAUSE OF ACTION

### Common-Law Trespass
### (All Defendants except New Dow)

380.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

381.    The State has significant property interests in the natural resources of the State. These property rights and interests include, but are not limited to, the State's public trust and *parens patriae* interests and authority in protecting such natural resources from contamination and injury.

382.    A trustee by definition is authorized to take action to protect trust property as if the trustee were the owner of the property.

383.    The State also brings this action in its *parens patriae* capacity on behalf of its citizens to protect quasi-sovereign interests, including the integrity of the State's natural resources.  The State in its *parens patriae* capacity seeks relief for the invasion of its citizens' possessory interests by AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.

384.    The State never authorized Defendants' invasion of its natural resources and property with any of the foregoing AFFF-related PFAS.

385.    Defendants knew, or in the exercise of reasonable care should have known, that the Six PFAS are hazardous to natural resources and property, including groundwater, surface water, and public water systems, and including the property and interests of the State.

386.    Defendants' acts and omissions directly and proximately caused and continue to cause AFFF-related PFAS to intrude onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property.

387.    At the time of Defendants' acts and omissions, Defendants knew with substantial certainty that AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA would reach onto and contaminate State natural resources and property, including groundwater, surface waters, soils, sediments, and other natural resources and property.  Defendants knew and understood, or should have known and understood, the properties of the Six PFAS, including through their knowledge and experience regarding contamination from the Six PFAS at their own facilities where they manufactured and/or used the Six PFAS and other conduct alleged in this Complaint.  Despite this knowledge, Defendants manufactured, marketed, distributed, promoted, and/or sold AFFF containing PFAS and/or PFAS to be used in AFFF with a profit motive in a way that has harmed the State.

388.    As a direct and proximate result of the Defendants' acts and omissions, the State has been damaged and is entitled to compensatory damages for the costs of investigation, remediation, and treatment, damages for loss of use and enjoyment of State natural resources and property, cost of restoring State natural resources and property to their original conditions as if the trespass had not occurred, and/or other relief the State may elect at trial.

389.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

390.    As a further direct and proximate result of Defendants' acts and omissions, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

391. Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

### FOURTH CAUSE OF ACTION

### Strict Liability for Design Defect and/or Defective Product – 14 M.R.S. § 221 (All Defendants except New Dow)

392. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

393. Defendants during the relevant time period were designers, manufacturers, marketers, distributors, and/or sellers of AFFF containing PFAS and/or PFAS to be used in AFFF, including AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.

394. As designers, manufacturers, marketers, distributors, and/or sellers of AFFF containing PFAS, and/or PFAS to be used in AFFF, Defendants owed a duty to all persons whom Defendants' AFFF containing PFAS and/or PFAS to be used in AFFF might foreseeably harm, including the State and its citizens, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

395. Defendants represented, asserted, claimed, and/or warranted that AFFF containing PFAS and/or PFAS to be used in AFFF were safe for their intended and foreseeable uses.

396. When Defendants placed AFFF containing PFAS and/or PFAS to be used in AFFF into the stream of commerce and delivered them into the State, they were defective, unreasonably dangerous, and not reasonably suited for their intended, foreseeable, and ordinary storage, handling, and uses, including for the following reasons:

a. Unintended releases of the AFFF products containing the Six PFAS are commonplace;

b. The Six PFAS are released to the environment through the normal and foreseen

use of the Six PFAS for use in AFFF products and/or AFFF products containing the Six PFAS;

c.       When the Six PFAS are released into the environment, the Six PFAS have a tendency to mix with groundwater and migrate great distances;

d.       When the Six PFAS are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, the Six PFAS persist over long periods of time because the Six PFAS are recalcitrant to biodegradation and bioremediation;

e.       The Six PFAS found within AFFF products bioaccumulate in humans and wildlife;

f.       Very low concentrations of the Six PFAS found within AFFF products can make water unpotable;

g.       The Six PFAS found within AFFF products pose risks to human health;

h.       Defendants, with knowledge of the risks, failed to use reasonable care in the design of the Six PFAS and/or AFFF containing the Six PFAS;

i.       The Six PFAS found within AFFF pose greater dangers to State natural resources and property than would be expected by ordinary persons such as the State, users, and the general public exercising reasonable care;

j.       The risks which the Six PFAS found within AFFF products pose to State natural resources and property outweigh their utility in firefighting activities and training exercises, among other supposed benefits; and

k.       Safer alternatives to the Six PFAS found within AFFF and/or AFFF products containing the Six PFAS have existed and been available to Defendants at all times relevant to this Complaint.

397.       The above-described defects exceeded the knowledge of ordinary persons such as the State, users, and the general public exercising reasonable care.

398.    AFFF containing PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA and/or Defendants' Six PFAS for use in AFFF were distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

399.    AFFF containing PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA and/or Defendants' Six PFAS for use in AFFF reached consumers and the environment in a condition substantially unchanged from that in which they left Defendants' control.

400.    AFFF containing PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA and/or Defendants' Six PFAS for use in AFFF failed to perform as safely as an ordinary consumer would expect when used in their intended and reasonably foreseeable manner.

401.    As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, and monitoring, and other costs and expenses related to such AFFF-related contamination of State natural resources and property, for which Defendants are strictly, jointly, and severally liable.

402.    As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable.

403.    Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

### FIFTH CAUSE OF ACTION

### Strict Liability for Failure to Warn - 14 M.R.S. § 221

**(All Defendants except New Dow)**

404.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

405.     Strict liability attaches to manufacturers when, by the failure to provide adequate warnings about its hazards, a product is sold in an unreasonably dangerous condition.

406.     As manufacturers, marketers, distributors, promoters, and/or sellers of AFFF containing PFAS and/or PFAS for use in AFFF, Defendants had a duty to issue warnings to the State, the public, public officials, consumers, and users of the risks posed by AFFF containing PFAS and the Six PFAS.

407.     Defendants knew that AFFF containing PFAS and/or PFAS for use in AFFF would be purchased, transported, stored, handled, used, and disposed of without notice of the hazards which the Six PFAS and/or AFFF containing PFAS pose to State natural resources and property.

408.     Defendants' failure to warn of these hazards made AFFF containing PFAS and/or such PFAS for use in AFFF unreasonably dangerous.

409.     At all times relevant to this Complaint, Defendants have had actual and/or constructive knowledge of facts, including the following, which rendered AFFF containing PFAS and/or PFAS for use in AFFF hazardous to State natural resources and property:

a.     Unintended releases of AFFF products containing the Six PFAS are commonplace;

b.     The Six PFAS are released to the environment through the normal and foreseen use of AFFF products containing the Six PFAS;

c.     When the Six PFAS are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, the Six PFAS have a tendency to mix with

groundwater and migrate great distances;

      d.      When the Six PFAS are released into the environment through the intentional use of or accidental spilling of PFAS-containing AFFF, the Six PFAS persist over long periods of time because the Six PFAS are recalcitrant to biodegradation and bioremediation;

      e.      The Six PFAS found within AFFF products bioaccumulate in humans and wildlife;

      f.      Very low concentrations of the Six PFAS found within AFFF products can make water unpotable;

      g.      The Six PFAS found within AFFF products pose risks to human health; and

      h.      PFAS found within AFFF are associated with certain cancers in humans.

410.      The foregoing facts relating to the hazards that the AFFF containing PFAS and/or PFAS for use in AFFF pose to State natural resources and property are not the sort of facts that, at the relevant times, the State, users, consumers, or the general public could ordinarily discover or protect themselves against absent sufficient warnings.

411.      Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged here to the State, public officials, users, consumers, and/or the general public.

412.      Defendants' failure to warn proximately caused reasonably foreseeable injuries to the State.  The State and others would have heeded legally adequate warnings, and AFFF containing PFAS and/or PFAS for use in AFFF would not have gained approval in the marketplace, and AFFF containing PFAS and/or PFAS for use in AFFF would have been treated differently in terms of procedures for firefighting training and extinguishment activities.

413.      As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.  The State has incurred, is incurring, and will incur,

investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are strictly, jointly, and severally liable.

414.     As a further direct and proximate result of the acts and omissions of Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are strictly, jointly, and severally liable.

415.     Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## SIXTH CAUSE OF ACTION

### Negligence
### (All Defendants except New Dow)

416.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

417.     As manufacturers, marketers, distributors, promoters, and/or sellers of AFFF containing PFAS and/or PFAS for use in AFFF, Defendants owed a duty to the State as well as to all persons whom Defendants' PFAS-containing AFFF products might foreseeably harm to exercise due care in the design, manufacturing, promotion, marketing, sale, distribution, testing, labeling, use, warning, and instructing for use of AFFF containing PFAS and/or PFAS for use in AFFF.

418.     Defendants had a duty and the financial and technical means to test AFFF containing PFAS and/or PFAS for use in AFFF and to warn public officials, consumers, users, and the general public of the hazardous characteristics of PFAS.

419.     Defendants had a duty to not contaminate the environment.

420.     Defendants had a duty to not contaminate State natural resources and lands in which the State has substantial property interests.

421.     Defendants represented and claimed that AFFF containing PFAS and/or PFAS for use in AFFF did not require any different or special handling or precautions.  Any warnings Defendants did provide were generic and did not suffice to warn reasonable users of the dangers to the environment posed by these AFFF containing PFAS products and/or the Six PFAS found within such products.

422.     At times relevant to this Complaint, Defendants knew or should have known of the following environmental and health risks, among others:

a.     Unintended releases of AFFF products containing PFAS, including the Six PFAS, are commonplace;

b.     The Six PFAS are released to the environment through the normal and foreseen use of AFFF products containing the Six PFAS;

c.     When the Six PFAS are released into the environment through the intentional use or accidental spilling of PFAS-containing AFFF, the Six PFAS have a tendency to mix with groundwater and migrate great distances;

d.     When the Six PFAS are released into the environment through the intentional use or accidental spilling of PFAS-containing AFFF, the Six PFAS persist over long periods of time because the Six PFAS are recalcitrant to biodegradation and bioremediation;

e.     The Six PFAS found within AFFF products bioaccumulate in humans and wildlife;

f.     Very low concentrations of the Six PFAS found within AFFF products can make water unpotable;

g.     The Six PFAS found within AFFF products pose risks to human health; and

h.     PFAS, including the Six PFAS, found within AFFF are associated with certain

cancers in humans.

423.     The foregoing facts relating to the hazards which PFAS-containing AFFF and the Six PFAS, pose to State natural resources and property are not the sort of facts which the State, users, consumers, and the general public could ordinarily discover or protect themselves against absent sufficient warnings.

424.     AFFF containing PFAS and/or PFAS for use in AFFF manufactured, marketed, distributed, promoted and/or sold by Defendants were used in a normal and foreseeable manner.

425.     Defendants have negligently breached their duties of due care to the State, consumers, users, and the general public by, among other things:

a.     Promoting and defending AFFF containing PFAS and/or the Six PFAS for use in AFFF, while concealing the threat that AFFF containing PFAS and/or the Six PFAS for use in AFFF pose to natural resources and property;

b.     Marketing, touting, and otherwise promoting the benefits of AFFF containing PFAS and/or the Six PFAS for use in AFFF without disclosing the truth about the environmental and potential health hazards posed by AFFF containing PFAS and/or the Six PFAS for use in AFFF;

c.     Failing to eliminate or minimize the harmful impacts and risks posed by AFFF containing PFAS and/or the Six PFAS for use in AFFF;

d.     Failing to curtail or reduce the distribution of AFFF containing PFAS and/or the Six PFAS for use in AFFF;

e.     Failing to instruct the State, consumers, users, and the general public about the safe handling and use of AFFF containing PFAS and/or the Six PFAS for use in AFFF; and/or

f.     Failing to warn and instruct the State, consumers, users, and the general public about the risks to natural resources posed by AFFF containing PFAS and/or the Six PFAS for use

in AFFF about the necessary precautions and steps to prevent or minimize releases of such AFFF containing PFAS in distribution, storage, use and disposal, and about how to remediate such releases promptly.

426.     As a direct and proximate result of Defendants' acts and omissions, the State's natural resources and property are contaminated with AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA.  The State has incurred, is incurring, and will incur, investigation, remediation, cleanup, restoration, removal, treatment, monitoring, and other costs and expenses related to contamination of the State's natural resources and property, for which Defendants are jointly and severally liable.

427.     As a further direct and proximate result of the acts and omissions of the Defendants, the State has sustained and will sustain other substantial expenses and damages, including damages for loss of use and enjoyment, for which Defendants are jointly and severally liable.

428.     Defendants' acts and omissions have caused and/or threatened to cause injuries to the State's natural resources and property that are indivisible.

## SEVENTH CAUSE OF ACTION

### Actual Fraudulent Transfer Related to the Chemours Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law (Against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva)

429.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

430.     The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law, against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva.

431.     As a result of the transfer of assets and liabilities related to the Chemours Spin-off described in this Complaint, Historical DuPont limited the availability of assets to cover judgments for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of AFFF containing PFAS and/or PFAS for use in AFFF.

432.     Historical DuPont has acted with actual intent to hinder, delay, and defraud creditors of Historical DuPont, and what would become Chemours, by (i) transferring the Dividend to Historical DuPont, and (ii) causing the incurrence of obligations in connection with the Chemours Spin-off.

433.     Historical DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of creditors, such as Maine, that have been damaged as a result of Historical DuPont's actions described in this Complaint.

434.     Historical DuPont manufactured, marketed, distributed, sold, and promoted AFFF containing PFAS and/or PFAS for use in AFFF despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

435.     At the time of the Chemours Spin-off, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of AFFF containing PFAS and/or PFAS for use in AFFF, including those damages and injuries caused by the business line that Chemours would come to own.

436.     The State was a creditor of Historical DuPont and the business line that Chemours would come to own at the time of the Chemours Spin-off.

437.     A number of the statutorily enumerated badges of fraud are present with respect to the Chemours Spin-off and evidence Defendants' fraudulent intent.  *See* 14 M.R.S. § 3575(2); 6 Del. C. § 1304(b).

438.     The transfer of the Dividend to Historical DuPont was a transfer to an insider of Chemours, and the incurrence of obligations by Chemours to Historical DuPont, was to an insider of Chemours, Historical DuPont.  *See* 14 M.R.S. § 3575(2)(A); 6 Del. C. § 1304(b)(1).  That obligation was the assumption of the Chemours Liabilities which include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours Separation Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours Separation Agreement.  The transfer of these obligations to Chemours from Historical DuPont occurred at a time that Historical DuPont owned sufficient shares of Chemours, and through (i) the DuPont Board's members, (ii) Historical DuPont employees (i.e., Nigel Pond and the other DuPont Employee Board Members), and (iii) Historical DuPont agents (i.e., Historical DuPont's outside counsel), Historical DuPont controlled Chemours.  Historical DuPont was an insider of Chemours when the Chemours Spin-off was approved and consummated.  *See* 14 M.R.S. §§ 3572(1), (7); 6 Del. C. §§ 1302(a), (b).

439.     The Chemours Spin-off concealed the liabilities actually assumed by Chemours.  *See* 14 M.R.S. § 3575(2)(C); 6 Del. C. § 1304(b)(3).  The true scope of the obligations that were to be assumed by Chemours in the Chemours Spin-off was kept from Chemours management designees (and later when they were actually functioning in those roles).  Additionally, the schedules to the Chemours Separation Agreement that correspond with the subsections of the definition of "Chemours Assumed Environmental Liabilities" were not publicly filed and the Info Statement dramatically understated the amount of those liabilities.

440.    The Chemours Spin-off occurred at a time when Historical DuPont and/or the business line that Chemours would come to own had been sued or threatened with suit related to environmental liabilities.  *See* 14 M.R.S. § 3575(2)(D); 6 Del. C. § 1304(b)(4).  The business line that Chemours would come to own and Historical DuPont were subject to a substantial amount of litigation at the time that the Chemours Spin-off was approved and when it occurred, including numerous environmental suits and remediation actions.

441.    The consideration received by Chemours in respect of the Chemours Spin-off for the transfer of the Dividend to Historical DuPont, and for the incurrence of obligations by Chemours to Historical DuPont in respect of the Chemours Spin-off, was not for reasonably equivalent value.  *See* 14 M.R.S. § 3575(2)(H); 6 Del. C. § 1304(b)(8).  The Chemours Spin-off was predicated upon Historical DuPont's "High End (Maximum) Realistic Exposure" estimates for liabilities, which were valued based on accounting principles and have proven in several instances to be drastically below the actual liability amounts.

442.    Chemours was insolvent or became insolvent shortly after the Chemours Spin-off.  *See* 14 M.R.S. § 3575(2)(I); 6 Del. C. § 1304(b)(9).  The Maine Uniform Fraudulent Transfer Act (UFTA) recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation, or when a debtor is generally not paying debts as they become due.  *See* 14 M.R.S. §§ 3573(1), (2); *see also* 6 Del. C. §§ 1302(a), (b).  Chemours was balance-sheet insolvent at the time of the Chemours Spin-off.  Additionally, the trading prices for Chemours's debt reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off.  Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due.

443.    The existence of Houlihan's solvency opinion does not support Chemours's solvency. Houlihan used Historical DuPont's contingent liability figures that Historical DuPont

engineered to massively understate the real potential maximum exposure in preparing Houlihan's solvency opinion.

444. The Chemours Spin-off occurred shortly before or shortly after a substantial debt was incurred. *See* 14 M.R.S. § 3575(2)(J); 6 Del. C. § 1304(b)(10). The Chemours Spin-off occurred after the indebtedness under the Credit Agreement and indentures was incurred. As part of the Chemours Spin-off, Chemours incurred significant obligations, namely the assumption of the Chemours Liabilities which include the Chemours Assumed Environmental Liabilities (as each are defined in the Chemours Separation Agreement), as well as the indemnification obligations under Section 6.3 of the Chemours Separation Agreement. Additionally, Chemours paid the Dividend to Historical DuPont.

445. Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-off, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

446. DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to DowDuPont and Corteva because each of Historical DuPont, DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

447. The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## EIGHTH CAUSE OF ACTION

### Constructive Fraudulent Transfer Related to the Chemours Spin-off, Pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a) & 1307 and/or such other applicable state law
### (Against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva)

448. The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

449. The State seeks relief pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a)(1) & 1307 and/or such other applicable state law, against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva.

450. The State was a creditor of Historical DuPont and Chemours at the time of the Chemours Spin-off.

451. Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of Chemours Spin-off related obligations, including the transfer of the Dividend.

452. Chemours was insolvent as a result of the Chemours Spin-off. Chemours was balance-sheet insolvent at the time of the Chemours Spin-off. Additionally, the debt trading prices of the Notes reflect insolvency as of the date the Chemours Spin-off closed and spiraled downhill in the immediate aftermath of the Chemours Spin-off. Further, as a result of the Chemours Spin-off, Chemours could not pay its debts as they became due. Lastly, the existence of Houlihan's solvency opinion does not support Chemours's solvency.

453.     Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-off, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this lawsuit.

454.     DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to DowDuPont, New Dow, and Corteva because each of Historical DuPont, DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

455.     The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## NINTH CAUSE OF ACTION

### Constructive Fraudulent Transfer Related to the Chemours Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law (Against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva)

456.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

457.    The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law, against Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva.

458.    Chemours did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain Chemours Spin-off-related obligations, including the transfer of the Dividend.  Historical DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Historical DuPont believed or reasonably should have believed that it would incur debts beyond Chemours's ability to pay as they became due.

459.    At the time of the Chemours Spin-off, Chemours (i) was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to Chemours' business, and/or (ii) intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

460.    At the time of the Chemours Spin-off, Historical DuPont and the business line that Chemours would come to own had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS, including AFFF containing PFAS and/or PFAS containing products, including for use in AFFF, including those damages and injuries caused by the business line that Chemours would come to own.

461.    At the time of the Chemours Spin-off, and at all times relevant to this Complaint, Chemours has been insolvent.

462.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other

provisional remedy (including levy) against the assets transferred to Historical DuPont and the incurrence of obligations to Historical DuPont in the Chemours Spin-off, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, The Chemours Company, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

463.     DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred, including the Dividend, to Historical DuPont in the Chemours Spin-off, and later to DowDuPont, New Dow, and Corteva because each of Historical DuPont, DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Dividend; (ii) the fraudulent intent underlying the Chemours Spin-off; and/or (iii) Chemours's insolvency.

464.     The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

**TENTH CAUSE OF ACTION**

**Actual Fraudulent Transfer Related to the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law (Against Historical DuPont, DowDuPont, New Dow, and Corteva)**

465.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

466.     The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(A) & 3578 and/or 6 Del. C. §§ 1304(a)(1) & 1307 and/or such other applicable state law against Historical DuPont,

DowDuPont, New Dow, and Corteva.

467. The State is and was a creditor of Historical DuPont and DowDuPont at all relevant times.

468. Through its participation in the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off, Historical DuPont and DowDuPont transferred valuable assets and business to DowDuPont, New Dow, and Corteva (the Separation Transfers).

469. The Separation Transfers were made for the benefit of DowDuPont, New Dow, and Corteva.

470. At the time that the Separation Transfers were made, DowDuPont was in a position to control, and did control, DowDuPont, New Dow, and Corteva.

471. DowDuPont, Historical DuPont, New Dow, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors of Historical DuPont and DowDuPont.

472. The State has been harmed as a result of the Separation Transfers.

473. DowDuPont, Historical DuPont, New Dow, and Corteva engaged in acts in furtherance of a scheme to transfer assets out of the reach of creditors, such as Maine, that have been harmed as a result of Historical DuPont's and DowDuPont's actions described in this Complaint.

474. As a result of the transfer of assets and liabilities related to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off described in this Complaint, DowDuPont, New Dow, and Corteva sought to limit the availability of assets to cover judgments for all of the liability for damages and injuries arising from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS,

including AFFF containing PFAS and/or PFAS containing products, including for use in AFFF.

475.    Historical DuPont manufactured, marketed, distributed, sold, and promoted PFAS, including AFFF containing PFAS and/or PFAS containing products, including for use in AFFF despite knowing of the health and environmental risks of PFAS for decades before Chemours existed as an independent company.

476.    At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, Historical DuPont and/or DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding liability of Historical DuPont and DowDuPont, for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS, including AFFF containing PFAS and/or PFAS containing products, including for use in AFFF.

477.    The State was a creditor of Historical DuPont and DowDuPont at the time of the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off.

478.    Historical DuPont and/or DowDuPont acted without receiving reasonably equivalent value in exchange for the transfers and/or obligations comprising the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off.  Historical DuPont and/or DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

479.    At the time of the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, and at all times relevant to this Complaint, Historical DuPont and DowDuPont had been insolvent because each of their debts were greater than the fair saleable value of each of their assets.

480.     A number of the statutorily enumerated badges of fraud are present with respect to the Merger, the subsequent restructuring transactions and assets transfers, the Dow Spin-off, and the Corteva Spin-off, and evidence Defendants' fraudulent intent.  *See* 14 M.R.S. § 3575(2); 6 Del. C. § 1304(b).

481.     In connection with the DowDuPont Separation, DowDuPont divided up its assets and obligations among entities it controlled, namely DowDuPont and Corteva.  *See* 14 M.R.S. § 3575(2)(A); 6 Del. C. § 1304(b)(1).  Certain obligations were assumed by DowDuPont and Corteva, but not New Dow, including Historical DuPont's liabilities, as well as the indemnification obligations under Article VIII of the DowDuPont Separation Agreement.  The transfer of these obligations from Historical DuPont to DowDuPont, then from DowDuPont to DowDuPont, New Dow, and Corteva, occurred at a time that DowDuPont controlled DowDuPont, New Dow, and Corteva through DowDuPont's Board's members, DowDuPont employees, and DowDuPont agents.  DowDuPont was an insider of DowDuPont, New Dow, and Corteva, when the DowDuPont Separation was approved and consummated.  *See* 14 M.R.S. §§ 3572(1), (7); 6 Del. C. §§ 1301(1)(b), (e).

482.     The DowDuPont Separation concealed the liabilities actually assumed by DowDuPont and Corteva.  *See* 14 M.R.S. § 3575(2)(C); 6 Del. C. § 1304(b)(3).  The true scope of the obligations that were to be assumed by DowDuPont, New Dow, and Corteva in the DowDuPont Separation Agreement were concealed.  Additionally, the schedules to the DowDuPont Separation Agreement were not publicly filed.

483.     The DowDuPont Separation occurred at a time when Historical DuPont and DowDuPont had been sued or threatened with suit related to environmental liabilities.  *See* 14 M.R.S. § 3575(2)(D); 6 Del. C. § 1304(b)(4).  Historical DuPont and DowDuPont were subject to a substantial amount of litigation at the time that the DowDuPont Separation was approved

and when it occurred, including numerous environmental suits and remediation actions.

484.    The consideration received by DowDuPont, New Dow, and Corteva in respect of the DowDuPont Separation was not reasonably equivalent to the value of the obligation incurred by DowDuPont, New Dow, and Corteva in the DowDuPont Separation. *See* 14 M.R.S. § 3575(2)(H); 6 Del. C. § 1304(b)(8).

485.    DowDuPont was insolvent or became insolvent shortly after the DowDuPont Separation, the Dow Spin-off, and the Corteva Spin-off. *See* 14 M.R.S. § 3575(2)(I); *see also* 6 Del. C. § 1304(b)(9). The Maine UFTA recognizes "[i]nsolvency" where the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation. *See* 14 M.R.S. §§ 3573(1), (2); *see also* 6 Del. C. §§ 1302(a), (b). DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation and the Corteva Spin-off.

486.    Finally, the DowDuPont Separation and the Corteva Spin-off occurred shortly before or shortly after a substantial debt was incurred. *See* 14 M.R.S. § 3575(2)(J); 6 Del. C. § 1304(b)(10). The DowDuPont Separation and the Corteva Spin-off occurred either shortly before or shortly after DowDuPont's incurrence of $4 billion in indebtedness to Corteva. As part of the DowDuPont Separation and the Corteva Spin-off, DowDuPont incurred significant obligations, namely the assumption of the liabilities and indemnification obligations, each under the DowDuPont Separation Agreement.

487.    Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to Corteva and New Dow and the incurrence of obligations to Corteva pursuant to the Corteva Spin-off and the Dow Spin-off, respectively, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold

Historical DuPont, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

488.    DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and asset transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

489.    The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

### ELEVENTH CAUSE OF ACTION

### Constructive Fraudulent Transfer Related to the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, Pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a) & 1307 and/or such other applicable state law (Against Historical DuPont, DowDuPont, New Dow, and Corteva)

490.    The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

491.    The State seeks relief pursuant to 14 M.R.S. §§ 3576(1) & 3578 and/or 6 Del. C. §§ 1305(a) & 1307 and/or such other applicable state law against Historical DuPont, DowDuPont, New Dow, and Corteva.

492.    The State was a creditor of Historical DuPont and DowDuPont at the time of the DowDuPont Separation.

493.     DowDuPont, New Dow, and Corteva did not receive reasonably equivalent value in return for the assumption and/or incurrence of DowDuPont Separation related obligations.

494.     DowDuPont was insolvent as a result of the DowDuPont Separation. DowDuPont was balance-sheet insolvent at the time of the DowDuPont Separation.

495.     Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont, New Dow, and Corteva and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

496.     DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and asset transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to DowDuPont, New Dow, and Corteva because DowDuPont, New Dow, and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

497.     The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## TWELFTH CAUSE OF ACTION

**Constructive Fraudulent Transfer Related to the Merger, the Subsequent Restructuring Transactions and Assets Transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, Pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law (Against Historical DuPont, DowDuPont, New Dow, and Corteva)**

498.     The State realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

499.     The State seeks relief pursuant to 14 M.R.S. §§ 3575(1)(B) & 3578 and/or 6 Del. C. §§ 1304(a)(2) & 1307 and/or such other applicable state law against Historical DuPont, DowDuPont, New Dow, and Corteva.

500.     Historical DuPont and DowDuPont did not receive reasonably equivalent value in return for the assumption and/or incurrence of certain DowDuPont Separation related obligations.  DowDuPont acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DowDuPont believed or reasonably should have believed that DowDuPont would incur debts beyond its ability to pay as they became due.

501.     At the time of the DowDuPont Separation, DowDuPont was engaged or was about to engage in a business for which its remaining assets were unreasonably small in relation to the business or intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

502.     At the time of the DowDuPont Separation, DowDuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Historical DuPont's and DowDuPont's liability for damages and injuries from Historical DuPont's manufacturing, marketing, distribution, sale, and promotion of PFAS, including AFFF related PFAS and PFAS-containing products, including for use in AFFF.

503.     At the time of the DowDuPont Separation, and at all times relevant to this Complaint, DowDuPont has been insolvent because its debts were greater than the fair saleable value of its assets.

504.     Pursuant to 14 M.R.S. § 3578 and/or 6 Del. C. § 1307, the State seeks, to the extent necessary to satisfy the State's claims in this Complaint, the attachment or other provisional remedy (including levy) against the assets transferred to DowDuPont and the incurrence of obligations to Corteva in the DowDuPont Separation, or the proceeds of such assets now held by DowDuPont, New Dow, and Corteva, or other property of Historical DuPont, DowDuPont, New Dow, and Corteva, and/or to hold Historical DuPont, DowDuPont, New Dow, and Corteva liable for any damages or other remedies that may be awarded through this litigation.

505.     DowDuPont, New Dow, and Corteva are not good-faith transferees of the assets initially transferred to Historical DuPont in the Merger, the subsequent restructuring transactions and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off, and later to DowDuPont and Corteva because DowDuPont and Corteva knew or should have known of (i) the fraudulent intent underlying the Merger, the subsequent restructuring transaction and assets transfers, the DowDuPont Separation Agreement, the Dow Spin-off, and the Corteva Spin-off Dividend; and/or (ii) the insolvency of DowDuPont.

506.     The State further reserves such other rights and remedies that may be available to it under 14 M.R.S. § 3578 and/or 6 Del. C. § 1307 and/or such other applicable state law as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## PUNITIVE DAMAGES

### (All Defendants)

507.    Defendants' reprehensible conduct in manufacturing, marketing, distributing, promoting, and/or selling AFFF containing PFAS and/or PFAS for use in AFFF was undertaken with conscious, willful, and wanton disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Maine.  Defendants' conduct was outrageously reprehensible and malicious.  Defendants acted and/or failed to act with conscious and deliberate disregard for a known, substantial, and intolerable risk of harm, with the knowledge that their acts or omissions were substantially certain to result in the threatened harm, and/or as a matter of free and intentional business choices.  Therefore, the State requests an award of punitive damages to the maximum extent permitted by law in an amount reasonable, appropriate, and sufficient to punish Defendants and deter them from committing the same or similar tortious acts in the future.

## XII.    PRAYER FOR RELIEF

The State of Maine seeks judgment against all Defendants for:

A.    Compensatory damages arising from AFFF-related PFAS contamination and injury of State natural resources and property, including groundwater, surface waters, drinking water supplies, biota, wildlife including fish, and their associated soils, sediments, and uses, and other State natural resources and property, according to proof, including, but not limited to:

(i)    natural resource damages;

(ii)    loss-of-use damages;

(iii)    costs of investigation;

(iv)    costs of testing and monitoring;

(v)    costs of providing water from an alternate source;

      (vi)     costs of installing and maintaining wellhead treatment;

      (vii)    costs of installing and maintaining a wellhead protection program;

      (viii)   costs of installing and maintaining an early warning system to detect AFFF-related PFAS before it reaches wells;

      (ix)    costs of remediating AFFF-related PFAS from natural resources including groundwater, surface waters, soils, sediments, and other natural resources;

      (x)     costs of remediating AFFF-related PFAS contamination at release sites;

      (xi)    any other costs or other expenditures incurred to address AFFF-related PFAS contamination and injury; and

      (xii)    interest on the damages according to law;

B.     An order compelling Defendants to abate the AFFF-related PFAS public nuisance, including by establishing an abatement fund to investigate, remove, treat, remediate, clean up and otherwise mitigate AFFF-related PFAS contamination in Maine;

C.     An order compelling Defendants to abate AFFF-related PFAS contamination by removing PFAS from State natural resources and property and/or by paying the State's costs to abate the contamination;

D.     An order voiding the fraudulent transfers of assets among Defendants The Chemours Company, Corteva, Historical DuPont, New DuPont, and New Dow and recovering the property or value fraudulently transferred among these Defendants to put the State in the position in which it would have been had these fraudulent transfers not occurred;

E.     An order enjoining New DuPont, Corteva, and New Dow from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Historical DuPont and/or impose a constructive trust over any proceeds from the sale of Historical DuPont assets for the

benefit of the State;

      F.      Punitive damages;

      G.      Costs (including reasonable attorney fees, court costs, and other expenses of

litigation);

      H.      Prejudgment interest;

      I.      An order compelling Defendants to pay for all other damages sustained by the

State in its public trustee, *parens patriae*, and other capacities as a direct and proximate result of

Defendants' acts and omissions alleged herein; and

      J.      Any other and further relief as the Court deems just, proper, and equitable.

### XIII.   JURY TRIAL DEMANDED

The State demands a trial by jury on all claims so triable.

**Dated:**   June 24, 2024

                    STATE OF MAINE

                    AARON M. FREY
                    ATTORNEY GENERAL

                    /s/ Matthew F. Pawa
                    Matthew F. Pawa*
                    Benjamin A. Krass*
                    SEEGER WEISS LLP
                    1280 Centre Street, Suite 230
                    Newton Centre, MA  02459
                    (617) 641-9550
                    Email: MPawa@seegerweiss.com
                             BKrass@seegerweiss.com

                    Kyle J. McGee*
                    Viola Vetter*
                    Jason H. Wilson*
                    GRANT & EISENHOFER P.A.
                    123 Justison Street
                    Wilmington, DE 19801
                    (302) 622-7000
                    Email: kmcgee@gelaw.com
                             vveter@gelaw.com

jwilson@gelaw.com

*Admitted *pro hac vice*